# Exhibit A



# Richland County
## Fifth Judicial Circuit
## Public Index



Richland County Home Page   Online Payments   Public Index   City of Columbia Municipal Ct   S.C. Judicial Department   Summary Ct Dockets

Switch View

## Augusts A Adams , plaintiff, et al vs Cape Plc , defendant, et al

| Case Number: | 2024CP4006639 | Court Agency: | Richland County Common Pleas | Filed Date: | 11/12/2024 |
|---|---|---|---|---|---|
| Case Type: | Common Pleas | Case Sub Type: | Special-Comp/Oth 699 | File Type: | Jury |
| Status: | Assigned To Judge | Assigned Judge: | Toal, Jean Hoefer | | |
| Disposition: | | Disposition Date: | | Disposition Judge: | |
| Original Source Doc: | | Original Case #: | | | |
| Judgment Number: | | Court Roster: | | | |

Case Parties   Judgments   Tax Map Information   Associated Cases   Actions   Financials

| Name | Description | Type | Motion Roster | Begin Date | Completion Date | Documents |
|---|---|---|---|---|---|---|
| Adams, Augusts A | ADR/Alternative Dispute Resolution (Workflow) | Action | | 06/10/2025-12:36 | | |
| Adams, Augusts A | NEF(12-12-2024 01:20:14 PM) Amended/Amended Summons And ... | Filing | | 12/12/2024-13:58 | | 🗐 |
| Adams, Augusts A | Amended/Amended Summons And Complaint | Filing | | 12/12/2024-13:20 | | 🗐 |
| Adams, Augusts A | Add Party to Case | Filing | | 12/12/2024-13:20 | | |
| Adams, Augusts A | NEF(11-18-2024 03:59:34 PM) Notice/Notice of Appearance | Filing | | 11/18/2024-16:00 | | 🗐 |
| Adams, Augusts A | Notice/Notice of Appearance | Filing | | 11/18/2024-15:59 | | |
| Adams, Augusts A | NEF(11-12-2024 04:52:55 PM) Service/Acceptance Of Servic... | Filing | | 11/12/2024-16:54 | | 🗐 |
| Adams, Augusts A | Service/Acceptance Of Service on Cape Plc | Filing | | 11/12/2024-16:52 | | 🗐 |
| Adams, Augusts A | Summons & Complaint | Filing | | 11/12/2024-12:36 | | 🗐🗐 |

CMSWeb 7.2 © 2024 South Carolina Judicial Branch ● All rights reserved

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

STATE OF SOUTH CAROLINA )     IN THE COURT OF COMMON PLEAS
                        )
COUNTY OF RICHLAND      )     FOR THE FIFTH JUDICIAL CIRCUIT

AUGUSTUS A. ADAMS and          )     C/A NO. 2024-CP-40-_____
DIANE ADAMS                    )
                               )
TOMMY D. AGNER, SR.            )
as Executor of the Estate of   )     In Re:
VONNIE K. AGNER, deceased      )     Asbestos Personal Injury Litigation
                               )     Coordinated Docket
ALLAN N. ANDERSON, JR. and     )
CYNTHIA ANDERSON               )
                               )
GEORGE J. ARSENITH and         )
CHRISTINE A. ARSENITH          )     __SUMMONS__
                               )
DONALD BARNHART, JR. and       )
MARY BARNHART                  )
                               )
KATHRYN BARONE, individually   )
and as Executrix of the Estate )
of NICHOLAS BARONE, deceased   )
                               )
RICHARD TREE, individually     )
and as successor-in-interest to)
RICHARD J. BOETSCH, deceased, and )
LEAH SANDFORD, individually    )
                               )
BRENDA E. BOSTIAN, individually )
and as Personal Representative of the Estate of )
HOYLE S. BOSTIAN, deceased     )
                               )
TRACY BOWERY MEYER,            )
as Personal Representative of the Estate of )
LEON B. BOWERY, deceased       )
                               )
RONALD J. BROKSHIRE and        )
BELVIA R. BROOKSHIRE           )
                               )
ALICIA KNIGHT, individually    )
and as Administratrix of the Estate of )
WALLACE B. CHAMBERS, deceased  )
                               )
LENORA CHILDERS, individually  )

1

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

and as Personal Representative of the Estate of )
**LEWIS C. CHILDERS**, deceased )
)
**DAVID E. CHRISTENSEN** and )
**LINDA G. CHRISTENSEN** )
)
**LINDA A. COOK**, individually )
and as Executor for the Estate of )
**ROLAND COOK**, deceased )
)
**DON R. COX, SR.** )
)
**JAY S. CREEKMORE**, individually )
and as Executor of the Estate of )
**MARY M. CREEKMORE** )
)
**JAMES F. DAVIS** and )
**VERA C. DAVIS** )
)
**ROBBIE M. EFIRD** )
as Administrator of the Estate of )
**ROBIN M. EFIRD**, deceased, and )
**LINDA EFIRD**, individually )
)
**CHARLES FERRELL** and )
**PATRICIA A. FERRELL** )
)
**WENDY M. FITZGERALD**, individually )
and as Special Administrator of the Estate of )
**DENNIS J. FITZGERALD**, deceased )
)
**RICKY DEAN FLYNN**, )
as the Executor of the Estate of )
**JERRY K. FLYNN**, deceased )
)
**AMY GEE**, individually )
and as Personal Representative of the Estate of )
**MICHAEL L. GEE**, deceased )
)
**GLENDA T. GIROIR** and )
**DALE GIROIR** )
)
**SANDRA M. GONCE**, individually )
and as Executrix of the Estate of )
**DWIGHT GONCE**, deceased )
)

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**GEORGE N. GOSNELL** and    )
**PATRICIA C. GOSNELL**    )
    )
**TERRY L. GREEN, SR.,**    )
as Personal Representative of the Estate of    )
**ROBERT J. GREEN**, deceased, and    )
**EVELYN V. GREEN**, individually    )
    )
**RACHEL P. GREENE**, individually    )
and as Personal Representative of the Estate of    )
**CHRISTOPHER GREENE**, deceased    )
    )
**MICHELLE L. MCCORMICK** and    )
**KRISTEN R. HELTON**, as Co-Personal    )
Representatives of the Estate of    )
**KENNETH D. HARDING**, deceased    )
    )
**CINDY HARTSELL MARTIN**, individually    )
and as Personal Representative of the Estate of    )
**JERRY G. HARTSELL**, deceased, and    )
**JOAN HARTSELL**, individually    )
    )
**SHIRLEY ANN CARPIN,**    )
as Independent Executor of the Estate of    )
**SHIRLEY A. HILSTER** , deceased    )
    )
**MISTI K. CRAWLEY** and    )
**ZACHARY D. HUNT**, as    )
Personal Representatives of the Estate of    )
**LESLEY D. HUNT**, deceased    )
    )
**MICHAEL D. JOHNSON** and    )
**KRISTI R. JOHNSON**    )
    )
**THEODORE L.KELLY, SR.** and    )
**BERENICE M. KELLY**    )
    )
**SUSAN K. McCARTY**    )
as Executor of the Estate of    )
**JAMES H. KENNON**, deceased    )
    )
**GREGORY N. TARBUCK, JR.**    )
as Personal Representative of the Estate of    )
**RICHARD D. KING**, deceased    )
    )
    )

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**JOLENE R. KOTZERKE**, individually as the )
surviving spouse and Executor for the Estate of )
**STEVEN D. KOTZERKE**, deceased )
)
**GARY S. LACKEY** and )
**VIRGINIA C. LACKEY** )
)
**PATRICIA LAMM**, individually )
and as Personal Representative of the Estate of )
**MICHAEL H. LAMM**, deceased )
)
**ROBERT P. LEBLANC** )
)
**MICHAEL D. LINK** and )
**SANDRA STRICKLAND LINK** )
)
**RICHARD LONG** )
)
**JAMES E. LOVE, JR.** and )
**JOAN M. LOVE** )
)
**ROBERT W. LYNN** and )
**KAREN J. LYNN** )
)
**CRAIG R. HAGAN**, )
as Personal Representative of the Estate of )
**NIKOLAUS J. MARCHER**, deceased, and )
**KLAUS MARCHER**, individually and as legal )
heir to **NIKOLAUS J. MARCHER**, deceased )
)
**DONALD MCDOWELL** and )
**RHONDA V. MCDOWELL** )
)
**PHILIP J. MCGUIRE** and )
**PATRICE MCGUIRE** )
)
**DAVID P. MCKELVEY**, )
as Personal Representative of the Estate of )
**PAUL R. MCKELVEY**, deceased )
)
**SHARON M. MILAM,** individually )
and as Independent Executor of the Estate of )
**JIMMIE R. MILAM**, deceased )
)
)
)

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**MARTHA M. WILSON**, individually
and as Personal Representative of the Estate of
**TED E. MITCHELL**, deceased

**NELSON W. MOGG** and
**DOROTHY MOGG**

**ELAINE M. MONLUX**, individually as the
surviving spouse and Executor for the Estate of
**RICHARD A. MONLUX**, deceased

**GARY MULLINS** and
**ARVELLA MULLINS**

**LEONARD O'LOUGHLIN** and
**KAREN REISSFELDER**

**MICHELLE OLIVE**, individually
and as Executor of the Estate of
**EVERETT R. OLIVE**, deceased

**JUDITH D. PATTERSON**, individually
and as Executor of the Estate of
**JOHN K. PATTERSON, JR.**, deceased

**KELLY PAYNE CLARK** and **SHANNON
PAYNE LANCASTER**, as Co-Executors of the
Estate of **SHELBY L. PAYNE**, deceased

**DORENE L. PEIFER,** individually
and as Trustee for the next-of-kin for
**RONALD M. PEIFER**, deceased

**RICHARD R. PELFREY** and
**PATRICIA H. PELFREY**

**CURTIS R. PERKINS**, Individually
and as Executor of the Estate of
**PATRICIA L. PERKINS**, deceased

**LINWOOD W. PIERCE** and
**BRIDGET PIERCE**

**SHANE CHADWICK PIKE** and **JASON
ANDREW PIKE**, as Co-Executors of the Estate
of **MARSHALL E. PIKE**, deceased

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**ROBERT B. RAY** and )
**BESSIE E. RAY** )
)
**JACKIE D. ROBERTS** and )
**VICTORIA A. ROBERTS** )
)
**DEBORAH ROBICHAUD**, individually as the )
surviving spouse and Executor for the Estate of )
**GARY P. ROBICHAUD**, deceased )
)
**SHARON LYNN TESSENIAR,** )
as Personal Representative of the Estate of )
**ANTHONY D. ROBINSON**, deceased, and )
**JOYCE J. ROBINSON**, individually )
)
**JERRY P. ROSS** and )
**PAULETTE W. ROSS** )
)
**ALYCE M. SCOGGINS**, individually )
and as successor-in-interest to )
**DAVID M. SCOGGINS**, deceased; )
**DAVID D. SCOGGINS**, and **SCHANTEL R.** )
**GREEN**, individually and as legal heirs to )
**DAVID M. SCOGGINS**, deceased )
)
**KATHLEEN SCOGGINS**, individually )
and as Special Administrator to the Estate of )
**DAVID C. SCOGGINS**, deceased )
)
**LARRY G. SELLARS** and )
**GLENDA K. SELLARS** )
)
**ANNA MARIE S. PRITCHETT,** )
as Personal Representative of the Estate of )
**CHARLES E. SHIPMAN**, deceased, and )
**DANIELLE B. SHIPMAN**, individually )
)
**MICHAEL L. SIMS,** )
as Personal Representative of the Estate of )
**DONALD E. SIMS**, deceased )
)
**GEORGE R. SPAYD, JR.** )
)
**DELLA JEANETTE KENNEDY**, individually )
and as Administrator of the Estate of )

**RODNEY L. SPENCE**, deceased,                      )
and as Administrator of the Estate of                )
**ANN TAYLOR SPENCE**, deceased                      )
                                                     )
**TERRY SYLVESTER**,                                 )
as Personal Representative of the Estate of          )
**EUGENE L. SYLVESTER,** deceased, and               )
**SARA SYLVESTER**, individually                     )
                                                     )
**SANDRA F. TAYLOR**, individually                   )
and as Administrator of the Estate of                )
**BRADLEY D. TAYLOR**, deceased                      )
                                                     )
**SHIRLEY BUTTS TAYLOR**, individually               )
and as Personal Representative of the Estate of      )
**HORACE E. TAYLOR**, deceased                       )
                                                     )
**JOHN A. TIBBS** and                                )
**MARGARET B. TIBBS**                                )
                                                     )
**DONNA B. WELCH**, individually and as              )
Personal Representative of the Estate of             )
**MELVIN G. WELCH**, deceased                        )
                                                     )
**ROSALIE WILKINSON** and                            )
**HARRY WILKINSON**                                  )
                                                     )
**RICHARD A. WILLIAMS** and                          )
**NANCY N. WILLIAMS**                                )
                                                     )
**BRUCE S. WRIGHT** and                              )
**LOUISE K. WRIGHT**                                 )
                                                     )
                    Plaintiffs**,**                  )
v.                                                   )
                                                     )
**CAPE PLC**                                         )
by and through its court appointed Receiver          )
Peter Protopapas, sued as successor-in-interest to   )
CAPE INDUSTRIES LTD. (f/k/a CAPE                     )
ASBESTOS COMPANY LTD.) and its                       )
subsidiaries and global affiliates                   )
                                                     )
**ANGLO AMERICAN PLC**                               )
individually and as successor-in-interest to         )
                                                     )

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ANGLO AMERICAN CORPORATION OF SOUTH AFRICA LTD.       )

**DE BEERS PLC**       )

**DE BEERS CENTENARY AG**       )

**DE BEERS CONSOLIDATED MINES LTD.**       )

**DE BEERS S.A.**       )

**DE BEERS UK LTD.**       )

**DE BEERS JEWELLERS LTD.**       )

**DE BEERS JEWELLERS US, INC.**       )

**ANGLO AMERICAN US HOLDINGS INC.**       )

**ELEMENT SIX US CORP.**       )

**ELEMENT SIX TECHNOLOGIES US CORP.**       )

**ELEMENT SIX TECHNOLOGIES (OR) CORP.**       )

**FIRST MODE HOLDINGS, INC.**       )

**PLATINUM GUILD INTERNATIONAL (U.S.A.) JEWELRY INC.**       )

**LIGHTBOX JEWELRY INC.**       )

**FOREVERMARK US INC.**       )

**ANGLO AMERICAN CROP NUTRIENTS (U.S.A.), LLC**       )

**CHARTER CONSOLIDATED LTD.**       )

**ESAB CORPORATION**       )

**CENTRAL MINING & INVESTMENT CORPORATION LTD.**       )

8

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | |
|---|---|
| **CAPE HOLDCO LTD.** | ) |
| | ) |
| **THE LAW DEBENTURE CORPORATION PLC** | ) |
| | ) |
| | ) |
| **CAPE INDUSTRIAL SERVICES GROUP LTD.** | ) |
| | ) |
| | ) |
| **MOHED ALTRAD** | ) |
| | ) |
| **ALTRAD UK LTD.** | ) |
| | ) |
| **CAPE UK HOLDINGS NEWCO LTD.** | ) |
| | ) |
| **ALTRAD SERVICES LTD.** | ) |
| (f/k/a CAPE INDUSTRIAL SERVICES LTD.) | ) |
| | ) |
| **ALTRAD INVESTMENT AUTHORITY S.A.S.** | ) |
| | ) |
| | ) |
| Defendants**.** | ) |
| | ) |

## SUMMONS

TO DEFENDANTS ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the Plaintiffs' counsel, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service.  If you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Respectfully submitted,

_/s/ Charles W. Branham, III_
Charles W. Branham, III (SC Bar No. 106178)
**DEAN OMAR BRANHAM SHIRLEY, LLP**
302 N. Market Street, Suite 300
Dallas, Texas 75202
T: 214-722-5990
F: 214-722-5991
tbranham@dobslegal.com
Other email: tgilliland@dobslegal.com

and

_/s/ Theile B. McVey_
Theile B. McVey (SC Bar No. 16682)
Jamie D. Rutkoski (SC Bar No. 103270)
**KASSEL MCVEY ATTORNEYS AT LAW**
1330 Laurel Street
Columbia, South Carolina 29202
T: 803-256-4242
F: 803-256-1952
tmcvey@kassellaw.com
jrutkoski@kassellaw.com
Other email:  emoultrie@kassellaw.com

**ATTORNEYS FOR PLAINTIFFS**

November 11, 2024
Columbia, South Carolina.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** ) | | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF RICHLAND** ) | | **FOR THE FIFTH JUDICIAL CIRCUIT** |

**AUGUSTUS A. ADAMS** and )    **C/A NO. 2024-CP-40-_____**
**DIANE ADAMS** )
)
**TOMMY D. AGNER, SR.** )
as Executor of the Estate of )    In Re:
**VONNIE K. AGNER**, deceased )    Asbestos Personal Injury Litigation
)    Coordinated Docket
**ALLAN N. ANDERSON, JR.** and )
**CYNTHIA ANDERSON** )
)    Multi-Plaintiff Cause of Action:
**GEORGE J. ARSENITH** and )    Includes Living and Deceased Plaintiffs
**CHRISTINE A. ARSENITH** )
)
**DONALD BARNHART, JR.** and )    <u>**COMPLAINT**</u>
**MARY BARNHART** )
)
**KATHRYN BARONE**, individually )
and as Executrix of the Estate of )    (Jury Trial Demanded)
**NICHOLAS BARONE**, deceased )
)
**RICHARD TREE**, individually )
and as successor-in-interest to )
**RICHARD J. BOETSCH**, deceased, and )
**LEAH SANDFORD**, individually )
)
**BRENDA E. BOSTIAN**, individually )
and as Personal Representative of the Estate of )
**HOYLE S. BOSTIAN**, deceased )
)
**TRACY BOWERY MEYER,** )
as Personal Representative of the Estate of )
**LEON B. BOWERY**, deceased )
)
**RONALD J. BROKSHIRE** and )
**BELVIA R. BROOKSHIRE** )
)
**ALICIA KNIGHT**, individually )
and as Administratrix of the Estate of )
**WALLACE B. CHAMBERS**, deceased )
)
)

1

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**LENORA CHILDERS**, individually )
and as Personal Representative of the Estate of )
**LEWIS C. CHILDERS**, deceased )
                                              )
**DAVID E. CHRISTENSEN** and )
**LINDA G. CHRISTENSEN** )
                                              )
**LINDA A. COOK**, individually )
and as Executor for the Estate of )
**ROLAND COOK**, deceased )
                                              )
**DON R. COX, SR.** )
                                              )
**JAY S. CREEKMORE**, individually )
and as Executor of the Estate of )
**MARY M. CREEKMORE** )
                                              )
**JAMES F. DAVIS** and )
**VERA C. DAVIS** )
                                              )
**ROBBIE M. EFIRD** )
as Administrator of the Estate of )
**ROBIN M. EFIRD**, deceased, and )
**LINDA EFIRD**, individually )
                                              )
**CHARLES FERRELL** and )
**PATRICIA A. FERRELL** )
                                              )
**WENDY M. FITZGERALD**, individually )
and as Special Administrator of the Estate of )
**DENNIS J. FITZGERALD**, deceased )
                                              )
**RICKY DEAN FLYNN**, )
as the Executor of the Estate of )
**JERRY K. FLYNN**, deceased )
                                              )
**AMY GEE**, individually )
and as Personal Representative of the Estate of )
**MICHAEL L. GEE**, deceased )
                                              )
**GLENDA T. GIROIR** and )
**DALE GIROIR** )
                                              )
**SANDRA M. GONCE**, individually )
and as Executrix of the Estate of )
**DWIGHT GONCE**, deceased )

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**GEORGE N. GOSNELL** and **PATRICIA C. GOSNELL**                                    )
                                                                                     )
                                                                                     )
**TERRY L. GREEN, SR.**,                                                             )
as Personal Representative of the Estate of                                          )
**ROBERT J. GREEN**, deceased, and                                                   )
**EVELYN V. GREEN**, individually                                                    )
                                                                                     )
**RACHEL P. GREENE**, individually                                                   )
and as Personal Representative of the Estate of                                      )
**CHRISTOPHER GREENE**, deceased                                                     )
                                                                                     )
**MICHELLE L. MCCORMICK** and                                                        )
**KRISTEN R. HELTON**, as Co-Personal                                                )
Representatives of the Estate of                                                     )
**KENNETH D. HARDING**, deceased                                                     )
                                                                                     )
**CINDY HARTSELL MARTIN**, individually                                              )
and as Personal Representative of the Estate of                                      )
**JERRY G. HARTSELL**, deceased, and                                                 )
**JOAN HARTSELL**, individually                                                      )
                                                                                     )
**SHIRLEY ANN CARPIN**,                                                              )
as Independent Executor of the Estate of                                             )
**SHIRLEY A. HILSTER** , deceased                                                    )
                                                                                     )
**MISTI K. CRAWLEY** and                                                             )
**ZACHARY D. HUNT**, as                                                              )
Personal Representatives of the Estate of                                            )
**LESLEY D. HUNT**, deceased                                                         )
                                                                                     )
**MICHAEL D. JOHNSON** and                                                           )
**KRISTI R. JOHNSON**                                                                )
                                                                                     )
**THEODORE L.KELLY, SR.** and                                                        )
**BERENICE M. KELLY**                                                                )
                                                                                     )
**SUSAN K. McCARTY**                                                                 )
as Executor of the Estate of                                                         )
**JAMES H. KENNON**, deceased                                                        )
                                                                                     )
**GREGORY N. TARBUCK, JR.**                                                          )
as Personal Representative of the Estate of                                          )
**RICHARD D. KING**, deceased                                                        )
                                                                                     )
                                                                                     )

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**JOLENE R. KOTZERKE**, individually as the     )
surviving spouse and Executor for the Estate of     )
**STEVEN D. KOTZERKE**, deceased     )
     )
**GARY S. LACKEY** and     )
**VIRGINIA C. LACKEY**     )
     )
**PATRICIA LAMM**, individually     )
and as Personal Representative of the Estate of     )
**MICHAEL H. LAMM**, deceased     )
     )
**ROBERT P. LEBLANC**     )
     )
**MICHAEL D. LINK** and     )
**SANDRA STRICKLAND LINK**     )
     )
**RICHARD LONG**     )
     )
**JAMES E. LOVE, JR.** and     )
**JOAN M. LOVE**     )
     )
**ROBERT W. LYNN** and     )
**KAREN J. LYNN**     )
     )
**CRAIG R. HAGAN**,     )
as Personal Representative of the Estate of     )
**NIKOLAUS J. MARCHER**, deceased, and     )
**KLAUS MARCHER**, individually and as legal     )
heir to **NIKOLAUS J. MARCHER**, deceased     )
     )
**DONALD MCDOWELL** and     )
**RHONDA V. MCDOWELL**     )
     )
**PHILIP J. MCGUIRE** and     )
**PATRICE MCGUIRE**     )
     )
**DAVID P. MCKELVEY**,     )
as Personal Representative of the Estate of     )
**PAUL R. MCKELVEY**, deceased     )
     )
**SHARON M. MILAM,** individually     )
and as Independent Executor of the Estate of     )
**JIMMIE R. MILAM**, deceased     )
     )
     )
     )

4

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**MARTHA M. WILSON**, individually )
and as Personal Representative of the Estate of )
**TED E. MITCHELL**, deceased )
 )
**NELSON W. MOGG** and )
**DOROTHY MOGG** )
 )
**ELAINE M. MONLUX**, individually as the )
surviving spouse and Executor for the Estate of )
**RICHARD A. MONLUX**, deceased )
 )
**GARY MULLINS** and )
**ARVELLA MULLINS** )
 )
**LEONARD O'LOUGHLIN** and )
**KAREN REISSFELDER** )
 )
**MICHELLE OLIVE**, individually )
and as Executor of the Estate of )
**EVERETT R. OLIVE**, deceased )
 )
**JUDITH D. PATTERSON**, individually )
and as Executor of the Estate of )
**JOHN K. PATTERSON, JR.**, deceased )
 )
**KELLY PAYNE CLARK** and **SHANNON** )
**PAYNE LANCASTER**, as Co-Executors of the )
Estate of **SHELBY L. PAYNE**, deceased )
 )
**DORENE L. PEIFER,** individually )
and as Trustee for the next-of-kin for )
**RONALD M. PEIFER**, deceased )
 )
**RICHARD R. PELFREY** and )
**PATRICIA H. PELFREY** )
 )
**CURTIS R. PERKINS**, Individually )
and as Executor of the Estate of )
**PATRICIA L. PERKINS**, deceased )
 )
**LINWOOD W. PIERCE** and )
**BRIDGET PIERCE** )
 )
**SHANE CHADWICK PIKE** and **JASON** )
**ANDREW PIKE**, as Co-Executors of the Estate )
of **MARSHALL E. PIKE**, deceased )

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**ROBERT B. RAY** and
**BESSIE E. RAY**

**JACKIE D. ROBERTS** and
**VICTORIA A. ROBERTS**

**DEBORAH ROBICHAUD**, individually as the
surviving spouse and Executor for the Estate of
**GARY P. ROBICHAUD**, deceased

**SHARON LYNN TESSENIAR**,
as Personal Representative of the Estate of
**ANTHONY D. ROBINSON**, deceased, and
**JOYCE J. ROBINSON**, individually

**JERRY P. ROSS** and
**PAULETTE W. ROSS**

**ALYCE M. SCOGGINS**, individually
and as successor-in-interest to
**DAVID M. SCOGGINS**, deceased;
**DAVID D. SCOGGINS**, and **SCHANTEL R. GREEN**, individually and as legal heirs to
**DAVID M. SCOGGINS**, deceased

**KATHLEEN SCOGGINS**, individually
and as Special Administrator to the Estate of
**DAVID C. SCOGGINS**, deceased

**LARRY G. SELLARS** and
**GLENDA K. SELLARS**

**ANNA MARIE S. PRITCHETT**,
as Personal Representative of the Estate of
**CHARLES E. SHIPMAN**, deceased, and
**DANIELLE B. SHIPMAN**, individually

**MICHAEL L. SIMS**,
as Personal Representative of the Estate of
**DONALD E. SIMS**, deceased

**GEORGE R. SPAYD, JR.**

**DELLA JEANETTE KENNEDY**, individually
and as Administrator of the Estate of

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**RODNEY L. SPENCE**, deceased, )
and as Administrator of the Estate of )
**ANN TAYLOR SPENCE**, deceased )
)
**TERRY SYLVESTER**, )
as Personal Representative of the Estate of )
**EUGENE L. SYLVESTER,** deceased, and )
**SARA SYLVESTER**, individually )
)
**SANDRA F. TAYLOR**, individually )
and as Administrator of the Estate of )
**BRADLEY D. TAYLOR**, deceased )
)
**SHIRLEY BUTTS TAYLOR**, individually )
and as Personal Representative of the Estate of )
**HORACE E. TAYLOR**, deceased )
)
**JOHN A. TIBBS** and )
**MARGARET B. TIBBS** )
)
**DONNA B. WELCH**, individually and as )
Personal Representative of the Estate of )
**MELVIN G. WELCH**, deceased )
)
**ROSALIE WILKINSON** and )
**HARRY WILKINSON** )
)
**RICHARD A. WILLIAMS** and )
**NANCY N. WILLIAMS** )
)
**BRUCE S. WRIGHT** and )
**LOUISE K. WRIGHT** )
)
          Plaintiffs**,** )
v. )
)
**CAPE PLC** )
by and through its court appointed Receiver )
Peter Protopapas, sued as successor-in-interest to )
CAPE INDUSTRIES LTD. (f/k/a CAPE )
ASBESTOS COMPANY LTD.) and its )
subsidiaries and global affiliates )
)
**ANGLO AMERICAN PLC** )
individually and as successor-in-interest to )
)

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ANGLO AMERICAN CORPORATION OF SOUTH AFRICA LTD.          )
                                                         )
                                                         )
**DE BEERS PLC**                                         )
                                                         )
**DE BEERS CENTENARY AG**                                )
                                                         )
**DE BEERS CONSOLIDATED MINES LTD.**                     )
                                                         )
**DE BEERS S.A.**                                        )
                                                         )
**DE BEERS UK LTD.**                                     )
                                                         )
**DE BEERS JEWELLERS LTD.**                              )
                                                         )
**DE BEERS JEWELLERS US, INC.**                          )
                                                         )
**ANGLO AMERICAN US HOLDINGS INC.**                      )
                                                         )
**ELEMENT SIX US CORP.**                                 )
                                                         )
**ELEMENT SIX TECHNOLOGIES US CORP.**                    )
                                                         )
                                                         )
**ELEMENT SIX TECHNOLOGIES (OR) CORP.**                  )
                                                         )
                                                         )
**FIRST MODE HOLDINGS, INC.**                            )
                                                         )
**PLATINUM GUILD INTERNATIONAL (U.S.A.) JEWELRY INC.**   )
                                                         )
                                                         )
**LIGHTBOX JEWELRY INC.**                                )
                                                         )
**FOREVERMARK US INC.**                                  )
                                                         )
**ANGLO AMERICAN CROP NUTRIENTS (U.S.A.), LLC**          )
                                                         )
                                                         )
**CHARTER CONSOLIDATED LTD.**                            )
                                                         )
**ESAB CORPORATION**                                     )
                                                         )
**CENTRAL MINING & INVESTMENT CORPORATION LTD.**         )
                                                         )
                                                         )

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

CAPE HOLDCO LTD. )
)
THE LAW DEBENTURE CORPORATION )
PLC )
)
CAPE INDUSTRIAL SERVICES GROUP )
LTD. )
)
MOHED ALTRAD )
)
ALTRAD UK LTD. )
)
CAPE UK HOLDINGS NEWCO LTD. )
)
ALTRAD SERVICES LTD. )
(f/k/a CAPE INDUSTRIAL SERVICES LTD.) )
)
ALTRAD INVESTMENT AUTHORITY )
S.A.S. )
)
           Defendants. )
)

---

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs in the above caption are identified above and on Exhibit A, hereto. Exhibit A details the injured party name, Personal Representative (if applicable), disease, date of diagnosis, date of death (if applicable) and relevant years of exposure and details of alleged exposure to asbestos attributable to Defendants.

Plaintiffs as named above and on Exhibit A, in their just and legal capacities, name Defendants CAPE PLC, by and through its court appointed Receiver, Peter D. Protopapas, as successor-in-interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) ("CAPE PLC" or "Cape"); Anglo American PLC (individually and as successor-in-interest to Anglo American Corporation of South Africa Ltd.), De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers S.A., De Beers UK Ltd., De Beers Jewellers Ltd., De Beers Jewellers US,

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Inc., Anglo American US Holdings Inc., Element Six US Corp., Element Six Technologies US Corp., Element Six Technologies (OR) Corp., First Mode Holdings, Inc., Platinum Guild International (U.S.A.) Jewelry Inc., Lightbox Jewelry Inc., Forevermark US Inc., Anglo American Crop Nutrients (U.S.A.), LLC, Charter Consolidated Ltd., ESAB Corporation, Central Mining & Investment Corporation Ltd., Cape Holdco Ltd., The Law Debenture Corporation PLC, Cape Industrial Services Group Ltd., Mohed Altrad, Altrad UK Ltd., Cape UK Holdings NewCo Ltd., Altrad Services Ltd. (f/k/a Cape Industrial Services Ltd.), and Altrad Investment Authority S.A.S. (each a "Defendant" and collectively, and with CAPE PLC the "Defendants") and its subsidiaries and global affiliates, for compensatory and punitive damages, by and through their attorneys, and come before this court and alleges as follows:

## GENERAL ALLEGATIONS

1.      This action is brought pursuant to the laws of South Carolina for the following causes of action: 1) Negligence; 2) Product Liability: Strict Liability - S.C. Code Ann. § 15-73-10, et seq.; 3) Vicarious Liability of Defendants Based upon Respondeat Superior; 4) Negligence Imparted to Contractor Defendants; 5) Product Liability: Breach of Implied Warranties - S.C. Code Ann. § 36-2-314; 6) Negligence Per Se; 7) Fraudulent Misrepresentation; 8) the South Carolina Unfair Trade Practices Act- S.C. Code Ann. § 39-5-10, *et. seq.*; and 9) Loss of Consortium.

2.      In some instances, Plaintiffs also bring this cause of action pursuant to the Wrongful Death Act, S.C. Gen. Stat. 15-51-10 *et seq.*, as well as the Survival Action, S.C. Code Ann. § 15-5-90, for the wrongful death of the specified Plaintiffs on Exhibit A, on behalf of all persons entitled to recover damages.

3.      Collective Plaintiffs (hereinafter, "Plaintiffs") were all diagnosed with asbestos related diseases caused by exposure to asbestos dust and fibers including but not limited to

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

mesothelioma or lung cancer. Plaintiffs' exposure occurred during the course of their employment

with and around asbestos-containing products and/or though asbestos fibers carried home on

family members' persons and clothing.

4.      This Court has personal jurisdiction over CAPE PLC and its alter egos/successors

in interest because CAPE PLC is deemed to have its principle place of business is located in South

Carolina.  In addition, Plaintiffs' claims arise from Defendants' conduct in:

(a)     Transacting business in this State, including the sale, supply, purchase, and/or use of asbestos and/or asbestos-containing products, within this State; and/or

(b)     Contracting to supply services or things in the State; and/or

(c)     Commission of a tortious act in whole or in part in this State; and/or

(d)     Having an interest in, using, or possessing real property in this State; and/or

(e)     Entering into a contract to be performed in whole or in part by either party in this State; and/or

(f)     Exposing Decedent to asbestos dust, fibers and/or particles generated from the ordinary and foreseeable use of the asbestos-containing products it sold, supplied, distributed, incorporated, and/or otherwise placed in the stream of commerce in the State of South Carolina; and/or

(g)     Cape, PLC is in receivership, the order of appointment which encompasses the subsidiaries of the Defendants, including specifically, but not limited to North American Asbestos Company located in the State of South Carolina.

5.      Upon information and belief, each of the Defendants is subject to this Court's

jurisdiction because, among other things, this action arises from the acts of each Defendant, and/or

their agents, co-conspirators, predecessors in interest, and/or amalgamated corporate parents: (i)

transacting business in the State; (ii) contracting to supply services or things in the State; (iii)

committing a litany of tortious acts in whole or in part in the State; (iv) causing injuries and deaths

in the State by acts or omissions outside the State, while regularly conducting or soliciting

11

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

business, engaging in a persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered in the State; (v) having an interest in, using, or possessing real property in the State; (vi) entering into a contract to be performed in whole or in part by either party in the State; and/or (vii) producing, manufacturing, or distributing goods with the reasonable expectation (or in this case, the actual knowledge) that those goods are to be used or consumed in the State and were so used or consumed. *See* S.C. Code §§ 36-2-803(A)(1)–(5), (7)–(8).

6.     Plaintiffs' cumulative exposure to asbestos as a result of acts and omissions of Defendants and their defective products/actions, individually and together, was a substantial factor in causing Plaintiffs' asbestos related diseases and other related injuries and therefore under South Carolina law, is the legal cause of Plaintiffs' injuries and damages.

7.     Plaintiffs, nor their family members, were aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease or the hazards associated with bringing home asbestos fibers on one's clothing and person.

8.     Plaintiffs and/or their family members, worked with, or in close proximity to others who worked with, asbestos-containing materials including but not limited to asbestos-containing products and other asbestos-containing materials manufactured and/or sold by Defendants identified above.

9.     Defendants are liable for damages stemming from their own tortious conduct or the tortious conduct of an "alternate entity" as hereinafter defined.  Defendants are liable for the acts of their "alternate entity" and each of them, in that there has been a corporate name change, Defendants are the successor by merger, by successor in interest, or by other acquisition or operation of law including, but not limited to theories of alter-ego or amalgamation of interests, resulting in a virtual destruction of Plaintiffs' remedy against each such "alternate entity";

Defendants, have acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such "alternate entities" have acquired the assets, product line, or a portion thereof of each such Defendants; Defendants caused the destruction of Plaintiffs' remedy against each such "alternate entity"; each such Defendants has the ability to assume the risk-spreading role of each such "alternate entity;" and that each such Defendants enjoys the goodwill originally attached to each "alternate entity."

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| CAPE PLC | Successor-in-interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) ("CAPE PLC" or "Cape"); Anglo American PLC (individually and as successor-in-interest to Anglo American Corporation of South Africa Ltd.), De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers S.A., De Beers UK Ltd., De Beers Jewellers Ltd., De Beers Jewellers US, Inc., Anglo American US Holdings Inc., Element Six US Corp., Element Six Technologies US Corp., Element Six Technologies (OR) Corp., First Mode Holdings, Inc., Platinum Guild International (U.S.A.) Jewelry Inc., Lightbox Jewelry Inc., Forevermark US Inc., Anglo American Crop Nutrients (U.S.A.), LLC, Charter Consolidated Ltd., ESAB Corporation, Central Mining & Investment Corporation Ltd., Cape Holdco Ltd., The Law Debenture Corporation PLC, Cape Industrial Services Group Ltd., Mohed Altrad, Altrad UK Ltd., Cape UK Holdings NewCo Ltd., Altrad Services Ltd. (f/k/a Cape Industrial Services Ltd.), and Altrad Investment Authority S.A.S. |

10.     Plaintiffs have been informed and believe, and thereon allege, that at all times herein mentioned, Defendants or their "alternate entities" were or are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of South Carolina, or the laws of some other

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

state or foreign jurisdiction, and that said Defendants were and/or are authorized to do business in the State of South Carolina, and that said Defendants have regularly conducted business in the State of South Carolina.

11.     Plaintiffs have been informed and believe, and thereon allege, that progressive lung disease, mesothelioma and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a period of time.

12.     As a direct and proximate result of the conduct as alleged within, Plaintiffs suffered permanent injuries, including, but not limited to, mesothelioma and other lung damage, as well as the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to his damage in the sum of the amount as the trier of fact determines is proper.

13.     As a direct and proximate result of the conduct as hereinafter alleged, Plaintiffs incurred liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time. Plaintiff requests leave to supplement this Court and all parties accordingly when the true and exact cost of Plaintiffs' medical treatment is ascertained.

14.     As a further direct and proximate result of the conduct as hereinafter alleged, Plaintiffs incurred, and will incur, loss of profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiffs.  Plaintiffs pray leave to supplement this Court and all parties accordingly to conform to proof at the time of trial.

15.     Plaintiffs hereby disclaim each and every claim or cause of action which does or may arise from any United States Military service or on any federal enclave.  This disclaimer is

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

not related solely to actions taken by or at the direction of a federal officer, but is, rather broader. Plaintiffs are not making any claims and are not alleging any causes of action against any entity for any asbestos exposure of any kind which occurred as a result of and military service of the injured parties herein named.  Moreover, Plaintiffs further disclaim each and every claim or cause of action arising from any exposure to asbestos as a result of Plaintiffs' presence on or at any federal enclave.  Plaintiffs further disclaim each and every claim or cause of action arising under the United States Constitution and under any Federal Law or Regulation.  Finally, Plaintiffs disclaim each and every claim or cause of action which may be asserted under federal admiralty or maritime law.  Courts across the Country have found that such disclaimers are proper and within the province of the Plaintiffs to disclaim.  Any removal by any Defendants on the basis of the disclaimed claims will result in a motion for sanctions and seeking attorneys' fees.

## THE PARTIES

16.     Plaintiffs are identified above and on Exhibit A, hereto.  Exhibit A details the injured party name, Personal Representative (if applicable), disease, date of diagnosis, date of death (if applicable) and relevant years of exposure and details of alleged exposure to asbestos attributable to Defendants.

17.     Defendants, **CAPE PLC**, as successor-in-interest to CAPE INDUSTRIES LTD. (f/k/a CAPE ASBESTOS COMPANY LTD.) and its subsidiaries and global affiliates, was and is a United Kingdom public limited company with its principal place of business in England.  At all times material hereto, CAPE PLC was authorized to do business in the State of South Carolina while engaged, directly or indirectly, in the business of mining, designing, manufacturing, processing, importing, converting, compounding, supplying, installing, replacing, repairing, using, and/or retailing substantial amounts of asbestos and/or asbestos-containing products, materials, or

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

equipment, including, but not limited to, raw asbestos fibers and products resulting from use of the fiber. CAPE PLC is sued as a Product Defendants. Furthermore, this Defendants has done and does substantial business in the State of South Carolina, including the sale and distribution of its dangerous and/or defective products and services. The exposures to this Defendant's products, actions, inactions, and/or other activities, which caused or contributed to cause Plaintiffs' disease and injury, occurred in South Carolina. Plaintiffs' claims against CAPE PLC arise out of this Defendant's business activities in the State of South Carolina. CAPE PLC may be served through its court appointed Receiver who maintains his principle place of business in Richland County South Carolina. *See* CAPE PLC Receivership Order.

18.    Plaintiffs are informed and believe that Defendant **Anglo American PLC** (individually and as successor-in-interest to Anglo American Corporation of South Africa Ltd.) is a corporation organized under the laws of England, United Kingdom, with its principal place of business located in London, England, United Kingdom.

19.    Plaintiffs are informed and believe that Defendant **De Beers PLC** is a corporation organized under the laws of the Bailiwick of Jersey, with its principal place of business located in St. Helier, Jersey.

20.    Plaintiffs are informed and believe that Defendant **De Beers Centenary AG** is a corporation organized under the laws of Switzerland, with its principal place of business in Emmenbrücke, Switzerland.

21.    Plaintiffs are informed and believe that Defendant **De Beers Consolidated Mines Ltd.** is a corporation organized under the laws of the Republic of South Africa, with its principal place of business in Kimberly, Northern Cape, South Africa.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

22.     Plaintiffs are informed and believe that Defendant **De Beers S.A**. is a corporation organized under the laws of the Grand Duchy of Luxembourg, with its principal place of business in the Grand Duchy of Luxembourg.

23.     Plaintiffs are informed and believe that Defendant **De Beers UK Ltd**. is a corporation organized under the laws of England, United Kingdom, with its principal place of business in London, England, United Kingdom.

24.     Plaintiffs are informed and believe that Defendant **De Beers Jewellers Ltd**. is a corporation organized under the laws of England, United Kingdom, with its principal place of business in London, England, United Kingdom.

25.     Plaintiffs are informed and believe that Defendant **De Beers Jewellers US, Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Fairfield County, Connecticut.

26.     Plaintiffs are informed and believe that Defendant **Anglo American US Holdings Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in New Castle County, Delaware.

27.     Plaintiffs are informed and believes that Defendant **Element Six US Corp.** is a corporation organized under the laws of the State of New York, with its principal place of business in Harris County, Texas.

28.     Plaintiffs are informed and believe that Defendant **Element Six Technologies US Corp**. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Santa Clara County, California.

17

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

29.     Plaintiffs are informed and believes that Defendant **Element Six Technologies (OR) Corp.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Multnomah County, Oregon.

30.     Plaintiffs are informed and believe that Defendant **First Mode Holdings, Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in King County, Washington.

31.     Plaintiffs are informed and believe that Defendant **Platinum Guild International (U.S.A.) Jewelry Inc.** is a corporation organized under the laws of the State of New York, with its principal place of business in New York County, New York.

32.     Plaintiffs are informed and believe that Defendant **Lightbox Jewelry Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Kent County, Delaware.

33.     Plaintiffs are informed and believe that Defendant **Forevermark US Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Fairfield County, Connecticut.

34.     Plaintiffs are informed and believe that Defendant **Anglo American Crop Nutrients (U.S.A.), LLC** is a corporation organized under the laws of the State of Colorado, with its principal place of business in Burleigh County, North Dakota.

35.     Plaintiffs are informed and believe that Defendant **Charter Consolidated Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business located in Essex, England, United Kingdom.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

36.     Plaintiffs are informed and believe that Defendant **ESAB Corporation** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Montgomery County, Maryland.

37.     Plaintiffs are informed and believe that Defendant **Central Mining & Investment Corporation Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business located in Essex, England, United Kingdom.

38.     Plaintiffs are informed and believe that Defendant **Cape Holdco Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

39.     Plaintiffs are informed and believe that Defendant **The Law Debenture Corporation PLC** is a corporation organized under the laws of England, United Kingdom, with its principal place of business in London, England, United Kingdom.

40.     Plaintiffs are informed and believes that Defendant **Cape Industrial Services Group Ltd**. is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

41.     Plaintiffs are informed and believe that Defendant **Mohed Altrad** is an individual who resides in Montpelier, France.

42.     Plaintiffs are informed and believe that Defendant **Altrad UK Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

43.     Plaintiffs are informed and believe that Defendant **Cape UK Holdings NewCo Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

44.    Plaintiffs are informed and believe that Defendant **Altrad Services Ltd.** (f/k/a Cape Industrial Services Ltd.) is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

45.    Plaintiffs are informed and believe that Defendant **Altrad Investment Authority S.A.S.** is a corporation organized under the laws of France, with its principal place of business in Florensac, France.

46.    Plaintiffs believe that one or more additional companies were likewise involved in the alleged acts described herein and are liable for the same alleged harms under the same or similar theories of liability ("Additional Defendants"). Those Additional Defendants may include one or more companies operated or managed by organizations located in the United States, United Kingdom, South Africa, Luxembourg, Lichtenstein, Switzerland, or other jurisdictions, which have been used to obfuscate responsibilities with and control over Cape PLC during the relevant period alleged herein, which were or are alter ego entities of Cape PLC, or which otherwise facilitated, took part in, or benefited from the liability-avoidance scheme described herein. When the identities of these Additional Defendants become known to Plaintiffs, this Complaint may be amended *nunc pro tunc* to state the identities of such Additional Defendants.

## **VENUE**

47.    Venue is proper in this Court as it is the Receiver Court which appointed the Receiver for CAPE, PLC and pursuant to the *Barton* Doctrine, all claims against the Receiver must be filed in the receiver court. Further, on March 3, 2019, pursuant to the Order of the Supreme Court of South Carolina, Order Number 2017-03-03-01, the Honorable Jean H. Toal was appointed to have jurisdiction in all circuits in the State to dispose of all pretrial matters and motions, as well

as trials, arising out of asbestos and asbestos litigation filed within the state court system. Thus, the Honorable Jean H. Toal will have jurisdiction over this matter.

**BACKGROUND FACTS**

48.     Although this complaint arises out of events commencing many decades ago and continuing for decades, those events led to and resulted in asbestos-related disease that continues to be diagnosed in and suffered by residents of South Carolina, all across the United States and around the world, to this day. As described in detail below, Defendants (including their predecessors in interest) are directly responsible for injuries caused by these events, especially by the sale and use of asbestos or asbestos-containing products throughout the United States, including in South Carolina.

49.     Cape PLC is the successor in interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) and its subsidiaries and global affiliates (collectively, "Cape"), which was and is a private company organized and existing under the laws of the United Kingdom, with its principal place of business in England. At all times relevant, Cape was deeply involved in all elements of the global asbestos industry, mining hundreds of thousands of tons of raw asbestos in Apartheid-era South Africa and then selling asbestos fiber to scores of manufacturers of asbestos-containing products in the United States—substantial quantities of which were used in South Carolina.

50.     Cape's historic operations involved a complex scheme to sell millions and millions of dollars of asbestos—knowing with certainty that it would kill and maim tens of thousands of Americans—while, at the same time, developing and executing on a ploy to escape any legal or financial responsibility to the people harmed by intentionally depleting its U.S.-based subsidiary of attachable assets. It is sadly unsurprising that Cape, acting with various other foreign entities, concocted this scheme, because Cape boldly admitted that it had **no** "moral responsibility" to the

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

people injured or killed by Cape's asbestos products. CAPE000486. Executing on that scheme, Cape allowed default judgments against it in asbestos lawsuits across the United States, and simply absconded, leaving no assets for recovery. Ultimately, as averred below, Cape and its affiliated domestic and foreign entities got extraordinarily wealthy off the suffering and deaths of tens of thousands, and then cheated the system to escape responsibility for its and their tortious misconduct.

51.     How does a company like Cape pull off such a scheme? Because Cape was part of a South African mining empire that enjoyed unparalleled political power, resource wealth, commercial and legal deviousness, and wholesale antipathy towards ethical business practices and any decent concept of responsibility. More specifically, Cape was the industrial gem of the Anglo and De Beers mining houses, which were controlled by the powerful Oppenheimer family of Johannesburg. *See, e.g.*, Laurie Flynn, *Studded with Diamonds and Paved with Gold: Miners, Mining Companies and Human Rights in Southern Africa* 180 (1992) [hereinafter, "Flynn (1992)"] ("Cape Industries, a British-registered part of Harry Oppenheimer's Anglo American empire . . . [was] among the biggest asbestos producers from the beginning").

52.     As averred herein, those Defendants are responsible for a scheme that included, without limitation, the following acts:

(a)     Failing to follow corporate formalities among affiliated entities, with a select few entities and individuals dominating the management and operations of Cape and its parent company, Charter Consolidated Ltd.;

(b)     Leveraging that common ownership and control of numerous mining and other investment entities to effectively dominate the South African economy and global market for certain forms of asbestos;

(c)     Creating and operating a byzantine web of entities with the deliberate purpose of avoiding public scrutiny and escaping the liabilities of the affiliated companies and their shareholders;

22

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

(d)     Siphoning funds from entities within that web, including Cape's sole American subsidiary, to maximize the financial return to Cape's overseas owners, eliminate liabilities, and escape responsibility by neutralizing the risk of asset attachment by tort creditors; and

(e)     Destroying corporate records and publicly misrepresenting the nature of Cape's business and liability-avoidance scheme in the United States, all designed to avoid responsibility to the tens of thousands of people injured by Cape asbestos.

53.     Each of the named Defendants facilitated and caused Cape's U.S.-based sales and liability-avoidance scheme, or otherwise acted as successors in interest to or beneficiaries of entities involved in that scheme, and, thus, are responsible for the alleged bodily injury underlying the claims against Cape PLC across the United States, including specifically in South Carolina.

**I.     Cape was established as part of a South African mining empire.**

54.     Cape: A De Beers-Affiliated Project. From its beginning, Cape was formed to act  in coordination with powerful mining interests in South Africa. Specifically, in 1891, Francis Oats— a director and eventual chairman of De Beers Consolidated Mines Ltd. (collectively with its affiliates and successors in interest, as named as Third-Party Defendants herein, "De Beers")— formed the Cape Mineral Syndicate to exploit asbestos reserves that had been recently re-discovered in the Orange River Valley in South Africa. Two years later, on December 28, 1893, the Cape Asbestos Company Ltd. was organized in the United Kingdom for the express purpose of: (i) taking over the Cape Mineral Syndicate's mining operations, and (ii) manufacturing asbestos products in England. As a De Beers-affiliated company, Cape was co-founded by Oats and his close business associate, Ludwig Breitmeyer (also a future De Beers director), while another De Beers director, Rudolf Hinrichsen, was installed as Cape's first chairman. Jock McCulloch, *African Issues: Asbestos Blues: Labour, Capital, Physicians & the State in South Africa* 43

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

(Indiana Univ. Press 2002) [hereinafter, "McCulloch (2002)"]. Thus, from its founding, Cape's operations and ownership were integrated with the interests of De Beers.

55.     <u>Wernher, Beit & Co.</u> In the 1890s, Breitmeyer was "a partner in the London [mining finance] firm of Wernher, Beit & Co.," which—with its branch in South Africa, *i.e.*, Hermann, Eckstein & Co.—"became famous as the Corner House" Group. *Cape Asbestos (1893– 1953): The Story of The Cape Asbestos Company Limited* 16 (1953) [hereinafter, "Cape Diamond Jubilee"]; Sir J. Percy Fitzpatrick, *South African Memories* 14 (1932). The Corner House Group was the most powerful mining finance house in South Africa at the time and was founded by London- based "Randlords" Alfred Beit and Julius Wernher. *See* Martin Meredith, *Diamonds, Gold and War: The British, the Boers, and the Making of South Africa* 187 (2007) [hereinafter "Meredith (2007)"] ("At first, Eckstein's office in Johannesburg was called 'Beit's building'; but it later became known as Eckstein's Corner and then as the Corner House; and what it represented was the most powerful group of financiers in southern Africa."); *id.* at 294 (noting that "foreign mining magnates" such as Wernher and Beit "were dubbed by the British press" as "the Randlords," who "indulge[d] in luxury lifestyles in Britain" from their fortunes made in Africa).[1]

56.     <u>Role at De Beers and Cape.</u> The members of the Corner House Group, particularly Alfred Beit, were fundamental to the amalgamation of diamond-mining interests that occurred with the formation of De Beers Consolidated Mines Ltd. in 1888. *See id.* at 247 ("The mastermind behind the amalgamation of the diamond mines in Kimberly was not [Cecil] Rhodes but . . . Alfred Beit – 'Little Alfred' – to whom he invariably turned for solutions.").[2] In turn, Ludwig Breitmeyer

---

[1] *See also, e.g.*, Sir J. Percy Fitzpatrick, *South African Memories* 157 (1932) ("In few countries . . . did any single business firm bulk as big [as] . . . Wernher, Beit & Co. Their great wealth and power on the diamond fields, where . . . they were the real backers of [Cecil] Rhodes in his great work [*e.g.*, the amalgamation of interests at De Beers], and on the Witwatersrand gold fields, where under the name of H. Eckstein & Co., their position, power and influence were overwhelmingly predominant, made them of necessity a very great factor in [South Africa].").

[2] *See also, e.g.*, Sir J. Percy Fitzpatrick, *South African Memories* 27, 33, 90 (1932) ("Alfred Beit has been very generally regarded as the ablest businessman South Africa has ever known. He was very much more than just a financier

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

served as alternate director on the De Beers board for Alfred Beit, while being intimately involved in Cape's founding and becoming Cape's first long term Chairman (from 1894 until his death in 1930). *See* Cape Diamond Jubilee (1953) at 6, 16 (noting Breitmeyer became Cape's Chairman after the first one died). In that role, Breitmeyer managed Cape in the company's infancy, while it was funded and controlled by members of the Corner House Group (*i.e.*, the key members of De Beers). *See id.* at 12, 16.

57.    Breitmeyer's Personal Rise. While acting as Cape's Chairman, Breitmeyer was part of the Corner House Group's continued dominance over mining in South Africa into the 1920s (until that role was overtaken by a relative newcomer, *see infra* ¶ 49). For example, in 1905, on information and belief, Breitmeyer was involved in the organization of the Central Mining & Investment Corp. Ltd. ("Central Mining") to take over the assets and business interests of Wernher, Beit & Co., which included interests in Cape Asbestos. *See, e.g.*, Duncan Innes, *Anglo American and the Rise of Modern South Africa* 55 (1984) [hereinafter "Innes (1984)"] ("[T]he House of Wernher Beit expanded considerably at this time, changing its name to Central Mining in 1905[.]").[3] In 1912, moreover, Breitmeyer became a full-time De Beers director. *See* Hedley A. Chilvers, *The Story of De Beers* 307 (1939) ("BREITMEYER, L. Director from December 5, 1912, to the date of his death, March 13, 1930. Was alternate to A. Beit from May 14, 1888, to June 25, 1889, and from May 18, 1891, to February 6, 1896."); De Beers 1930 Annual Report, at 3 (Oct. 13, 1930) (Sir Ernest Oppenheimer, as the new De Beers Chairman, reporting "regret to record

---

… There can be no doubt whatever that Beit was Rhodes's financial genius, and without him the great creations which are credited to Rhodes would not have been accomplished. … When the big amalgamation was completed and the De Beers Consolidated created, Rhodes, Beit and Wernher were made life-governors with a share in ultimate profits, which … proved of enormous value afterwards.").

[3] *See also Archives Hub: Papers of the Central Mining and Investment Corporation*, https://archiveshub.jisc.ac.uk/search/archives/780f1a0a-48ec-3e42-8e82-53503070110e; *Company Information: Central Mining & Investment Corporation Limited (The)*, https://find-and-update.company-information.service.gov.uk/company/00084511.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

the death . . . of [a] valued friend and colleague, Mr. L. Breitmeyer, who had been a Director of the Company for the past 18 years").

58.     <u>The Oppenheimer–Anglo Takeover of De Beers.</u> In or around 1925, at a critical juncture in South African mining history, Breitmeyer sought to take control of De Beers, but was thwarted by Sir Ernest Oppenheimer—who, soon after, became De Beers' chairman. *See* Hedley A. Chilvers, *The Story of De Beers* 227 (1939) ("Offers for the purchase of the Company's diamonds were received in 1925 from L. Breitmeyer and friends and from Sir Ernest Oppenheimer and friends for a period of five years from January 1, 1926. The offer of the latter was accepted"); De Beers 1930 Annual Report, at 3 (Oct. 13, 1930) (noting leadership of Oppenheimer). Critical to his success as the new De Beers chairman, Ernest Oppenheimer also controlled the Anglo American Corporation of South Africa Ltd. (collectively with its affiliates and successors in interest, including Anglo American PLC, "Anglo"), which Oppenheimer formed in September 1917 to bring about an "amalgamation between" various mines and other business interests. *See* David Pallister et al., *South Africa Inc.: The Oppenheimer Empire (Revised & Updated Ed.)* 54–55 (Yale Univ. Press 1988) [hereinafter, "Pallister (1988)"].

59.     <u>Anglo's Interest in Cape.</u> In the aftermath of the Oppenheimer-led takeover of De Beers, Breitmeyer maintained his directorship at De Beers and his Chairmanship at Cape. *See, e.g.*, De Beers 1930 Annual Report, at 3 (Oct. 13, 1930) (noting long, continued role as De Beers director); Cape Diamond Jubilee (1953) at 6 (chronology of Cape's initial leadership). However, Breitmeyer died soon after (in 1930), with Central Mining or other affiliates of the Corner House Group continuing to control Cape.[4] On information and belief, however, soon after the

---

[4] *See, e.g.*, McCulloch (2002) at 8 (observing that by 1944, "the major shareholders [in Cape] were the Central Mining and Investment Corporation of London and the estate of the late Alfred Beit," who had died nearly four decades prior in 1906); Cape Diamond Jubilee (1953) at 35, 48, 61 (referencing Central Mining and other affiliates of the Corner House Group involved with leadership and operations at Cape).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Oppenheimer-led takeover of De Beers, Anglo and its affiliated entities developed direct and indirect ties (including by assuming contracts and liabilities) in various businesses affiliated with the Corner House Group, including Central Mining and Cape. *See cf.* Hedley A. Chilvers, *The Story of De Beers* 227 (1939) ("The new (Oppenheimer) Syndicate took over in October the stock of diamonds of the old (Breitmeyer) Syndicate and all contracts and liabilities."). And at minimum, Anglo's "involvement in Cape Asbestos grew during the Second World War," because by then, Central Mining had become affiliated as an "Oppenheimer company" and was also Cape's "majority shareholder." Geoffrey Tweedale & Laurie Flynn, *Piercing the Corporate Veil: Cape Industries and Multinational Corporate Liability for a Toxic Hazard, 1950–2004*, 8 Enterprise & Society 268, 274 (2007) [hereinafter, "Tweedale & Flynn (2007)"]. Moreover, by 1949, "Central [Mining] had a majority on the board of directors of Cape," *id.*, and by 1958 (at the latest), Anglo had executed a "take over [of] Central Mining," Pallister (1988) at 120.

60.    Cape as Part of an Empire. In other words, by the middle of the twentieth century, Cape was the asbestos-mining leg of an amalgamated mining empire based out of South Africa that included the De Beers diamond monopoly and mining powerhouse of Anglo associated with the Oppenheimer business dynasty.[5]

61.    Benefits of Anglo Affiliation. Cape's affiliations—especially with Anglo—were key to Cape's success, because Anglo (i) acted as "South Africa's largest and most influential corporation," (ii) dominated the mining industry, and (iii) "ma[de] up the core of the country's economy." Pallister (1988) at 25 ("The old adage that what is good for General Motors in the United States is far more apposite to Anglo and South Africa. Certainly Anglo

---

[5] While started by Sir Ernest Oppenheimer, leadership at Anglo was passed down to his son, Harry Oppenheimer, who is now succeeded by the founder's grandson, Nicholas ("Nicky") Oppenheimer, reportedly the third wealthiest man in Africa. *See* Rob LaFranco *The Forbes Billionaires List: Africa's Billionaires* (Jan. 30, 2023), https://www.forbes.com/lists/africa- billionaires/?sh=5a12a2a724d5.

controls a far greater proportion of the South African economy than [GM] could ever hope to achieve in the USA."). For example, Central Mining (as controlled by Anglo) leveraged its expertise and methods in gold mining to improve the performance at Cape mines by seconding employees to Cape in South Africa—but with Anglo, not Cape, paying their compensation. *See* McCulloch (2002) at 51–52 (detailing "claims that seconded staff kept their original medical aid and pension entitlements [of Central Mining], and their salaries were paid by the parent company Anglo American").[6]

62.    The Deviousness of Its Business Structure. Exhibiting extraordinary business and legal deviousness, the Oppenheimer family (along with their close associates) structured and coordinated "a web of secret companies" to avoid financial liabilities, including tax liabilities. Pallister (1988) at 25; *see also* Stefan Kanfer, *The Last Empire: De Beers, Diamonds, and the World* 292, 316–17 (1995) [hereinafter, "Kanfer (1995)"] (noting that the Anglo businesses were often investigated for "illegally doing business in the [United] States"). Outwardly, however, the Oppenheimer family and its associates did not acknowledge the true extent of cross-associations between their various companies—which in the aggregate allowed the Oppenheimer family to dominate the South African economy. *See, e.g.*, A.J.W. Owston Tr. 31–32 (Aug. 22, 1984) (Charter executive director and Anglo employee claiming not to know who controls Anglo or De Beers, but admitting the greater group enjoyed having "inside South Africa dozens of subsidiaries in all kinds of activities").[7]

---

[6] In turn, in later years (*see infra* ¶ 54), Charter could "call on the comprehensive technical services of Anglo," which Charter acknowledged "contributed greatly to the examination and evaluation of the many mining and prospecting projects initiated by or brought to" Charter. *See* Charter 1966 Annual Report, at 24 (May 31, 1966).

[7] *See also* Pallister (1988) at 25 ("Technically there are simply two major South African publicly quoted companies, the Anglo American Corporation of South Africa . . . and De Beers Consolidated Mines, with an admitted close working relationship and various cross-holdings with other companies. Because the boards of [Anglo] and De Beers present their companies as independent entities on stock exchanges and to business partners and governments around the world, they can never formally admit that the two operate as inseparable twins.").

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

63.     <u>The Creation of Charter.</u> After World War II, the Oppenheimer family sought to extend its business holdings internationally, including by consolidating companies with ownership and control of Cape. Thus, in 1965, Central Mining merged with two other mining and investment companies (The British South Africa Company and The Consolidated Mines Selection Company Ltd.) to form Charter Consolidated Ltd. ("Charter"). Anglo created Charter to serve as Anglo's "international investment arm," Pallister (1988) at 345, thereby creating an Oppenheimer-controlled corporate triumvirate—with Charter being the third of "three essential companies" of what insiders called "the greater group," *i.e.*, Anglo, De Beers, and Charter. *See* A.J.W. Owston Tr. 31–32, 66 (Aug. 22, 1984); J.A.B. Nichols Tr. 10, 61(Aug. 29, 1984). [8]



64.     <u>Charter's 1969 "Takeover" of Cape.</u> Although Charter had both direct and indirect interests in Cape from its founding, it purported to only have a minority interest initially, before quickly accumulating shares and acquiring majority ownership by 1969. *See* Charter 1965 Annual

---

[8] *See also, e.g., Charter Website: History* (Dec. 12, 2008), https://web.archive.org/web/20081212114613/http://www.charter.ie/chtr_int/about/history/; (noting that "[v]arious companies within the Anglo American Corporation of South Africa have held an interest in Charter Consolidated shares").

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Report, at 5 (May 19, 1965) (listing Cape as a "principal interest[]" of Charter at its founding); Charter 1968 Annual Report, at 34 (May 28, 1968) (reporting 19.5% interest in Cape and the "mining and manufacture of asbestos"); Charter 1969 Annual Report, at 7, 25, 31 (June 3, 1969) (reporting 25.3% interest in Cape and efforts to obtain majority ownership through takeover offers to other unidentified Cape shareholders). On information and belief, in 1969 and prior years, Charter or other Anglo-affiliated entities purchased Cape shares from other companies associated (previously) with the Corner House Group, including, without limitation, Rand Mines Ltd., Rand Mines Holdings Ltd., or their affiliates, in which Charter and Anglo also held large ownership interests. *See* Charter 1969 Annual Report, at 28, 32 (June 3, 1969) (noting 15.9% interest in Rand Mines Ltd. and 23.6% interest in Transvaal Consolidated Land & Exploration Company Ltd.). Indeed, at its founding, Charter touted its close relationship with these and other members of the Corner House Group. *See, e.g.*, Charter 1965 Annual Report, at 7 (May 19, 1965) (noting shared interests involving Charter, Central Mining, and Rand Mines Ltd. under section of report titled "CORNER HOUSE GROUP"); Innes (1984) at 212–13 (stating that "as part of the Corner House Group, Rand Mines had become one of the country's leading mining houses," but eventually fell under the control of Anglo by the early 1960s); *see also* Meredith (2007) at 302 (detailing the founding of Rand Mines in 1893, which was formed by the contribution of mining claims and "five existing companies" by H. Eckstein & Co., with "the partners in Eckstein, including Beit and Wernher in London," receiving shares in the new entity).

65.    <u>Charter: A Shell Game.</u> In the end, Charter's purported "takeover" of Cape was nothing more than a continuation of other Oppenheimer-affiliated entities' control of Cape over the prior decades,[9] and serves as only one example of the many corporate shell games used by the

---

[9] *See, e.g.*, Charter 1966 Annual Report, at 7 (May 31, 1966) (noting Central Mining "acquired interests in . . . asbestos, . . . besides a number of industrial interests in the United Kingdom"); Charter 1970 Annual Report, at 16 (June 18,

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Oppenheimer business empire to obscure their financial interests globally.

66.    <u>One Main Office for One Enterprise.</u> Similarly, the corporate separation between Charter and Anglo was superficial. By way of example only, Charter and Anglo shared common office space at 40 Holborn Viaduct in London, employed personnel who routinely switched roles between the entities, and each had boards that were dominated by the Oppenheimer family and their business associates/servants. *See, e.g.*, E.G. Rudland Tr. 7–8, 21–22 (Apr. 7, 1981) (describing overlapping personnel and directorships); House of Commons, Expenditure Comm., Session 1973–74, *Fifth Report: Wages and Conditions of African Workers Employed by British Firms in South Africa* 22–23 (Jan. 22, 1974) [hereinafter, "House of Commons Rep."] (noting that Charter "even allow[s] Anglo American to supply directors for Charter representation on boards"); Peter Schmeisser, *Harry Oppenheimer's Empire: Going for Gold*, N.Y. Times, Mar. 19, 1989 [hereinafter, "Schmeisser Article"] (noting common office space of De Beers, Anglo, and Charter in London, as well as overlapping directors among the Oppenheimer companies); Charter 1965 Annual Report, at 10 (May 19, 1965) (as part of the Charter merger, there was an "[i]ntegration of the London staffs" of the three merged companies, with the new organization located at 40 Holborn Viaduct); Charter 1966 Annual Report, at 24 (May 31, 1966) (noting merged companies were also combined "with the London staffs of Anglo . . . and Consolidated Share Registrars Limited" to create a "wholly owned subsidiary, Charter Consolidated Services Limited," which also took over the office lease and "provide[d] staff and services in London, not only for all companies in the Charter . . . group, but also for the Anglo . . . , De Beers and Corner House groups").

67.    <u>Charter's Role in the Empire.</u> Consistent with this scheme, Charter operated such that its "every move was made in the interests of De Beers and Anglo"—furthering the

---

1970) (noting that "there has long been a close association [of Cape] with Charter through one of its forerunners," *i.e.*, Central Mining).

amalgamated Oppenheimer empire's effort "to extend [its] grasp to North America," while allowing it to "unobtrusively buy, spawn or control" varied and sizeable business interests around the world through a "series of . . . cross-holdings." Kanfer (1995) at 291–92, 315 (describing Charter as one side of a "pyramid" of global business interests).[10]

68.    <u>Domination of Charter.</u> The Oppenheimers consistently sat on Charter's board of directors after its founding,[11] while at the same time dominating Charter's share ownership.[12] Indeed, Charter's management was a long continuation of Randlord-style business, in which the "real proprietors" and "owners" of a business (such as the Oppenheimer family) participate primarily in profits, while local affiliated entities (such as Charter and Cape) profit by the grace of the Randlords—with an "unwritten obligation of honour to respect [Randlord] wishes and position." Sir J. Percy Fitzpatrick, *South African Memories* 90–91 (1932) (Corner House Group representative in Johannesburg detailing this norm between De Beers and Corner House Group members). Thus, it was clear to all, including Members of Parliament, that "[w]here Anglo American lead, Charter Consolidated are prepared to follow." House of Commons Rep. at 23.

69.    <u>Charter's Investment in South Africa.</u> By the early 1970s, Charter became the largest English corporate investor in South Africa—albeit, one investing primarily in Anglo-affiliated entities, including its own parent Anglo (in which Charter had a 10% equity stake). *Id.*

---

[10] *See also, e.g.*, Schmeisser Article ("The structure of Oppenheimer's empire is dizzyingly complex and nearly impenetrable to outsiders. He wields his power indirectly, through pyramided holding companies, interlocking shareholdings and a myriad of cross-directorships. As a result of this operating strategy, few people are aware that in the last two decades scores of businesses in the United States [and elsewhere] have been founded or purchased with Oppenheimer capital and are managed by Oppenheimer loyalists while maintaining no legal ties to South Africa.").

[11] *See, e.g.*, Charter 1967 Annual Report, at 4 (June 9, 1967) (noting Oppenheimer's role as chairman, beginning a two-year term in that role); Charter 1971 Annual Report, at 3 (June 1, 1971) (noting Sir Philip Oppenheimer's role as Deputy Chairman and a member of the executive committee).

[12] *See, e.g.*, Anglo 1979 Annual Report, at 69 (June 22, 1979) (indicating that both Harry and Nicky Oppenheimer had 18,333,268 beneficial shares in Anglo, with the next highest directorship holding being 30,000 shares); Charter 1968 Annual Report, at 10 (May 28, 1968) (indicating that Harry Oppenheimer dominated ownership of Charter with 5,004,600 shares).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

at 22. Uniquely, in contrast to other corporate investors who sought majority ownership (and thus control) over their South African businesses, Charter had a minority stake (usually around 10%) in most of its South African investments, with one notable exception: its majority ownership of Cape. *Id.* at 22 & n.1.

70.    Charter's Interest in Cape. Charter's "largest industrial subsidiary company" was Cape, with Charter even seconding and compensating key personnel for Cape's management. J.N. Clarke Tr. 14, 17–18 (Apr. 21, 1983); *see also, e.g.*, G.A. Higham Tr. 7–9, 28, 87 (Oct. 3, 1984) (Cape Chairman admitting that Charter had been paying his compensation for years and that he acts as Chairman for "a number of Charter's [other] industrial subsidiaries" as well). In other words, although most of Charter's assets were tied up in minority investment interests—effectively operating as a holding company—Cape was Charter's primary operating company and "principal industrial subsidiary." *See* Charter 1972 Annual Report, at 15 (May 30, 1972) (also emphasizing Cape's profitability). In turn, Charter used its "close association" with other South African companies, namely Anglo, to "exercise . . . influence" in Apartheid-era South Africa, *see* House of Commons Rep. at 22—thereby allowing Cape to profitably mine and export asbestos to the United States for decades.

71.    Clear Takeaway, Despite Complexity. Ultimately, although the facts are complex, it is clear that through an "Anglo holding company" (*i.e.*, Charter), Cape and its subsidiaries were part of the "Anglo American Group of Companies"[13] that dominated the

---

[13] As explained by Anglo, the "term 'group' has a wider meaning in the South African mining industry than its statutory definition of a parent company and its subsidiaries . . . . The mining finance houses in South Africa have traditionally operated 'the group system', whereby the parent house not only administers companies that are not necessarily subsidiaries, but provides them with a full range of administrative and technical services and is able, by virtue of its financial strength and standing, to assure them of capital for expansion and development. Thus the Anglo American Corporation Group comprises a large number of companies that are closely linked to [Anglo] but which are not generally subsidiaries or controlled companies as defined in the statutes." Anglo 1974 Annual Report, at 3 (Apr. 28, 1975).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

South African mining economy during the twentieth century. Innes (1984) at 271, 283 (listing Cape among other Anglo subsidiaries in a published history about Anglo and its importance in South Africa); *see also, e.g.*, Schmeisser Article (reporting that the Oppenheimer family "has dominated the South African economy for nearly half of [the twentieth] century" and that "Anglo American, which accounts for more than 50 percent of the stocks traded on the Johannesburg stock exchange, permeates every conceivable corner of the South African marketplace").

72.    A Profitable Mid-Century Business. In turn, Cape reflected the Oppenheimer empire's shared commercial interest[14] in the high-growth, highly profitable asbestos industry after World War II. *See, e.g.*, Jock McCulloch & Geoffrey Tweedale, *Defending the Indefensible: The Global Asbestos Industry and Its Fight for Survival* 37 (Oxford Univ. Press 2008) [hereinafter, "McCulloch & Tweedale (2008)"] (observing that "the major [asbestos] companies derived the bulk of their profits from" asbestos mines); Charter 1970 Annual Report, at 12, 16 (June 18, 1970) (reporting a "substantial jump in trading profits for the year . . . due to the inclusion of earnings from Cape Asbestos").[15]

73.    Goal of Corporate Complexity. Although the precise "connection between Cape, Charter, Central Mining and Anglo American is complex," McCulloch (2002) at 51–52, that complexity reflects an intentional scheme to obfuscate corporate relationships and ownership interests while minimizing the amalgamated business empire's liability risks, including for

---

[14] *See, e.g.*, Anglo 1976 Annual Report, at 7 (Mar 25, 1977) (reporting that Anglo had "important interests in the production of . . . asbestos" through Charter); De Beers 1978 Annual Report, at 48– 49, 52 (Mar. 30, 1979) (referencing "strengthening [of] De Beers' earnings base," which through Anglo and Charter, "the London-based mining finance house," included interests in "asbestos . . . and other minerals, and in industrial enterprises in the United Kingdom"); Charter 1972 Annual Report, at 39 (May 30, 1972) ("In mining, the Anglo American Corporation group and its close associate De Beers Consolidated Mines Limited have important interests in the production of . . . asbestos.").

[15] *See also, e.g.*, Charter 1970 Annual Report, at 31 (June 18, 1970) (reporting that the sale of asbestos fibre contributed the most to the company's trading profit); Charter 1972 Annual Report, at 3 (May 30, 1972) (noting among top "[f]eatures of the year" that Cape's "profits increased from £2,528,000 to £3,098,000"); Charter 1977 Annual Report, at 47 (June 9, 1977) (noting £9,831,000 pre-tax trading profit from mining and sale of asbestos fibre and 28.2% profit margin from the same, *i.e.*, the highest among Charter's manufacturing subsidiaries).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

asbestos (as well as taxes).[16]

74.     The Point of Charter. Specifically, Charter was designed to serve as a corporate cushion—a products-liability patsy—for Anglo that could (i) promptly purge itself of substantial cash (through dividends based on new profits, or by otherwise reallocating assets among holding companies through more complex transactions) to Oppenheimer-affiliated entities, and (ii) add a "formal" degree of separation between Anglo and Cape, *i.e.*, a profitable asbestos business, but one they knew would injure tens of thousands and thus created a substantial risk of liability in the future. *See infra* ¶¶ 81–88 (detailing working conditions and known disease in South Africa and England); *see also cf.* Jock McCulloch & Pavla Miller, *Mining Gold and Manufacturing Innocence: Occupational Lung Disease and the Buying and Selling of Labour in Southern Africa* 390–91 (2023) (noting "Charter's controlling share in Cape gave Anglo American a commercial interest in the asbestos industry" and "Anglo American's board reason to monitor" alleged liabilities of Cape).

75.     Infamous Recognition for Success. Through these corporate maneuvers, Cape, as "part of the great South African conglomerates of De Beers and Anglo-American Corporation, provides a classic example of . . . tactics" centered on hiding behind a corporate-veil fiction, *i.e.*, "us[ing] complex and confusing corporate structures to distance themselves from liability." McCulloch & Tweedale (2008) at 181 (also describing recognition by judicial tribunals that "Cape

---

[16] As described later, *infra* ¶¶ 89–105, when the victims of this scheme began to sue and win verdicts, Anglo implemented additional—but still wholly superficial—corporate changes to further distance itself from its asbestos business and mitigate its U.S. liability risk, with Cape Asbestos (i) dropping *Asbestos* from its name, (ii) ceasing to appoint Cape officials to the board of its American subsidiary (NAAC) as a "sensible precaution," (iii) interjecting another entity (Cape Industries Overseas Ltd.) between NAAC and Cape, to add yet *another* degree of superficial separation between Anglo and its U.S. asbestos business, and (iv) purporting to close NAAC and sell its South African asbestos mines, for the purpose of evading creditors, while Anglo continued to profit from the sale of asbestos through other entities.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

operated worldwide as a single economic unit" and provided "false testimony" about its organization).

76.     <u>Control as the Key to Success.</u> The Oppenheimer "family's control [of these enterprises] and its personal wealth" was consistently the "key" to coordinating the management of their businesses, including Charter and Cape. *See* Pallister (1988) at 41 (noting that apart from Oppenheimer kin, the "powerful inner cabinet that [took] the most sensitive and important decisions" for the global empire was limited to (i) two individuals who had each served as Chairmen of Charter, and (ii) former personal assistants who were "considered to be part of the 'family'").

77.     <u>Domination of the South African Mining Economy.</u> In the end, the amalgamated Oppenheimer empire, as effectuated by De Beers, Anglo, and Charter primarily, was astonishingly successful in its domination of the South African mining economy—making up 10% of South Africa's GDP and 30% of its exports in 1973, while controlling or producing 40% of South Africa's gold, 80% of the world's diamonds, a sixth of the world's copper, and most of South Africa's coal. Tweedale & Flynn (2007) at 274; *see also, e.g.*, Charter 1972 Annual Report, at 39 (May 30, 1972) (reporting Anglo's dominance of gold, coal, and uranium mining in South Africa).

78.     <u>Control of Asbestos Supply.</u> In fact, Cape controlled 90% of the global supply of amosite[17] asbestos and dominated the distribution of other types of asbestos as well—effectively enjoying a monopoly over a then-highly sought industrial resource. *See Hammond v. N. Am. Asbestos Corp.*, 454 N.E. 2d 210, 217 (Ill. 1983); *see also* McCulloch & Tweedale (2008) at 28 (describing industrial preference for amosite "in the construction and repair of ships").

---

[17] The name for this unique form of asbestos is derived from its association with a Cape business division in South Africa—*i.e.*, AMOSA, Asbestos Mines of South Africa. Flynn (1992) at 192.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

## II.     **Cape Created NAAC to Facilitate Its Asbestos Scheme**.

79.     <u>A U.S. Subsidiary to Fuel Growth.</u> As part of the Oppenheimer empire's global expansion, on October 14, 1953, Cape established the North American Asbestos Corporation ("NAAC") as a direct subsidiary domiciled in Illinois. *See, e.g.*, CAPE001511. Although Cape had been profitable for years, including "return[ing] a strong dividend" for shareholders (*i.e.*, Oppenheimer-affiliated interests) from 1936 to 1951, "the company's most bountiful years were the two decades until 1976"—the period when Cape operated NAAC to provide raw asbestos fiber to customers in the United States, the company's most important market. McCulloch (2002) at 68.

80.     <u>U.S. Industry Connections.</u> Previously, Cape had already been marketing its asbestos to numerous U.S.-based customers, including having an important business relationship with, among other companies, Union Asbestos & Rubber Co. (UNARCO) since the 1930s to create "Unibestos" insulation. For the sake of continuity, and to leverage established client connections, Cape Chairman Ronald Dent selected UNARCO Vice President, Bob Cryor, to be NAAC's first President—a role that Cryor filled until his death from mesothelioma in 1970. *See, e.g.*, *Cameron v. Owens-Corning Fiberglas, Corp.*, 695 N.E.2d 572, 578 (1998).[18]

81.     <u>NAAC's Role at Cape.</u> Cape designed NAAC to operate as Cape's wholly controlled instrumentality for the "purpose of expediting and facilitating the movement" of asbestos from South African mines into the United States (including South Carolina).[19] To facilitate this, NAAC had both marketing and distribution roles: (i) serving as Cape's sales agency in the

---

[18] Important to Cape, Cryor also had established relationships with executives at Johns-Manville Corp. (one of Cape's most important customers). Indeed, Johns-Manville Corp. trusted Cryor so much as to admit to him a company policy of not telling employees about their asbestos disease— out of fear that they would stop working and file claims, and instead choosing to withhold the information and let workers die to "save a lot of money." Paul Brodeur, *Outrageous Misconduct: The Asbestos Industry on Trial* 276–77 (1985).

[19] *See* CAPE000110–12 (1982 court filing describing NAAC's history); CAPE000177 (identifying NAAC as the sole U.S.-based entity of the Cape mining division); CAPE000869 (1973 letter describing NAAC as "a division of Cape Asbestos Co. Ltd., with corporate offices in London").

United States, with sole authority to offer Cape products and responsibility for transmitting information about customer needs to Cape mines, and (ii) ensuring the proper distribution of asbestos products from Africa "all the way through to the customer's plant," including to locations in South Carolina or through South Carolina ports.[20] NAAC "effect[ively] . . . put the Mines at every U.S. port." CAPE000988–89. By 1970, NAAC was the "largest U.S. importer of Amphibole Fibres," which were "re-distributed from . . . warehouse locations in East Coast, Gulf Coast and West Coast Ports." CAPE000878–79.

82.     Cape's Business in South Carolina. In coordination with, and at the direction of,  the amalgamated global Cape/Oppenheimer network, NAAC sold millions and millions of dollars of asbestos mined from South Africa to numerous U.S.-based clients, which used or distributed asbestos products in South Carolina. *See, e.g.*, CAPE000994–95 (NAAC letter identifying certain clients). NAAC's own records show that Cape sold asbestos to companies in South Carolina, including to Raybestos Manhattan, Inc. in North Charleston and Westinghouse Electric Corp. in Hampton, as well as to facilities on the South Carolina–Georgia border (*e.g.*, Babcock & Wilcox in Augusta, GA and Dow Chemical in Savannah, GA). *See also, e.g.*, S. Purrington Tr. 9–10, 64 (Aug. 25, 1986) (NAAC clerical worker from 1961 to 1978 identifying Dow Chemical as one of NAAC's three primary customers).

83.     The Disastrous Impact on South Carolinians. In turn, those Cape products caused individuals (including residents of South Carolina) to be exposed to asbestos and suffer bodily injury, which has resulted in myriad suits against Cape ("Asbestos Suits").

84.     Goal of National Distribution. In addition, Cape and NAAC implemented a

---

[20] *See* CAPE000263–66 (describing intended business of NAAC); CAPE000333 (1975 Cape cover letter of NAAC director resignations); CAPE000729 (appointment announcement describing NAAC as "specialize[d] in marketing and distribution of Blue and Amosite asbestos in the United States, Canada, Mexico and the Caribbean"); CAPE000988–89 (1969 NAAC memorandum describing customer services).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

"conscious pattern of product distribution [of asbestos] nationally"—particularly, amosite, over which Cape had a monopoly. *See In re: Asbestosis Cases*, Case No. 78-CP-06-105, Order, at 3 (S.C. Common Pleas Apr. 7, 1980) [hereinafter, "S.C. 1980 Order"] (rejecting objection to the exercise of personal jurisdiction over NAAC in South Carolina); *see also* Flynn (1992) at 188 ("What Cape did [in the United States of America] is not dissimilar to the situation where someone fires a gun into a crowd of people. You may not know which of them will be killed but you know for certain that some of them will be killed.").

85.    <u>Prevalence of Cape's Asbestos.</u> Cape's amosite (along with Cape's other types of mined asbestos) was an ingredient in the most popular and dominant asbestos products in the market, which were used in virtually every state, including products "used in [South Carolina]." *See* S.C. 1980 Order, at 3; *see also, e.g.*, Raybestos-Manhattan 1963 Annual Report, at 2 (Mar. 13, 1964) (Cape's major customer in South Carolina touting: "Whoever you are, whatever your business, a [Raybestos-Manhattan] product touches your life."); *Parker v. Bell Asbestos Mines, Ltd.*, 607 F. Supp. 1397, 1403–04 (E.D. Pa. 1985) (rejecting argument that Charter was entitled to dismissal, given possibility that plaintiff could "prove that Charter controls Cape, and that Cape has deliberately avoided liability to American plaintiffs, [such that] it will be fair to ask Charter to stay and defend Cape's position"). In short, Cape deliberately and purposefully availed itself of the entirety of the United States market for asbestos fiber, including the South Carolina market.

86.    <u>Management at NAAC.</u> The volume of Cape's asbestos supply to the United States was breathtaking given the ostensibly small footprint of NAAC, "which was essentially a one-man operation" consisting of an operational lead supported by four office clerical personnel.[21] All key decisions, however, including with respect to the fulfillment of specific purchase orders,

---

[21] *See* CAPE000110–12 (describing NAAC's lean staffing); CAPE001514 ("Despite the volume of sales and profits of NAAC, our operation is a very small one, with only a total of 5 employees.").

were closely coordinated with and directed by other Cape entities, or made by a board comprised of Cape executives and lawyers (until Cape executives resigned in 1975, in what they described at the time as a "sensible precaution" against U.S. litigation). *E.g.*, CAPE000333.[22]

87.   <u>A Pawn in the Oppenheimer Empire.</u> In selecting directors to participate in this worldwide scheme, Cape Chairman Ronald Dent—also a director for Charter and several other Charter-owned companies, apart from NAAC and Cape—valued "the type of man who would fit into our scheme of things . . . without causing embarrassment all around." CAPE000261–62; *see also* Charter 1972 Annual Report, at 33 (May 30, 1972) (noting Dent's role as a Charter director and ownership of Cape shares, which were also directly owned by other Charter directors).

88.   <u>Domination of American Subsidiary.</u> NAAC's operations and decision-making were wholly dominated by Cape and its owners, including Charter and other affiliated mining/investment interests in South Africa. How dominated was NAAC? The company could not "borrow one dollar without [Cape's] approval" and was routinely forced to withdraw cash to pay dividends to Cape, thereby minimizing NAAC's available assets that could be reached by American creditors.[23] Astoundingly, NAAC's then-President Bob Cryor admitted that NAAC relegated its interests to Cape as "part of a coordinated group with responsibilities to the whole" group. CAPE000931–32.

89.   <u>NAAC's Failure to Purchase Adequate Insurance.</u> Cape's domination also influenced and controlled NAAC's risk management decision-making, including its purchase of insurance. Officially, Cape had a company-wide policy to purchase insurance "at minimum cost consistent with adequate cover." CAPE0001465. But in reality, NAAC felt "pressure from [its]

---

[22] *See also, e.g.*, CAPE001528 (listing six directors in 1970).
[23] *See, e.g.*, CAPE001507 (1976 letter noting borrowing limit); CAPE000816 (1976 board minutes showing payment of $250,000 dividend).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Home Office in London [that] forced [it] to seek lower rates" and choose carriers and policy terms based solely on short-term cost. *See* NAAC Letter to J. Kirk of Talbot Bird & Co. (Nov. 17, 1959). Because of Cape's domination of NAAC, and as a part of the liability-avoidance scheme, Cape directed NAAC to buy wholly inadequate insurance coverage to address its massive future products- liability exposure.

**III.     Cape Led Efforts in the U.S. and Internationally to Hide the Risks of Asbestos.**

90.     Known History of Illness in South Africa. Early in its history—even before setting up operations in the United States—Cape's management and ownership knew of the serious health hazards posed by their South African asbestos, as illness was endemic among Cape's own employees. For example, because child labor was extensively used in the South African asbestos mining industry and Cape lacked basic industrial hygiene measures, Cape was responsible for causing "radiologic asbestosis with cor pulmonale [*i.e.*, heart failure]" in Black children "before the age of 12." Dr. Gerrit Schepers, "Discussion," *Ann. N.Y. Acad. Sci.*, 132:246 (1965).[24]

91.     Infamy for South African Conditions. Indeed, Cape's operations in South Africa were so infamous that they became a case study—literally—in corporate irresponsibility. *See* Patricia Werhane et al., *Case Study: South African Mining and Asbestos-Related Diseases*, Univ. of Va. Darden School of Bus., at 7 (Apr. 11, 2006) ("[L]ong after the hazards of asbestos were well known to the company as well as the mining community in general, Cape took advantage of lax labor legislation . . . [and also] benefited from cheap labor. Whole families, including children as

---

[24] Years later, Dr. Schepers provided a detailed account of his time at a Cape mine in Penge, South Africa, including seeing (i) "a big strong man with a sjambok whip," whose apparent job was "to hit a hessian sack on the ground below the end of a chute," and (ii) inside the battered sack, a "boy of ten or twelve," whose job was "to get inside the bag and trample down the fluffy asbestos. He was cheaper than machinery or safe sacks. He was covered from top to toe in asbestos dust so I grabbed him and took him off to the X-ray machine. The X-ray showed he was already suffering from asbestosis. I was told that Cape employed a lot more children and I gave instructions to my technician that he was to round up all the children in the village with the little Cape Asbestos copper identification bands riveted around their wrists – identification tags, just like slaves, so they couldn't run off. A number of the other children had asbestosis too. The conditions were unbelievable." Flynn (1992) at 192–93.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

young as 12 years, were involved in the mining and milling operations at Cape's facilities, and workers handled asbestos with their bare hands. Not only Cape workers, but also those who lived in the communities around Cape mines were exposed to high levels of asbestos that were sometimes 30 times higher than the legal limit in Britain. One of Cape's asbestos mills at Prieska was in the center of town, close to a church and school. One medical doctor stated that he diagnosed 900 mesothelioma victims, including his own son."). Cape allowed these "work practices" to continue because they "were profitable for employers and Cape's management readily acknowledged the importance of the mines to its success." McCulloch & Tweedale (2008) at 44–45.

92.     <u>Known History of Illness in England.</u> Likewise, Cape's operations in England were infamous for lacking basic hygiene measures, such that a medical examination of 80 workers in 1928 "showed that nearly all had 'definite evidences' of asbestosis." Geoffrey Tweedale, *Magic Mineral to Killer Dust: Turner & Newall and the Asbestos Hazard* 20 (Oxford Univ. Press 2000) [hereinafter, "Tweedale (2000)"]; *see also, e.g.*, Flynn (1992) at 180 ("[Cape's] British factories had been shown to be so negligently run that they brought death, disease and injury to the communities around them"). Among Cape's managers and owners, the danger of asbestos exposure was well known, with scientific studies repeatedly re-establishing a link between exposure to asbestos and illness.[25]

---

[25] *See, e.g.*, R. Gaze Tr. 2, 111 (June 5, 1975) (Cape official admitting knowledge of asbestosis risk "since the first day [he] was employed" there in 1943); J. Christopher Wagner et al., *Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province*, 17 Brit. J. Indus. Med. 260, 261–62 (1960) (study published by South African researchers linking mesothelioma with occupational and non-occupational exposure to Cape asbestos); Richard Doll, *Mortality from Lung Cancer in Asbestos Workers*, 12 Brit. J. Indus. Med. 81, 86 (1955) (concluding from data that "lung cancer was a specific industrial hazard of certain asbestos workers"); *see also* McCulloch & Tweedale (2008) at 8–9, 119–20 (listing various studies of, or laws concerning, asbestos disease from 1898 to 1964, and noting that "[f]ew medical authors ever expressed doubt about the relationship between malignant mesotheliomas and asbestos exposure, and by 1953, the issue seemed to be fairly well resolved").

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

93.     <u>Apathy to Personal Suffering.</u> Nevertheless, the dangers of asbestos were hidden from Cape employees (and the general public) and atrocious conditions at Cape facilities continued for decades—causing widespread disease and later becoming focal points of damning exposés on the asbestos industry. *See* Tweedale (2000) at 238, 251, 255–56 (noting various documentaries showing, among other things, a Cape manager who "always kept a black tie in his desk for funerals").

94.     <u>Lobbying and Perpetuating Misinformation in the United States.</u> Yet, while having knowledge of these health hazards, and while peddling a toxic product throughout the United States (including in South Carolina), Cape used misinformation to influence public and corporate opinions about asbestos—working with government officials to protect South African (*i.e.*, Oppenheimer) business interests.[26] Cape acted as head cheerleader for the continuation of the asbestos trade, taking a keen interest in organizing efforts to downplay knowledge of the health hazards posed.[27]

95.     <u>Examples of U.S. Misinformation Efforts.</u> For example, in 1954, the year after NAAC's establishment, Cape became a member of the U.S.-based Asbestos Textile Institute, which organized regular meetings to discuss developments in the asbestos industry, including the prospect of governmental regulation. Above all other companies, Cape was especially keen to suppress knowledge about the risks of asbestos. Thus, when Johns-Manville proposed labeling on bags of asbestos in 1968, Cape had a "bitter" response, suggesting that such a step should never be taken unilaterally by one producer. *Dring v. Cape: Key Points from Documents Obtained by*

---

[26] *See, e.g.*, CAPE000955 (official of South African mining holding company, Cape Asbestos South Africa (Pty.) Ltd., writing to NAAC as a fellow member "of the Cape Asbestos Group and the Charter Consolidated Group," and introducing as a resource the Commercial Counsellor at the South African Embassy in Washington, DC).

[27] *See, e.g.*, CAPE000130 (Cape Asbestos Fibres Limited prioritizing efforts to "organize a body of medical opinion that is prepared to stand up" to critical opinions).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

*the Asbestos Victims Support Groups Forum UK*, at 23 (*available at* https://asbestosforum.org.uk/cape-documents/) [hereinafter, "Dring Documents"]. And once Johns-Manville finally decided to adopt a warning label, Cape proposed use of an inaccurate warning that inhalation of only "substantial quantities" of asbestos could be harmful. *Id.* at 21.

96.     <u>Lobbying and Perpetuating Misinformation in England.</u> In England in the 1950s and 1960s, Cape joined forces with other companies in the British asbestos industry to establish the Asbestosis Research Council and the Asbestos Information Committee, which worked to "publish several reassuring booklets on the use of asbestos." Tweedale (2000) at 174, 191. In addition, in or around 1966–68, Cape lobbied the British Occupational Hygiene Society to weaken protections for workers from a "no dust policy" to a "maximum allowable concentration approach," while continuing its misinformation campaign in the public and its strong-arm tactics designed to deter other manufacturers from introducing warning labels. Dring Documents, at 1.

97.     <u>Hiding the Truth to Profit.</u> A linchpin of these schemes was Cape's role in providing misleading reassurances to the government and public about the dangers of asbestos, which conflicted with Cape's own internal data on the health risks of asbestos. Ultimately, when faced with a decision of shutting down the business (particularly, its South African mines) or "suppress[ing] knowledge of disease," Cape "chose[] the latter" and "worked hard to keep information about mesothelioma secret." McCulloch & Tweedale (2008) at 120.

**IV.     Cape Implemented a Strategy to Evade Liability in the United States**

98.     <u>Initial Maneuvers to Evade Liability Risk.</u> In the early 1970s, after the onset of asbestos- related products-liability litigation, *see, e.g.*, *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076 (5th Cir. 1973) (successful suit by insulation worker, widely acknowledged to have precipitated a wave of asbestos litigation in the 1970s), Cape and its affiliated entities undertook

numerous actions in a deliberate effort to escape responsibility for the harm caused by Cape asbestos products.[28] For example, Cape went through tortured machinations to make it *appear* it was reducing oversight over NAAC, but in reality, NAAC continued to operate as a controlled instrumentality under Cape's domination.[29] And these changes were the result of careful assessments by Cape officials—with the help of its lawyers and other advisors—regarding how to minimize the liability exposure of not only Cape, but Cape's parent (Charter) and its other South African affiliates. *See* CAPE000141 (NAAC counsel advising Cape on risk of judgments attaching to Charter assets).

99.     Public Downplaying of Responsibility. At first, at least in their public statements, Charter and Cape "strenuously contested" their liability and concluded that "no material liability is likely to arise as a result of the actions," because "[i]n the opinion of American legal advisers, the amounts claimed are highly speculative and conjectural and have only a tenuous basis in law or in fact." Charter 1975 Annual Report, at 30 (June 3, 1975).

100.     Implementing Liability-Avoidance Strategy. In parallel, and central to that claim and their plan to avoid liability, Cape directed a campaign of litigation avoidance by refusing to accept process or appear in any U.S. proceedings. That campaign continues unabated today, as

---

[28] *See, e.g.*, CAPE000351–56 (1975 lawyer letter referring to "attempt to limit NAAC's and Cape's exposure to future United States litigation").

[29] *See* CAPE000123 (NAAC discouraging Cape visits to the U.S. in 1978 or else negate "maneuvers" related to "continued problems with product liability litigation"); CAPE000152 (1975 letter suggesting to "disassociate the Parent Company as fully as possible from the operating companies"); CAPE000154 (1975 letter raising whether to "do something to change the identity of NAAC in order to avoid exposing the company unnecessarily," while doing "everything possible to maintain a successful selling operation in the United States"); CAPE000166–67 (1974 lawyer letter suggesting that "no one from Cape be an officer of NAAC since we want it to be as independent as possible in order to avoid any contention that it is the alter ego of Cape and that Cape is doing business in the United States"); CAPE000333 (1975 Cape Asbestos letter stating "that it would be a sensible precaution against Cape's involvement in any future proceedings for [Cape personnel] to resign from the N.A.A.C. Board," and enclosing resignation letters).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

evidenced by Cape's failure to respond to the Second Amended Summons in this action, which was served pursuant to Article 10 of the Hague Convention on March 8, 2022.[30]

101.    <u>Opinion of Moral Irresponsibility.</u> More broadly, according to Cape executives, this strategy was warranted because they "really cannot be said to have a moral responsibility [to respond to the suits] and are simply victims of the US product liability cult." Tweedale & Flynn (2007) at 283; CAPE000486.

102.    <u>Financials Based on Immoral Opinion.</u> In addition, despite knowing the liability risk, Cape and its affiliates—including its parent company, Charter—refused to make any provision for or reserve of cash to address that liability. *See* CAPE000781 (1971 correspondence regarding Charter's annual report). Indeed, for most of NAAC's existence under Charter, Charter refused to even acknowledge NAAC, despite listing various other Cape subsidiaries in England, South Africa, and other countries as among Cape's subsidiaries. *See, e.g.*, Charter 1970 Annual Report, at 10 (June 18, 1970) (listing Cape entities in South Africa, England, and Ireland).

103.    <u>Cape Liquidates NAAC as Part of Its Liability-Avoidance Scheme.</u> Ultimately, to avoid liability to the tens of thousands of people injured or killed by its asbestos, Cape decided to liquidate NAAC, effective January 31, 1978 (though articles of dissolution were filed later, on or around May 19, 1978). *See, e.g.*, CAPE001035 (April 1978 letter noting liquidation and requesting, "for safety's sake," that Cape officials stop sending accounting memoranda to former NAAC officials). Existing commercial debts of NAAC were paid, with any remaining assets transferred upstream to NAAC's direct parent company at the time, Cape Industries Overseas

---

[30] *See* CAPE000550–51 (NAAC personnel opining in 1978 "that it is most unlikely that any plaintiff would bother to pursue collection of any default judgments against Cape"); CAPE000702 (NAAC counsel in 1979 confirming receipt of correspondence stating that "U.K. and South African lawyers confirm that any resulting judgments will not be enforceable against Cape's U.K. and South African assets" and that "the potential loss of all NAAC's outstanding assets is not material in the Cape Group context").

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Ltd.—a U.K. entity wholly owned by Cape Industries Ltd. (formed in 1975 to create the *appearance* of separation). *See* CAPE000593 (noting conveyance of assets); CAPE000149 (noting new entity).

104. <u>Liquidation Despite Continued Profitability.</u> The decision to liquidate NAAC occurred notwithstanding consistent years of record profits from Cape's sale of asbestos fiber in the United States. *See, e.g.*, Charter 1976 Annual Report, at 7, 38–39 (June 8, 1976) (reporting £10.2 million of operating profit "in spite of difficult trading conditions," with the "greatest increase" in improved profit "arising in the mining division, which raised total tonnage both mined and sold," even despite "substantial price increases"); Charter 1977 Annual Report, at 7, 11, 13 (June 9, 1977) (reporting another "record year" from Cape with pre-tax profit of £14.2 million, with the "mining division again perform[ing] exceptionally well").

105. <u>NAAC's Minimal Assets at Liquidation.</u> As part of its overall scheme, and in light of Cape's funneling of cash from NAAC to overseas entities over many years, NAAC's assets at liquidation were minimal, as an absolute matter, and especially when compared to the total wealth of Cape and the broader Oppenheimer empire.[31]

106. <u>Accepting Defaults to Perpetuate the Liability-Avoidance Scheme.</u> NAAC's liquidation was central to Cape's liability-avoidance strategy, and was predicated on legal advice that no British or South African court would enforce a judgment against a Cape entity if it never appeared again in the United States.[32] That strategy, more broadly, was taken right out of the

---

[31] *See, e.g.*, CAPE000701 (Cape counsel writing in 1979 with respect to whether the remaining assets in the NAAC liquidating trust should be written off, soon after its creation); CAPE000702 (1979 correspondence noting that NAAC's auditor "agree[d] that the potential loss of all NAAC's outstanding assets is not material in the Cape Group context" (capitalization altered)); CAPE000722 (1978 correspondence noting judgment non-enforceability and "[auditor] advice to [Cape] that the loss of NAAC's outstanding assets is not material in the Cape Group context").

[32] *See, e.g.*, CAPE000141–43 (1975 legal letter advising Cape on default-judgment risk); CAPE000566 (1978 memorandum agreeing that it would be in the "best interests of Cape companies other than NAAC" to make "no response" to litigation); CAPE000617–19 (summarizing 1984 deposition testimony regarding litigation strategy).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Oppenheimer empire's operational playbook in the United States: (i) profit greatly from a business (including for the sale of asbestos), (ii) extract those profits from the United States to foreign entities, across an ever-changing, byzantine corporate structure, (iii) undercapitalize the United States operating entity, (iv) liquidate ownership interests when they sensed liability was imminent, while otherwise maintaining that there was no physical presence in the United States, and (v) retain overseas the massive financial fruits of their unlawful schemes, which, as to asbestos sales, were at the expense of dead and dying Americans, including South Carolinians. *See, e.g.*, Kanfer (1995) at 317–18 (describing De Beers' abrupt sale of equity in an American company to avoid antitrust liability, which had previously been hidden by "the usual thicket of [European] registrations," such that "financial facts were buried in the records of some 300 interlocking corporations").

107.  Continuation of the Asbestos Business. Even before NAAC's dissolution, Cape contemplated ways to continue the flow of asbestos to U.S. customers and asbestos profits out of the United States, despite the formality of liquidating NAAC.[33]

108.  Creation of New American and Foreign Entities. To facilitate this ruse, Gerry Morgan (NAAC's final President) formed Continental Products Corporation ("CPC") to act as a commission agent for the future sales of asbestos from South Africa in the United States. Conveniently, CPC used the same NAAC address in Chicago, Illinois, and received funding from Cape in London. And CPC acted with South African mines to sell through a Lichtenstein-based entity named Associated Mines Company ("AMC") associated with Cape or other Oppenheimer-affiliated business interests. *See, e.g.*, CAPE000386; CAPE000531 (announcement of CPC as "Agent to handle the North American requirements for Amosite and Crocidolite asbestos fibre").

---

[33] *See, e.g.,* CAPE000728 (1977 meeting memorandum involving Cape officials "to discuss liquidation of NAAC and formation of new off-shore company to service North American market").

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

109.    <u>Transfer of IP Rights to New Entities.</u> Brazenly, Cape even directed the transfer of certain intellectual property owned by NAAC for future use by CPC and AMC. *See, e.g.,* M. Meyer Tr. 14–18 (May 18, 1982) (describing the assignment of the "Noramite" trademark for certain asbestos mats and plastics).

110.    <u>Objective of New Entities.</u> Ultimately, the "purpose of this corporate arrangement [was] to eliminate or reduce as much as possible the exposure in the United States of [South African mining companies] to lawsuits brought against it under theories of strict liability concerning products liability on the sale of asbestos in the United States." CAPE000377–79.

111.    <u>Selling Mines as Part of the Liability-Avoidance Scheme.</u> Outside of the United States, Cape took additional steps to disassociate itself from asbestos generally, despite its long-held role "as a major world producer of asbestos fibre" and "the Cape name [being] synonymous with asbestos." Cape 1980 Review, at 2. On June 29, 1979, Cape sold "the whole of [its] asbestos mining interest in South Africa" to Transvaal Consolidated Land and Exploration Company Ltd. ("Transvaal"), *id.*, earning proceeds of £15.1 million to "finance the group's expansion in other areas of its business," Charter 1979 Annual Report, at 12 (July 4, 1979).

112.    <u>Anglo's Continued Interest in Asbestos.</u> Although Charter asserted that "mining subsidiaries in South Africa were sold *outside* the group," *id.* at 35 (emphasis added), its own annual reports from prior years establish that Charter had previously owned the purchasing entity, Transvaal, and still had a financial interest in Transvaal, including through either another Anglo entity or Charter's interest in Barlow Rand Ltd. *See* Charter 1965 Annual Report, at 3, 5 (May 19, 1965) (listing Transvaal as a "principal interest[]," along with Rand Mines Ltd.); Charter 1972 Annual Report, at 12 (May 30, 1972) (referencing merger between Rand Mines Ltd. and Thos Barlow & Sons Ltd. in June 1971, resulting in Charter acquiring a 3.86% interest in the

merged company, Barlow Rand Ltd., in exchange for its previous 15.9% interest in Rand Mines Ltd.); Charter 1973 Annual Report, at 8 (June 21, 1973) (reporting that Charter sold its interest in Transvaal in April 1972 "to companies in the Anglo American Corporation group").[34]

113.    Cape's Business Pivot. In 1982, Cape purported to cease all manufacturing of asbestos products.[35] Unfathomably, even for a collective of companies as devious as these, Cape refocused its business on—wait for it—asbestos removal. This is not fiction; it has been proudly touted by Cape.[36]

114.    The Scheme Was Contemptibly Successful. Within years of executing the liability-avoidance scheme, business historians recognized that "Cape Industries"—as part of Charter, *i.e.*, Anglo's international/industrial investment arm—was "astonishingly adept at extricating itself from the [asbestos] business without paying huge compensation." Pallister (1988) at 345.

## V.    The Oppenheimers Implemented a Strategy to Further Evade Responsibility.

115.    Empire Restructuring to Mitigate Risk. Tellingly, while Cape implemented its liability- avoidance strategy, the Oppenheimer family similarly made changes to its investments to remove power and assets from Charter and relegate it to the periphery of the empire. On information and belief, these changes were motivated because the Oppenheimers and their partners

---

[34] *See also, e.g.*, Joseph Lelyveld, *The Many Faces of Barlow Rand Ltd.*, N.Y. Times, Apr. 11, 1982 (noting Barlow Rand was "the second-biggest industrial and mining group in South Africa," after "the vast Anglo-American Corporation and its chairman, Harry F. Oppenheimer, whose place in the moneyed portion of [South African] society makes him a one-man aristocracy"); Flynn (1992) at 194 ("In the end the company became so worried about the extent of Anglo American's liabilities for deaths and injuries that they sold the mines, including Penge, to Barlow Rand, another company with strong connections to Harry Oppenheimer.").

[35] *Cape Website: Our History* (May 17, 2013), https://web.archive.org/web/20130517130040/http://www.capeplc.com/about-cape/our-history.aspx.

[36] *Cape Website: Our Services, Insulation* (Oct. 20, 2012), https://web.archive.org/web/20121020173812/http://www.capeplc.com/services-and-markets/our-services/insulation.aspx.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

(i) understood that Charter, like Cape, faced substantial financial exposure for asbestos-related liabilities in the United States, and (ii) were concerned those liabilities would also attach to Anglo and De Beers. *See, e.g.*, Charter 1980 Annual Report, at 34 (June 24, 1980) (reporting that Charter had been named a defendant in U.S. asbestos litigation "in its capacity as the holding company of" Cape and had been told that certain U.S. corporations would seek to hold Charter liable for their own liability).

116.   The Oppenheimers' Transfer of Shares. For example, beginning in the late 1970s, the Oppenheimer family began to substantially sell or otherwise divest their direct financial interests in Charter. *See, e.g.*, Charter 1977 Annual Report, at 47 (June 9, 1977) (indicating decrease in direct interest of Harry Oppenheimer); Charter 1983 Annual Report, at 41 (June 21, 1983) (indicating "nil" interest of the two listed Oppenheimers by April 1982).

117.   Minorco's Rise. Around 1980—*i.e.*, soon after Cape's sale of asbestos mines—the Minerals and Resources Corporation ("Minorco") "over[took] Charter as the group's overseas flagship." Pallister (1988) at 122; *see also* Donald G. McNeil Jr., *A Diamond Cartel May Be Forever; The Hereditary Leader of De Beers Pursues Post-Apartheid Growth*, N.Y. Times, Jan. 12, 1999 [hereinafter, "McNeil Article"] (reporting that Minorco had been created previously to evade anti-Apartheid sanctions).[37]

118.   Charter's Fall. As part of that pivot to Minorco, there was a "divestiture by Charter of its strategic holdings in Anglo American, De Beers and Anglo American Investment Trust," which was a "very major step" in reorganizing the amalgamated Oppenheimer business empire and reducing (but not eliminating) Anglo's "interference" with Charter. *See* A.J.W. Owston Tr. 67

---

[37]   *Available at* https://www.nytimes.com/1999/01/12/business/international-business-diamond-cartel-may-be-forever-hereditary-leader-de-beers.html.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

(Aug. 22, 1984). As part of this divestiture, Charter "disposed of nearly all [its] investments in South Africa and adjoining territories," which involved a "major restructuring" that Charter acknowledged "substantially changed" its "assets and business interests." Charter 1980 Annual Report, at 5, 9 (June 24, 1980). Although Charter was purported to have received "a substantial amount of cash" from that sale, proceeds were used to repay debt and acquire Minorco shares. *See id.* at 5–6.

119.   <u>Charter's Exile.</u> Due to these restructurings, Anglo stopped acknowledging Charter as a material part of the Oppenheimer business empire—as it had been effectively replaced by Minorco. *Compare* Anglo 1977 Annual Report, at 3 (Mar. 25, 1977) (organizational chart portraying Charter on equal footing to Anglo and De Beers), *with* Anglo 1983 Annual Report, at 5 (June 28, 1983) (updated organizational chart making no reference to Charter at all). By the end of the 1980s, the Oppenheimers had stopped serving on the Charter board of directors all together, after unwinding themselves from Charter's assets and associated liabilities. *See* Charter 1989 Annual Report, at 46 (June 10, 1989) (no Oppenheimer listed for the Charter board of directors).

120.   <u>A Weakened Charter.</u> For its part, after disposing of its South African investments, Charter touted a renewed focused on its operating subsidiaries in the United Kingdom, rather than acting primarily as a holding company for Oppenheimer business interests. *See, e.g.*, Charter 1986 Annual Report, at 2 (July 3, 1986) ("Charter has undergone a major change in recent years. The business has been extensively reshaped and much of the capital employed is now in operating companies."). However, without the backing of Anglo as a corporate patron, and with Cape no longer directly engaged with its main historical business—*i.e.,* mining and selling asbestos—both Charter and Cape were unable to achieve growth and profitability comparable to what they enjoyed in decades earlier as part of the Oppenheimer business empire.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

## VI.    **In Subsequent Years, There Have Been Changes to Third-Party Defendants**.

121.    <u>Changes to the Former Asbestos-Mining Empire.</u> Following Cape's escape from the United States, it changed its name and organization, and so did its affiliated companies and other actors that were part of the Cape liability-avoidance scheme. Certain of those entities and persons are named as Third-Party Defendants in this action, including as successors in interest and beneficiaries of Cape's liability-avoidance scheme, co-responsible for Cape's tortious conduct.



122.    <u>Changes to Cape.</u> Since the 1970s, Cape Asbestos Company Ltd. has undergone several changes to its organization, including (i) changing its name to Cape Industries Ltd. in 1974 (*i.e.*, removing "Asbestos" from its name, soon after the onset of asbestos products-liability litigation); (ii) re-registering as a public company and changing its name to Cape Industries PLC in 1981; (iii) shortening its name to Cape PLC in 1989; (iv) changing its name to Cape Intermediate Holdings PLC in 2011; and (v) re-registering as a private company to become Cape Intermediate Holdings Ltd. in 2013. And as of 2016, Cape Holdco Ltd. (controlled by Cape Industrial Services Group Ltd.) and The Law Debenture Corporation PLC were registered as Persons with Significant Control of Cape.

123. <u>Unmet Responsibilities.</u> Although Cape in the prior decades had entered into certain agreements to compensate for illness and death resulting overseas from its products (such as entering into a "Scheme of Arrangement" with former employees in 2006), Cape has done **nothing** about its massive unpaid responsibility for the death and illness caused by its asbestos products in South Carolina and elsewhere in the United States.

124. <u>Altrad's Acquisition and Subsequent Ownership of Cape.</u> On or around October 9, 2017, Altrad Investment Authority S.A.S. (a French company), through Altrad UK Ltd. (controlling Cape UK Holdings Newco Ltd.), acquired and has since controlled Cape. Those entities are owned and controlled by the multinational Altrad Group, which has renamed certain Cape entities as well, including Altrad Services Ltd. (f/k/a Cape Industrial Services Ltd.).

125. <u>Altrad's U.S. Subsidiaries.</u> In addition, the Altrad Group acquired Sparrows Offshore Group Ltd. in 2022, which established the Altrad Group's presence in the United States through its (i) operations in the southern United States, and (ii) ownership of U.S.-registered entities, including Hawk BidCo US Inc., Arranco US, LLC, Sparrows Offshore, LLC, and the Sparrows Group, LLC.[38]

126. <u>Altrad's Owner.</u> The Altrad Group—and thus Cape—is controlled by its French–Syrian President and Founder, Mohed Altrad, a/k/a the "Scaffolding King." *See* Altrad 2022 Annual Report, at 36 (Feb. 9, 2023);[39] *see also* Gaspard Sebag & Tara Patel, *Billionaire Scaffolding 'King' Guilty of Bribing Rugby Boss*, Bloomberg (Dec. 13, 2022) (reporting Mr. Altrad's recent corruption conviction, punished with an 18-month suspended jail term and €50,000 fine).[40]

---

[38] *See, e.g.*, *Altrad Completes Acquisition of Engineering and Maintenance Specialist Sparrows Group*, Altrad (July 12, 2022), https://www.altrad.com/en/newsreader/altrad-completes-acquisition-of-engineering-and-maintenance-specialist-sparrows-group.html; *Sparrows Website: Global Locations*,

[39] *Available at* https://newsmanager.altrad.com/files/altrad-group/news/2023/02/09_annual-report-2022/annual-report_2022_en_double_br-min.pdf.

[40] *Available at* https://www.bloomberg.com/news/articles/2022-12-13/scaffolding-billionaire-convicted-of-corruption-over-sponsorship#xj4y7vzkg.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

127.    <u>Altrad Defendants.</u> Ultimately, each of the entities identified herein along with Mohed Altrad, are either successors in interest to Cape and its numerous subsidiary and affiliated entities, or beneficiaries from Cape's liability-avoidance scheme, or both, and are collectively referred to as the "Altrad Defendants."

| ALTRAD AND CAPE-AFFILIATED ENTITIES<br>("ALTRAD DEFENDANTS") | |
| --- | --- |
| Cape Subsidiaries / Control:<br>• Cape Holdco Ltd.<br>• The Law Debenture Corp. PLC<br>• Cape UK Holdings NewCo Ltd.<br>• Cape Indus. Servs. Grp. Ltd.<br>• Altrad Servs. Ltd. (f/k/a Cape Indus. Servs. Ltd.) | Altrad Ownership:<br>• Mohed Altrad<br>• Altrad Inv. Auth. S.A.S<br>• Altrad UK Ltd. |

128.    <u>Involvement of Affiliated Oppenheimer Businesses.</u> At all times relevant to Cape's business in the United States and its perpetuation of the liability-avoidance scheme, Cape was owned, controlled, operated by, and dominated in furtherance of and in concert with Oppenheimer business interests in South Africa, the United Kingdom, and elsewhere—to those entities' substantial financial benefit.

129.    <u>Oppenheimer Defendants.</u> Those dominating, conspiring, facilitating, or otherwise financially benefiting entities include Anglo American Corporation of South Africa Ltd. (as predecessor in interest to Anglo American PLC) and De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers S.A., De Beers UK Ltd., and De Beers Jewellers Ltd. Those entities currently have presence, operations, and business in the United States, including in South Carolina, through De Beers Jewellers (US), Inc., Anglo American US Holdings Inc., Element Six U.S. Corporation, Element Six Technologies US Corporation, Element Six Technologies (OR) Corp., First Mode Holdings, Inc., Platinum Guild International (U.S.A.) Jewelry, Inc., Lightbox Jewelry Inc., Forevermark US, Inc., and Anglo American Crop Nutrients (USA), LLC. All of these

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

companies are collectively referred to as the "Oppenheimer Defendants," with Anglo American PLC acting as ultimate parent company for each. *See, e.g.*, Anglo 2022 Annual Report, at 283 (Feb. 22, 2023).[41]

130.    <u>Increased U.S. Activities.</u> Since closing NAAC and implementing their liability-avoidance scheme, the Oppenheimer Defendants have increased their business activities in the United States, with certain of them using courts in the United States to enforce trademarks or other valuable rights, including under the De Beers name.[42]

| ANGLO AMERICAN PLC ("OPPENHEIMER DEFENDANTS") | |
| --- | --- |
| "De Beers Group" Subsidiaries:<br>• De Beers PLC<br>• De Beers Centenary AG<br>• De Beers Consol. Mines Ltd.<br>• De Beers S.A.<br>• De Beers UK Ltd.<br>• De Beers Jewellers Ltd. | United States Subsidiaries:<br>• De Beers Jewellers (US), Inc.<br>• Anglo Am. US Holdings Inc.<br>• Element Six U.S. Corporation<br>• Element Six Techs. US Corp.<br>• Element Six Techs. (OR) Corp.<br>• First Mode Holdings, Inc.<br>• Platinum Guild Int'l (U.S.A.) Jewelry, Inc.<br>• Lightbox Jewelry Inc.<br>• Forevermark US, Inc.<br>• Anglo Am. Crop Nutrients (USA), LLC |

131.    <u>Changes to Charter.</u> In 1993, after the broader Oppenheimer empire had demoted Charter's role in the business, Charter re-registered as a public company, becoming Charter PLC.

---

[41]    *Available at* https://www.angloamerican.com/~/media/Files/A/Anglo-American-Group-v5/PLC/investors/annual-reporting/2022/aa-annual-report-full-2022.pdf. In 1998, Anglo American Corporation of South Africa Ltd. moved its headquarters to London and re-registered as Anglo American PLC, which involved complex changes to its corporate structure that included absorbing Minorco and moving assets out of South Africa (thereby mitigating the risk of post- Apartheid nationalization). *See* McNeil Article. In November 2011, moreover, the Oppenheimer family sold its direct stake in the De Beers Group to Anglo American PLC for $5.1 billion, while (on information and belief) retaining indirect ownership through other entities. *See, e.g.*, Mark Scott, *Anglo American in Deal to Take Control of De Beers*, N.Y. Times, Nov. 4, 2011.

[42] *See, e.g.*, *De Beers UK Ltd. v. Adwar Casting, Co., Ltd.*, No. 4:10-cv-00843, ECF No. 3 (W.D. Mo. Sept. 15, 2010) (corporate disclosure statement of plaintiff identifying De Beers UK Ltd. as a wholly owned subsidiary of De Beers Centenary AG); *De Beers Centenary AG v. John- Robert:Hasson*, No. 1:10-cv-23024, ECF No. 1 (S.D. Fla. Aug. 23, 2010) (action initiated by De Beers entity).

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

In 1996, Charter sold its interest in Cape for approximately £48 million. In 2008, a new holding company, Charter International PLC, took over Charter PLC,[43] and then, effective January 13, 2012, Colfax Corporation ("Colfax") acquired Charter at a $2.4 billion valuation, with Charter enjoying minimal debt on its balance sheet. *See* Colfax Corp. Form 8-K (Jan. 17, 2022);[44] Colfax Corp. Schedule 14A (Dec. 19, 2011).[45] In making that acquisition, Colfax disclosed Charter's exposure to asbestos-related lawsuits in the United States, but the companies (i) assessed it as not having "a material effect on Charter's financial position," (ii) dismissed any associated expenses as "negligible," and (iii) ultimately made no provision for Charter's asbestos liability. Colfax Corp. Schedule 14A (Dec. 19, 2011).

132.     Charter Defendants. By 2022, Colfax sold its interests in Charter's businesses, including, on information and belief, those associated with Cape-related liabilities—namely, ESAB Corporation. *See Enovis (Formerly Colfax) Completes Spin-Off of ESAB Corporation* (Apr. 5, 2022).[46] On information and belief, ESAB Corporation is currently the parent company of, as well as a successor in interest to, Charter Consolidated Ltd., along with Charter's subsidiary Central Mining & Investment Corporation Ltd., and each is collectively referred to as "Charter Defendants."

## CLAIMS OF THE PLAINTIFFS

133.     Plaintiffs, collectively listed on Exhibit A, individually and as Personal Representatives of various Estates, bring this action for monetary damages because of Plaintiffs contracting an asbestos-related diseases.

---

[43] *See    Charter   Website: History* (Dec.   12,   2008),
https://web.archive.org/web/20081212114613/http://www.charter.ie/chtr_int/about/history/.
[44] *Available at*
https://www.sec.gov/Archives/edgar/data/1420800/000134100412000060/cfx_8k.htm.
[45] *Available at* https://www.sec.gov/Archives/edgar/data/1420800/000114420411070464/v242942defm14a.htm.
[46] *Available at* https://ir.enovis.com/news-releases/news-release-details/enovis-formerly-colfax-completes-spin-esab-corporation.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

134.     Plaintiffs were each diagnosed with asbestos related disease, including but not limited to, mesothelioma and lung cancer, and in some cases, died from these same diseases.

135.     Plaintiffs' asbestos related diseases were each caused by exposure to asbestos during the course of their employment, work careers, and/or through take home exposures to asbestos as a result of their family members' work.

136.     Exposures relevant to Defendants, Cape PLC, as successor-in-interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) and  as a result, to each of the entities named herein, are detailed on Exhibit A.  These exposures involve direct and/or take-home exposure to airborne asbestos fibers released through activities, including but not limited to, the sale, distribution, installation, removal, manipulation, disturbance, and other activates of Defendants at jobsites where Cape PLC, as successor-in-interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) and its subsidiaries and global affiliates, supplied, removed, installed, or contracted for the use of asbestos fibers South Carolina and throughout the United States.

137.     Plaintiffs' cumulative exposure to asbestos as a result of acts and omissions of Defendants and their defective products and materials, individually and together, was a substantial factor in causing Plaintiffs' asbestos related diseases, and therefore under South Carolina law, is the legal cause of Plaintiffs' injuries and damages.

138.     Plaintiffs nor their family members, were aware at the time of exposure, that asbestos or asbestos-containing products presented any risk of injury and/or disease.

139.     Plaintiffs have been informed and believe, and thereon allege, that progressive lung diseases, including mesothelioma and other serious diseases, are caused by inhalation of asbestos fibers and that said diseases result from exposure to asbestos and asbestos-containing products over a period of time.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

140. As a direct and proximate result of the conduct as alleged within, Plaintiffs suffered permanent injuries, including, but not limited to, mesothelioma, lung cancer, and other lung damage, as well as the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to their damages in the sums of the amounts as the trier of fact determines are proper.

141. As a direct and proximate result of the conduct as hereinafter alleged, Plaintiffs incurred liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiffs at this time. Plaintiffs request leave to supplement this Court and all parties accordingly when the true and exact cost of Plaintiffs' medical treatments are ascertained.

142. As a further direct and proximate result of the conduct as hereinafter alleged, Plaintiffs incurred loss of profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiffs. Plaintiffs request leave to supplement this Court and all parties accordingly to conform to proof at the time of trial.

<div align="center">

**FOR A FIRST CAUSE OF ACTION**
**(Product Liability: Negligence)**

</div>

**Plaintiffs Complain of Defendants for a Cause of Action for Negligence Alleging as Follows:**

143. Plaintiffs incorporate herein by reference, as though fully set forth herein, each and every paragraph of the General Allegations above.

144. At all times herein mentioned, the named Defendants was an entity and/or the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, or division of an entity, hereinafter referred to collectively as "alternate entities," engaged in the

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

business of researching, studying, manufacturing, fabricating, designing, modifying, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos, other products containing asbestos, and products manufactured for foreseeable use with asbestos products.

145.     At all times herein mentioned, Defendants, and/or its "alternate entities" singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, inadequately warned or failed to warn of the health hazards, failed to provide adequate use instructions for eliminating the health risks inherent in the use of the products, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos, other products containing asbestos, and products manufactured for foreseeable use with asbestos products, in that said products caused personal injuries to Plaintiffs and others similarly situated, (hereinafter collectively called "exposed persons"), while being used for their intended purpose and in a manner that was reasonably foreseeable.

146.     The asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that there was an alternative for asbestos that could have been used as the product or as a component instead of asbestos within a normally asbestos-containing/utilizing product.  Said alternatives would have prevented Defendants' asbestos and asbestos-containing products from causing Plaintiffs' asbestos related disease and in some circumstances, subsequent death, due to an inability of any asbestos-alternative to penetrate the pleural lining of Plaintiffs'

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

lungs, even if inhaled. Said alternatives came at a comparable cost to Defendants and/or its "alternate entities." Said alternatives were of comparable utility to the asbestos or asbestos-containing products of Defendants and/or its "alternate entities." The gravity of the potential harm resulting from the use of Defendants' asbestos or asbestos-containing products, and the likelihood such harm would occur to users of its products, far outweighed any additional cost or marginal loss of functionality in creating and/or utilizing an alternative design, providing adequate warning of such potential harm, and/or providing adequate use instructions for eliminating the health risks inherent in the use of their products, thereby rendering the same defective, unsafe and dangerous for use by Plaintiffs and/or their family members. Defendants and/or its "alternate entities" had a duty to exercise due care in the pursuance of the activities mentioned above and Defendants breached said duty of due care.

147. Defendants and/or its "alternate entities" knew or should have known, and intended that the aforementioned asbestos and asbestos-containing products would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to grinding sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling by exposed persons, including Plaintiffs and/or their family members, would use or be in proximity to and exposed to said asbestos fibers.

148. At all times relevant, Defendants and/or its "alternate entities" were aware of its asbestos and asbestos-containing products' defect but failed to adequately warn Plaintiffs or their

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

family members, or others in their vicinity, as well as failed to adequately warn others of the known hazards associated with their products and/or failed to recall or retrofit its products. A reasonable manufacturer, distributor, or seller of Defendants' products would have, under the same or similar circumstances, adequately warned of the hazards associated with their products.

149.    Plaintiffs, their family members,  and others in their vicinity used, handled or were otherwise exposed to asbestos and asbestos-containing products referred to herein in a manner that was reasonably foreseeable. Plaintiffs' exposures to asbestos and asbestos-containing products occurred at various locations as set forth in this Complaint.

150.    Plaintiffs suffer/suffered from asbestos related disease, including but not limited to mesothelioma and lung cancers which are related to exposures to asbestos and asbestos-containing products. Plaintiffs, not their exposed family members, were not aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury or disease.

151.    Defendants' conduct and defective products as described in this cause of action were a direct cause of Plaintiffs' injuries, and all damages thereby sustained by Plaintiffs. Therefore, Plaintiffs seek all compensatory damages in order to make them whole, according to proof.

152.    Furthermore, the conduct of Defendants and/or its "alternate entities" in continuing to market and sell products which they knew were dangerous to Plaintiffs, their family members, and the public without adequate warnings or proper use instructions was done in a conscious disregard and indifference to the safety and health of Plaintiffs and others similarly situated.

153.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, failing to recall or retrofit, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing,

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products or products manufactured for foreseeable use with asbestos products, Defendants and/or its "alternate entities" did so with conscious disregard for the safety of "exposed persons" who came in contact with asbestos and asbestos-containing products, in that Defendants and/or its "alternate entities" had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos, asbestos-containing products or products manufactured for foreseeable use with asbestos products, including, but not limited to, asbestosis, mesothelioma, lung cancer, and other lung damages. This knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of Defendants and/or its "alternate entities."

154.    Defendants and its "alternate entities" were aware that members of the general public and other "exposed persons," who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos, asbestos-containing products, or products manufactured for foreseeable use with asbestos products, could cause injury, and Defendants, and its "alternate entities," each of them, knew that members of the general public and other "exposed persons," who came in contact with asbestos and asbestos-containing products or products manufactured for foreseeable use with asbestos products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health and human life.

155.    The above-referenced conduct of Defendants, and its "alternate entities," was motivated by the financial interest of Defendants, its "alternate entities," and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, instructing, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection,

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos, asbestos-containing products and products manufactured for foreseeable use with asbestos products. Defendants, its "alternate entities," and each of them consciously disregarded the safety of "exposed persons" in pursuit of profit. Defendants was consciously willing and intended to permit asbestos and asbestos-containing products to cause injury to "exposed persons" without warning them of the potential hazards and further induced persons to work with and be exposed thereto, including Plaintiffs.

156.    Plaintiffs and other exposed persons did not know of the substantial danger of using Defendants' asbestos, asbestos containing-products, and products manufactured for foreseeable use with asbestos products. The dangers inherent in the use of these products were not readily recognizable by Plaintiffs, their family members, or other exposed persons. Defendants and/or its "alternate entities" further failed to adequately warn of the risks to which Plaintiffs and others similarly situated were exposed.

157.    Defendants and/or its "alternate entities" are liable for the fraudulent, oppressive, and malicious acts of its "alternate entities," and each Defendants' officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of its "alternate entities" as set forth herein.

158.    The herein-described conduct of Defendants, and its "alternate entities," was and is willful, malicious, fraudulent, and outrageous and in conscious disregard and indifference to the safety and health of persons foreseeably exposed.  Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof against all defendants.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

## FOR A SECOND CAUSE OF ACTION
### (Product Liability: Strict Liability - S.C. Code Ann. § 15-73-10, et seq.)

**As a Second and Distinct Cause of Action for Strict Liability, Plaintiffs Complain of Defendants, and Allege as Follows:**

159.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs.

160.    Plaintiffs suffered from asbestos related disease, including, mesothelioma and lung cancer, related to exposure to asbestos, asbestos-containing products and products manufactured for foreseeable use with asbestos products. Plaintiffs, nor their family members, were aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease.

161.    The Defendants' conduct and defective products as described above were a direct cause of Plaintiffs' injuries, and the injuries and damages thereby sustained by Plaintiffs.

162.    Furthermore, the Defendants' conduct and that of its "alternate entities" in continuing to market and sell products which they knew were dangerous to Plaintiffs and the public without adequate warnings or proper use instructions, was done in a conscious disregard and indifference to the safety and health of Plaintiffs and others similarly situated.

163.    Defendants and/or its "alternate entities" knew or should have known, and intended that the aforementioned asbestos and products containing asbestos would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to grinding, sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne

65

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

asbestos fibers, and that through such foreseeable use and/or handling, "exposed persons," including Plaintiffs, would use or be in proximity to and exposed to said asbestos fibers.

164.    Plaintiffs, their family members, and others in their vicinity used, handled or were otherwise exposed to asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products, referred to herein in a manner that was reasonably foreseeable. Plaintiffs' exposures to asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products occurred at various locations as set forth in this Complaint.

165.    Defendants and/or its "alternate entities" knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

166.    The asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that there was an alternative for asbestos that could have been used as the product or as a component instead of asbestos within a normally asbestos-containing/utilizing product. Said alternatives would have prevented Defendants' asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products from causing Plaintiffs' asbestos related diseases and in some circumstances, subsequent death, due to an inability of any asbestos-alternative to penetrate the pleural lining of the lung, even if inhaled. Said alternatives came at a comparable cost to each of the Defendants and/or its "alternate entities." Said alternatives were of comparable utility to the asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products of Defendants and/or its "alternate entities." The gravity of the potential harm resulting from the use of Defendants'

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

asbestos or asbestos-containing products, and the likelihood such harm would occur, far outweighed any additional cost or marginal loss of functionality in creating and/or utilizing an alternative design, providing adequate warning of such potential harm, and/or providing adequate use instructions for eliminating the health risks inherent in the use of their products, thereby rendering the same defective, unsafe and dangerous for use.

167.    The defect existed in the said products at the time they left the possession of Defendants, and/or its "alternate entities," and each of them. Said products were intended to reach the ultimate consumer in the same condition as it left defendants. Said products did, in fact, cause personal injuries, including mesothelioma, asbestosis, other lung damage, and cancer to "exposed persons," including Plaintiffs herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

168.    Plaintiffs and other exposed persons did not know of the substantial danger of using Defendants' asbestos, asbestos-containing products, or products manufactured for foreseeable use with asbestos products. The dangers inherent in the use of these products were not readily recognizable by Plaintiffs or other exposed persons. Said Defendants and/or its "alternate entities" further failed to adequately warn of the risks to which Plaintiffs and others similarly situated were exposed.

169.    Defendants' defective products as described above were a direct cause of Plaintiffs' injuries, and the damages thereby sustained.

170.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products, Defendants, and/or its "alternate entities," and each of them, did so with conscious disregard for the safety of Plaintiffs and other exposed persons who came in contact with the asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products, in that Defendants and/or its "alternate entities" had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products, including, but not limited to, mesothelioma, asbestosis, other lung damages and cancers. This knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of Defendants and/or its "alternate entities."

171.    Defendants and/or its "alternate entities" were aware that members of the public and other exposed persons, who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products could cause injury. Defendants and/or its "alternate entities" further knew that members of the general public and other exposed persons, who came in contact with asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products would assume, and in fact did assume, that exposure to asbestos and asbestos- containing products was safe, when in fact exposure was extremely hazardous to health and human life.

172.    The above-referenced conduct of Defendants and/or its "alternate entities" motivated by the financial interest of Defendants, its "alternate entities," and each of them, in the continuing and uninterrupted research, design, modification, manufacture, fabrication, labeling, instructing, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection,

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products. Defendants and/or its "alternate entities" consciously disregarded the safety of "exposed persons" in their pursuit of profit and in fact consciously intended to cause injury to Plaintiffs and other exposed persons and induced persons to work with, be exposed to, and thereby injured by asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products.

173.    Defendants are liable for the fraudulent, oppressive, and malicious acts of its "alternate entities," and each Defendants' officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and knew, or should have known of, the acts of each of its "alternate entities" as set forth herein.

174.    The conduct of said Defendants, its "alternate entities," and each of them as set forth in this Complaint, was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of exposed persons. Plaintiffs, for the sake of example and by way of punishing said Defendants, seeks punitive damages according to proof against Defendants.

175.    At all times herein mentioned, each of the named Defendants was an entity and/or the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, or division of an entity, hereinafter referred to collectively as "alternate entities," engaged in the business of researching, studying, manufacturing, fabricating, designing, modifying, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing,

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos, other products containing asbestos and products manufactured for foreseeable use with asbestos products.

### FOR A THIRD CAUSE OF ACTION
#### (Negligence *Per Se*)

**As a Third Distinct Cause of Action for Negligence *Per Se*, Plaintiffs Complain of Defendants, and Allege as Follows:**

176.     Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs.

177.     The actions and/or inactions of Defendants also constituted negligence *per se*.

178.     Defendants violated federal and state regulations relating to asbestos exposure. Such violations constitute negligence per se or negligence as a matter of law. Further, each such violation resulted in dangerous and unlawful exposures to asbestos for Plaintiffs. Plaintiffs are not making any claims under federal law; instead, Plaintiffs are simply using the violation of federal standards as proof of liability on state-law theories. Further, the reference to Federal regulations does not create a federal question. *See Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804 (1986). Any removal on this basis will be met with an immediate motion for remand and for sanctions.

179.     The negligence per se of Defendants was a proximate cause of Plaintiffs' injuries.

### FOR A FOURTH CAUSE OF ACTION
#### (Product Liability: Breach of Implied Warranties - S.C. Code Ann. § 36-2-314)

**As a Fourth Distinct Cause of Action for Breach of Implied Warranties, Plaintiffs Complain of Defendants and Allege as Follows:**

180.     Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

181.    Defendants and/or their "alternate entities" impliedly warranted that its asbestos materials or asbestos-containing products were of good and merchantable quality and fit for their intended use.

182.    The implied warranty made by the Defendants and/or their "alternate entities" that the asbestos and asbestos-containing products were of good and merchantable quality and fit for the particular intended use, was breached.  As a result of that breach, asbestos was given off into the atmosphere where Plaintiffs and/or their family members carried out duties and was inhaled by Plaintiffs.

183.    As a direct and proximate result of the breach of the implied warranty of good and merchantable quality and fitness for the particular intended use, Plaintiffs were exposed to Defendants' asbestos, asbestos-containing products, and/or products manufactured for foreseeable use with asbestos products and consequently developed mesothelioma, causing Plaintiffs to suffer all damages attendant thereto.

## FOR A FIFTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

**For a Fifth  Distinct Cause of Action for Fraudulent Misrepresentation, Plaintiffs Complain of Defendants, and Allege as Follows:**

184.    Plaintiffs repeat and re-alleges the portions of the above paragraphs where relevant.

185.    That during, before and after Plaintiffs' exposures to asbestos products manufactured by Defendants and/or their "alternate entities", the Defendants and/or their "alternate entities" falsely represented facts, including the dangers of asbestos exposure to Plaintiffs in the particulars alleged in the paragraphs above, while Defendants had actual knowledge of said dangers of asbestos exposure to persons such as Plaintiffs. At the same time of

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

these misrepresentations, Defendants knew of the falsity of its representations and/or made the representations in reckless disregard of their truth or falsity.

186.    The foregoing representations were material conditions precedent to Plaintiffs' continued exposure to asbestos-containing products.  Defendants and/or its "alternate entities" each intended that Plaintiffs act upon the representations by continuing his work around, and thereby exposure to, the asbestos products.  Plaintiffs and their family members  were ignorant of the falsity of Defendants' representations and rightfully relied upon the representations.

187.    As a direct and proximate result Plaintiffs' reliance upon Defendants' false representations, Plaintiffs suffered injury and damages as described herein.

## FOR A SIXTH CAUSE OF ACTION
### (Loss of Consortium)

**For a Sixth Distinct Cause of Action for Loss of Consortium, Plaintiffs Complain of Defendants, and Allege as Follows:**

188.    Plaintiffs incorporate by reference, the preceding paragraphs, where relevant.

189.    Deceased Plaintiffs', as identified on Exhibit A, were married and/or otherwise left surviving spouses, family members and heirs at the time of their passing.

190.    Prior to their injuries as alleged, Deceased Plaintiffs were able and did perform spousal and parental duties. As a proximate result thereof, subsequent to the injuries, Deceased Plaintiffs' were unable to perform spousal and parental duties and the work and service usually performed in the care, maintenance and management of the family home. As a proximate result thereof, Plaintiffs were deprived of the consortium of their spouses and family members including the performance of duties, all to Deceased Plaintiffs' damages, in an amount presently unknown to Plaintiffs but which will be proven at time of trial.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

191.    As a direct and proximate result of the acts of Defendants and/or their "alternate entities" and the severe injuries caused to Plaintiffs as set forth herein, Deceased Plaintiffs' spouses and family members suffered loss of consortium, including but not by way of limitation, loss of services, marital relations, parental relations, society, comfort, companionship, love, and affection of their spouses, and suffered severe mental and emotional distress and general nervousness. Plaintiffs pray judgment against Defendants, their "alternate entities" and each of them, as hereinafter set forth.

**FOR A SEVENTH CAUSE OF ACTION**
**(Wrongful Death Action, S.C. Code Ann. § 15-51-10, et seq.)**

**For a Seventh Distinct Cause of Action for Wrongful Death, Plaintiffs Complain of Defendants, and Allege as Follows:**

192.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs, where relevant.

193.    Plaintiffs bring this cause of action for Deceased Plaintiffs' wrongful death pursuant to S.C. Code Ann. § 15-51-10, for the benefit of the Estates of each Deceased Plaintiff, and on behalf of the heirs of Deceased Plaintiffs, as defined by S.C. Code § 15-51-20.

194.    As a direct and proximate result of the negligence, recklessness, carelessness, and intentional actions of Defendants as described above, Deceased Plaintiffs' died on the dates indicated on Exhibit A, and their surviving spouses and/or heirs have and will endure pecuniary loss, mental shock and suffering, wounded feelings, grief, sorrow, loss of love, loss of society with the Deceased Plaintiffs, loss of guidance, loss of companionship and deprivation of the use and comfort of the Deceased Plaintiffs' experience, knowledge and judgment in managing the affairs of himself and his beneficiaries, and they have been otherwise seriously damaged.  Moreover, reasonable funeral expenses were incurred, and

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Plaintiffs pray for judgment against Defendants in such amount of actual and punitive damages as the trier of fact may determine.

## FOR AN EIGHTH CAUSE OF ACTION
### (Survival Action, S.C. Code Ann. § 15-5-90)

**For an Eighth Distinct Cause of Action, known statutorily as a Survival Action, Plaintiffs Complains of Defendants, and Allege as Follows:**

195.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs, where relevant.

196.    Plaintiffs, as identified on Exhibit A hereto, are represented by their duly appointed Personal Representatives of the Deceased Plaintiffs' Estates, bring this survival action as allowed under S.C. Code Ann. § 15-5-90.

197.    Personal Representatives of the Plaintiffs bring this cause of action for Deceased Plaintiffs' medical, surgical and hospital bills, as well as for Deceased Plaintiffs' conscious pain and suffering prior to his untimely death, as well as for the mental distress of Deceased Plaintiffs due to knowledge of their impending death from these incurable diseases.

198.    As a direct and proximate result of the negligence, recklessness, carelessness, and in some cases intentional actions of Defendants as described, Deceased Plaintiffs endured conscious pain, suffering, mental anguish and distress until his untimely death, and Plaintiffs pray for judgment against Defendants in such amount of actual and punitive damages as the trier of fact may determine is just.

## FOR A NINTH CAUSE OF ACTION
### (Alter Ego and Veil Piercing Liability)
### (Against the Altrad Defendants, Charter Defendants and Oppenheimer Defendants)

**For a Ninth Distinct Cause of Action for Alter Ego and Veil Piercing Liability, Plaintiffs Complain of Altrad, Charter and Oppenheimer Defendants, and Allege as Follows:**

199.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

200.     South Carolina recognizes the imposition of liability under an "alter ego" theory based on a factual assessment of several factors, including: (i) common ownership; (ii) financial dependence; (iii) the degree of selection of executive personnel and failure to observe corporate formalities; and (iv) the degree of control over marketing and operational policies.

201.     Likewise, under a veil-piercing theory, South Carolina recognizes attaching liability to a shareholder through a two-part test involving, <u>first</u>, an eight-factor analysis of the shareholder's relationship to the corporation and, <u>second</u>, proof of an element of injustice or fundamental unfairness if the acts of the corporation are not regarded as the acts of the equity owners. As part of the first step, the eight factors are: (i) whether the corporation was grossly undercapitalized; (ii) failure to observe corporate formalities; (iii) non-payment of dividends; (iv) insolvency of the debtor corporation at the time; (v) siphoning of funds of the corporation by the dominant stockholder; (vi) non-functioning of other officers, directors, or stockholders; (vii) absence of corporate records; and (viii) the fact that the corporation was merely a façade for the operations of the dominant stockholder. In turn, to prove fundamental unfairness, the plaintiff must establish that: (i) the defendant was aware of the plaintiff's claim against the corporation, and (ii) thereafter, the defendant acted in a self-serving manner with regard to the property of the corporation and in disregard of the plaintiff's claim in the property.

202.     Numerous facts support the conclusion that, in furtherance of the ends of justice, the Court may exercise personal jurisdiction over the Altrad Defendants, the Charter Defendants and the Oppenheimer Defendants (collectively the "Alter-Ego Defendants") and impose liability on them for acts of Cape, which Alter-Ego Defendants are responsible for having dominated, controlled, facilitated, or benefited from, including, without limitation:

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

(a)     The sale and distribution of asbestos in the United States, including to facilities in South Carolina or in asbestos-containing products used in South Carolina;

(b)     The failure to follow corporate formalities between Cape and each of the Alter-Ego Defendants;

(c)     The common and intentionally obfuscated ownership interests of the Alter-Ego Defendants;

(d)     The financial, marketing, and operational dependence of Cape on those Alter-Ego Defendants;

(e)     The domination and control of Alter-Ego Defendants over Cape's and NAAC's executive personnel and boards of directors, which caused, among other things, NAAC to fail to safeguard the interests of personal-injury claimants by placing adequate products-liability insurance;

(f)     The funneling of assets out of the United States to escape attachment by personal- injury claimants, and the resulting gross undercapitalization of NAAC in the United States;

(g)     The absence of, and intentional destruction of, corporate records related to the events described herein;

(h)     The establishment or use of Cape and NAAC as sham entities and a façade for the operations of Oppenheimer interests in South Africa and elsewhere, thereby misrepresenting the true origin of Cape's products (including Cape's use of child laborers), the grave health hazards associated with those products, and the ownership of Cape's business (including ownership by African oligarchs); and

(i)     The self-serving actions of Alter-Ego Defendants, despite their having knowledge that Cape's asbestos and asbestos-containing products would cause bodily injury to tens of thousands of individuals in the United States, including in South Carolina, and result in claims for reimbursement.

203.    The damages alleged against Cape in the Asbestos Suits resulted from the actions of Alter-Ego Defendants or their predecessors in interest, which dominated, controlled, facilitated, or benefited from Cape's successful asbestos business and liability-avoidance scheme. Accordingly, the proper and appropriate remedy under the circumstances here is for the Court to declare that

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

the Alter-Ego Defendants are alter egos of Cape and thereby liable to Cape and/or the Receiver for Cape for Asbestos Suits.

### FOR A TENTH CAUSE OF ACTION
**(Amalgamation of Interests and Single Business Enterprise Liability)**
**(Against the Defendants Anglo American PLC, De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers UK Ltd., Charter Consolidated Ltd., ESAB Corporation, Central Mining & Investment Corporation Ltd., Altrad Investment Authority S.A.S.)**

**For a Tenth Distinct Cause of Action for Amalgamation of Interests and Single Business Enterprise Liability, Plaintiffs Complain of Defendants, and Allege as Follows:**

204.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

205.    Cape had or has unified, integrated, and intertwined business operations and resources with Anglo American PLC, De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers UK Ltd., Charter Consolidated Ltd., ESAB Corporation, Central Mining & Investment Corporation Ltd., and Altrad Investment Authority S.A.S.(collectively the "Amalgamation Defendants") to achieve a common business purpose.

206.    In turn, Amalgamation Defendants acted or continue to act with Cape and its affiliated entities as part of an amalgamation of interests and single business enterprise, which gives rise to the claims against them, including through (i) longstanding business activities directed at the United States, including South Carolina, including with respect to the mining, marketing, and distribution of asbestos and other minerals, and/or (ii) implementing or perpetuating an ongoing scheme to evade responsibility for harm caused to South Carolinians, as well as other Americans, by Cape's asbestos, while also financially benefiting from that scheme.

207.    Because the Amalgamation Defendants were or are intertwined with Cape and acting with a common business purpose, there has been bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions with Cape, including their

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

continuing to benefit from Cape's historical sale of asbestos and evasion of its associated liabilities to tort victims within the United States, including South Carolina, by avoiding answering to U.S. creditors and other injured parties for their asbestos-related injuries and harm.

208.    Thus, each Amalgamation Defendants (including predecessors in interest) was or is part of an amalgamated, single business enterprise with respect to the mining, production, manufacture, and distribution of asbestos fiber and/or the perpetuation of Cape's liability-avoidance scheme.

209.    As a result of these relationships, persons have allegedly been harmed, with the damages alleged against Cape in the Asbestos Suits resulting from the actions of the Amalgamation Defendants (including their predecessors in interest).

210.    Accordingly, the proper and appropriate remedy under the circumstances here is for the Court to declare that the Amalgamation Defendants were or are part of an amalgamation of interests and common business enterprise with Cape, and thereby liable to Cape and/or the Receiver for Asbestos Suits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment, joint and several, against Defendants and/or its "alternate entities" in an amount to be proved at trial, as follows:

1.    For Plaintiffs' actual damages according to proof, including pain and suffering, mental distress, as well as medical, surgical and hospital bills;

2.    For loss of income or earnings according to proof;

3.    For loss of care, comfort and society;

4.    For the Deceased Plaintiffs, or pecuniary loss of the beneficiaries/heirs including but not limited to funeral and burial costs, for mental shock and suffering of the beneficiaries/heirs,

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

for wounded feelings of the beneficiaries/heirs, for grief and sorrow of the beneficiaries/heirs, loss of his companionship and deprivation of the use and comfort of the Decedents' experience, knowledge and judgment in managing the affairs of their beneficiaries;

5.     For punitive damages according to proof;

6.     For Plaintiffs' cost of suit herein;

7.     For damages for breach of implied warranty according to proof;

8.     For damages for fraudulent misrepresentation according to proof;

9.     All economic and non-economic damages allowed pursuant to the Survival and Wrongful Death Act;

10.    For a declaration that the Alter-Ego Defendants are the Alter Ego of Cape;

11.    For a declaration that the Amalgamation Defendants were or are part of an amalgamation of interests and common business enterprise with Cape, and thereby liable to Cape and/or the Receiver for Asbestos Suits; and

10.    For such other and further relief as the Court may deem just and proper, including costs and prejudgment interest as provided by South Carolina law.


[THIS SPACE INTENTIONALLY LEFT BLANK]

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.**

Respectfully submitted,

*/s/ Charles W. Branham, III*
Charles W. Branham, III (SC Bar No. 106178)
**DEAN OMAR BRANHAM SHIRLEY, LLP**
302 N. Market Street, Suite 300
Dallas, Texas 75202
T: 214-722-5990
F: 214-722-5991
tbranham@dobslegal.com
Other email: tgilliland@dobslegal.com

*and*

*/s/ Theile B. McVey*
Theile B. McVey (SC Bar No. 16682)
Jamie D. Rutkoski (SC Bar No. 103270)
**KASSEL MCVEY ATTORNEYS AT LAW**
1330 Laurel Street
Columbia, South Carolina 29202
T: 803-256-4242
F: 803-256-1952
tmcvey@kassellaw.com
jrutkoski@kassellaw.com
Other email: emoultrie@kassellaw.com

**ATTORNEYS FOR PLAINTIFFS**

November 11, 2024
Columbia, South Carolina.

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

# EXHIBIT A

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| INJURED PARTY'S NAME | DISEASE | DATE of DX | DATE of DEATH (if Applicable) |
|---|---|---|---|
| Adams, Augustus A. | Meso - PL | 08/17/21 | n/a |
| Agner, Vonnie K. | Meso - PL | 09/05/19 | 07/18/20 |
| Anderson, Jr., Allan N. | Meso - PL | 02/02/23 | n/a |
| Arsenith, George J. | Meso - Other | 03/04/24 - 04/08/24 | n/a |
| Barnhart, Jr., Donald | Meso - PL | 05/29/24 | n/a |
| Barone, Nicholas | Meso - PL | 05/13/22 | 06/14/23 |
| Boetsch, Richard J. | Meso - PE | 11/16/20 | 07/03/22 |
| Bostian, Hoyle Steven | Meso - PE | 07/22/21 | 12/05/21 |
| Bowery, Leon B. | Meso - PL | 05/25/21 | 12/15/22 |
| Brookshire, Ronald J. | Lung Cancer | 12/14/23 | n/a |
| Chambers, Wallace B. | Meso - PE | 03/23/22 | 02/17/23 |
| Childers, Lewis C. | Lung Cancer | 04/02/20 | 05/13/20 |
| Christensen, David E. | Meso - PL | 11/09/22 | n/a |
| Cook, Roland | Meso - PL | 01/11/21 | 03/27/22 |
| Cox, Sr., Don R. | Lung Cancer | 02/03/23 | n/a |

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | | |
|---|---|---|---|
| Creekmore, Mary M. | Meso - PL | 10/29/21 | 09/27/22 |
| Davis, James F. | Meso - PL | 03/10/22 | n/a |
| Efird, Robin M. | Meso - PL | 07/30/19 | 02/07/20 |
| Ferrell, Charles | Lung Cancer | 05/10/23 | n/a |
| Fitzgerald, Dennis J. | Meso - Other | 08/15/19 | 01/17/21 |
| Flynn, Jerry K. | Meso - PL | 01/05/23 | 02/07/23 |
| Gee, Michael | Meso - PL | 10/03/22 | 12/12/23 |
| Giroir, Glenda T. | Meso - PL | 10/18/23 | n/a |
| Gonce, Dwight | Meso - PL | 06/16/22 | 12/25/22 |
| Gosnell, George N. | Meso - PE | Jan/Feb 2024 | n/a |
| Green, Robert J. | Lung Cancer | 10/08/21 | 10/23/21 |
| Greene, Christopher | Meso - PL | 02/05/15 | 12/29/20 |
| Harding, Kenneth D. | Meso - PL | 08/09/23 | 09/11/23 |
| Hartsell, Jerry G. | Meso - PL | 02/28/24 | 06/29/24 |
| Hilster, Shirley A. | Meso - PL | 07/20/20 | 10/11/20 |
| Hunt, Lesley D. | Meso - PL | 02/07/22 | 04/01/23 |

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | | |
|---|---|---|---|
| Johnson, Michael D. | Meso - PL | 05/05/23 | n/a |
| Kelly, Sr., Theodore L. | Meso - PL | 08/04/22 | n/a |
| Kennon, James H. | Lung Cancer | 03/06/20 | 05/27/20 |
| King, Richard D. | Meso - PL | 06/23/23 | 10/01/23 |
| Kotzerke, Steven D. | Lung Cancer | 10/13/22 | 09/20/22 |
| Lackey, Gary S. | LC/non-smoking markers | 06/26/23 | n/a |
| Lamm, Michael H. | Meso - PL | 01/20/22 | 06/06/23 |
| LeBlanc, Robert P. | Meso - PL | 10/23/23 | n/a |
| Link, Michael David | Meso - PL | 08/15/22 | n/a |
| Long, Richard | Meso - PL | 04/04/23 | n/a |
| Love, Jr., James E. | Meso - PL | 04/22/21 | n/a |
| Lynn, Robert W. | Meso - PE | 04/08/24 | n/a |
| Marcher, Nikolaus J. | Meso - PL | 04/06/21 | 11/09/22 |
| McDowell, Donald | Meso - PL | 08/03/23 | n/a |
| McGuire, Philip J. | Asbestosis & Pleural Plaques | 01/12/07 | n/a |
| McKelvey, Paul R. | Meso - PL | 06/19/19 | 09/03/19 |

| | | | |
|---|---|---|---|
| Milam, Jimmie R. | Meso - PL | 10/23/21 | 04/06/22 |
| Mitchell, Ted Everette | Lung Cancer | 08/27/21 | 02/17/24 |
| Mogg, Nelson W. | Meso - PL | 10/25/23 | n/a |
| Monlux, Richard A. | Meso - PL | 03/17/23 | 08/07/23 |
| Mullins, Gary | Meso - PL | 06/29/22 | n/a |
| O'Loughlin, Leonard | Meso - Other | 08/17/22 | n/a |
| Olive, Everett | Meso - Other | 07/13/22 | 08/07/22 |
| Patterson, Jr., John K. | Meso - PL | 09/17/18 | 12/14/19 |
| Payne, Shelby Linville | Meso - PL | 11/29/21 | 04/13/22 |
| Peifer, Ronald M. | Meso - PL | 04/23/21 | 05/26/22 |
| Pelfrey, Richard R. | Meso - Other | 09/17/24 | n/a |
| Perkins, Patricia L. | Meso - PL | 06/22/21 | 06/19/21 |
| Pierce, Linwood W. | Meso - PL | 05/21/21 | n/a |
| Pike, Marshall E. | Meso - PL | 09/30/21 | 06/21/23 |
| Ray, Robert B. | Meso - PL | 02/07/24 | n/a |
| Roberts, Jackie D. | Meso - PL | 09/06/24 | n/a |

| | | | |
|---|---|---|---|
| Robichaud, Gary P. | Meso - Other | 03/09/22 | 11/02/23 |
| Robinson, Anthony D. | Meso - PL | 04/22/24 | 06/19/24 |
| Ross, Jerry P. | Meso - PL | 04/04/24 | n/a |
| Scoggins, David M. | Meso - PL | 09/10/19 | 01/20/21 |
| Scoggins, David C. | Meso - PL | 06/21/22 | 06/12/24 |
| Sellars, Larry Gene | Lung Cancer | 09/08/23 | n/a |
| Shipman, Charles E. | Meso - PL | 02/05/21 | 04/25/21 |
| Sims, Donald E. | Lung Cancer | 04/06/20 | 05/24/20 |
| Spayd, Jr., George R. | Meso - PL | 05/16/23 | n/a |
| Spence, Rodney L. | Meso - PL | 08/28/20 | 09/10/20 |
| Sylvester, Eugene L. | Meso - PL | 04/05/23 | 05/12/23 |
| Taylor, Bradley D. | Meso - PE | 12/01/21 | 06/07/22 |
| Taylor, Horace E. | Lung Cancer | 11/06/17 | 12/05/19 |
| Tibbs, John A. | Lung Cancer | 12/15/22 | n/a |
| Welch, Melvin G. | Meso - PL | 06/27/22 | 04/17/23 |
| Wilkinson, Rosalie | Meso - PL | 04/18/24 | n/a |

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | | |
|---|---|---|---|
| Williams, Richard A. | Meso - PL | 01/12/24 | n/a |
| Wright, Bruce S. | Meso - PL | 11/13/22 | n/a |

ELECTRONICALLY FILED - 2024 Nov 12 12:36 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 4:52 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF RICHLAND | ) | FOR THE FIFTH JUDICIAL CIRCUIT |
| | ) | |
| AUGUSTUS A. ADAMS, *et al.,* | ) | C/A No.:   2024CP4006639 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ACCEPTANCE OF SERVICE** |
| | ) | |
| CAPE PLC, *etc., et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

I, Peter Protopapas, as attorney for above-named Defendant CAPE PLC, do hereby accept service on their behalf of the **SUMMONS and COMPLAINT,** along with the Exhibit in the above-entitled matter, on this ___ day of November 2024.

Peter Protopapas
Rikard & Protopapas
2110 N Beltline Blvd.
Columbia SC 29204

Columbia, South Carolina.

# Certificate of Electronic Notification

| Recipients |
| --- |
| **John Kassel**  - Notification transmitted on 11-12-2024 04:53:17 PM. |
| **Jamie Rutkoski**  - Notification transmitted on 11-12-2024 04:53:17 PM. |
| **Theile McVey**  - Notification transmitted on 11-12-2024 04:53:16 PM. |

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

****** IMPORTANT NOTICE - READ THIS INFORMATION *****

NOTICE OF ELECTRONIC FILING [NEF]

–

**A filing has been submitted to the court RE:** 2024CP4006639

**Official File Stamp:**               11-12-2024 04:52:55 PM

**Court:**                             CIRCUIT COURT

                                       Common Pleas

                                       Richland

**Case Caption:**                      Augusts A Adams , plaintiff, et al vs Cape Plc , defendant, et al

**Document(s) Submitted:**             Service/Acceptance Of Service

**Filed by or on behalf of:**          Theile Branham McVey

This notice was automatically generated by the Court's auto-notification system.

–

**The following people were served electronically:**

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Jamie Rae Rutkoski for Augusts A Adams, Joan M Love, Margaret B Tibbs, John A Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara Sylvester, Terry Sylvester, Della Jeanette Kennedy, George R Spayd, Jr, Michael L Sims, Danielle B Shipman, James E Love, Jr, Anna Marie S Pritchett, Glenda K Sellars, Larry G Sellars, Kathleen Scoggins, Schantel R Green, Shannon Lynne Tesseniar, David D Scoggins, Deborah Robichaud, Alyce M Scoggins, Victoria A Roberts, Richard Long, Paulette W Ross, Jackie D Roberts, Jerry P Ross, Bessie E Ray, Joyce J Robinson, Robert B Ray, Jason Andrew Pike, Shane Chadwick Pike, Bridget Pierce, Mary Barnhart, Sandra Strickland Link, Linwood W Pierce, Donald Barnhart, Jr, Christine A Arsenith, George J Arsenith, Cynthia Anderson, Allan N Anderson, Jr, Tommy D Agner, Sr, Diane Adams, Curtis R Perkins, Patricia H Pelfrey, Michael D Link, Richard R Pelfrey, Dorene L Peifer, Shannon Payne Lancaster, Kelly Payne Clark, Judith D Patterson, Michelle Olive, Karen Reissfelder, Leonard O'Loughlin, Arvella Mullins, Gary Mullins, Robert P Leblanc, Elaine M Monlux, Dorothy Mogg, Nelson W Mogg, Martha M Wilson, Sharon M Milam, David P Mckelvey, Patrice Mcguire, Philip J Mcguire, Patricia Lamm, Virginia C Lackey, Gary S Lackey, Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan K Mccarty, Berenice M Kelly, Theodore L Kelly, Sr, Kristi R Johnson, Michael D Johnson, Zachary D Hunt, Misti K Crawley, Shirley Ann Caprin, Joan Hartsell, Cindy Hartsell Martin, Kristen R Helton, Michelle L Mccormick, Rachel P Greene, Evelyn V Green, Rhonda V Mcdowell, Terry L Green, Sr, Patricia C Gosnell, George N Gosnell, Sandra M Gonce, Dale Giroir, Glenda T Giroir, Amy Gee, Donald Mcdowell, Ricky Dean Flynn, Wendy M Fitzgerald, Patricia A Ferrell, Charles Ferrell, Linda Efird, Robbie M Efird, Vera C Davis, James F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus

Marcher, Linda A Cook, Linda G Christensen,
David E Christensen, Lenora Childers, Alicia
Knight, Belvia R Brookshire, Craig R Hagan,
Ronald J Brookshire, Tracy Bowery Meyer,
Brenda E Bostian, Leah Sandford, Richard Tree,
Karen J Lynn, Kathryn Barone, Robert W Lynn,
Louise K Wright, Bruce S Wright, Nancy N
Williams, Richard A Williams, Harry Wilkinson,
Rosalie Wilkinson, Donna B Welch

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

John D. Kassel for Augusts A Adams, Joan M Love, Margaret B Tibbs, John A Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara Sylvester, Terry Sylvester, Della Jeanette Kennedy, George R Spayd, Jr, Michael L Sims, Danielle B Shipman, James E Love, Jr, Anna Marie S Pritchett, Glenda K Sellars, Larry G Sellars, Kathleen Scoggins, Schantel R Green, Shannon Lynne Tesseniar, David D Scoggins, Deborah Robichaud, Alyce M Scoggins, Victoria A Roberts, Richard Long, Paulette W Ross, Jackie D Roberts, Jerry P Ross, Bessie E Ray, Joyce J Robinson, Robert B Ray, Jason Andrew Pike, Shane Chadwick Pike, Bridget Pierce, Mary Barnhart, Sandra Strickland Link, Linwood W Pierce, Donald Barnhart, Jr, Christine A Arsenith, George J Arsenith, Cynthia Anderson, Allan N Anderson, Jr, Tommy D Agner, Sr, Diane Adams, Curtis R Perkins, Patricia H Pelfrey, Michael D Link, Dorene L Peifer, Shannon Payne Lancaster, Kelly Payne Clark, Judith D Patterson, Michelle Olive, Karen Reissfelder, Leonard O'Loughlin, Arvella Mullins, Gary Mullins, Robert P Leblanc, Elaine M Monlux, Dorothy Mogg, Nelson W Mogg, Martha M Wilson, Sharon M Milam, David P Mckelvey, Patrice Mcguire, Philip J Mcguire, Patricia Lamm, Virginia C Lackey, Gary S Lackey, Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan K Mccarty, Berenice M Kelly, Theodore L Kelly, Sr, Kristi R Johnson, Michael D Johnson, Zachary D Hunt, Misti K Crawley, Shirley Ann Caprin, Joan Hartsell, Cindy Hartsell Martin, Kristen R Helton, Michelle L Mccormick, Rachel P Greene, Evelyn V Green, Rhonda V Mcdowell, Terry L Green, Sr, Patricia C Gosnell, George N Gosnell, Sandra M Gonce, Dale Giroir, Glenda T Giroir, Amy Gee, Donald Mcdowell, Ricky Dean Flynn, Wendy M Fitzgerald, Patricia A Ferrell, Charles Ferrell, Linda Efird, Robbie M Efird, Vera C Davis, James F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus Marcher, Linda A Cook, Linda G

Christensen, David E Christensen, Lenora
Childers, Alicia Knight, Belvia R Brookshire, Craig
R Hagan, Ronald J Brookshire, Tracy Bowery
Meyer, Brenda E Bostian, Leah Sandford,
Richard Tree, Karen J Lynn, Kathryn Barone,
Robert W Lynn, Louise K Wright, Bruce S Wright,
Nancy N Williams, Richard A Williams, Harry
Wilkinson, Rosalie Wilkinson, Donna B Welch

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Theile Branham McVey for Augusts A Adams, Joan M Love, Margaret B Tibbs, John A Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara Sylvester, Terry Sylvester, Della Jeanette Kennedy, George R Spayd, Jr, Michael L Sims, Danielle B Shipman, James E Love, Jr, Anna Marie S Pritchett, Glenda K Sellars, Larry G Sellars, Kathleen Scoggins, Schantel R Green, Shannon Lynne Tesseniar, David D Scoggins, Deborah Robichaud, Alyce M Scoggins, Victoria A Roberts, Richard Long, Paulette W Ross, Jackie D Roberts, Jerry P Ross, Bessie E Ray, Joyce J Robinson, Robert B Ray, Jason Andrew Pike, Shane Chadwick Pike, Bridget Pierce, Mary Barnhart, Sandra Strickland Link, Linwood W Pierce, Donald Barnhart, Jr, Christine A Arsenith, George J Arsenith, Cynthia Anderson, Allan N Anderson, Jr, Tommy D Agner, Sr, Diane Adams, Curtis R Perkins, Patricia H Pelfrey, Michael D Link, Richard R Pelfrey, Dorene L Peifer, Shannon Payne Lancaster, Kelly Payne Clark, Judith D Patterson, Michelle Olive, Karen Reissfelder, Leonard O'Loughlin, Arvella Mullins, Gary Mullins, Robert P Leblanc, Elaine M Monlux, Dorothy Mogg, Nelson W Mogg, Martha M Wilson, Sharon M Milam, David P Mckelvey, Patrice Mcguire, Philip J Mcguire, Patricia Lamm, Virginia C Lackey, Gary S Lackey, Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan K Mccarty, Berenice M Kelly, Theodore L Kelly, Sr, Kristi R Johnson, Michael D Johnson, Zachary D Hunt, Misti K Crawley, Shirley Ann Caprin, Joan Hartsell, Cindy Hartsell Martin, Kristen R Helton, Michelle L Mccormick, Rachel P Greene, Evelyn V Green, Rhonda V Mcdowell, Terry L Green, Sr, Patricia C Gosnell, George N Gosnell, Sandra M Gonce, Dale Giroir, Glenda T Giroir, Amy Gee, Donald Mcdowell, Ricky Dean Flynn, Wendy M Fitzgerald, Patricia A Ferrell, Charles Ferrell, Linda Efird, Robbie M Efird, Vera C Davis, James F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus

Marcher, Linda A Cook, Linda G Christensen, David E Christensen, Lenora Childers, Alicia Knight, Belvia R Brookshire, Craig R Hagan, Ronald J Brookshire, Tracy Bowery Meyer, Brenda E Bostian, Leah Sandford, Richard Tree, Karen J Lynn, Kathryn Barone, Robert W Lynn, Louise K Wright, Bruce S Wright, Nancy N Williams, Richard A Williams, Harry Wilkinson, Rosalie Wilkinson, Donna B Welch

**The following people have not been served electronically by the Court. Therefore, they must be served by traditional means:**

Anglo American Us Holdings Inc

Element Six Us Corp

Element Six Technologies Us Corp

Executor Of The Estate Of Gary P Robichaud

Legal Heir To David M Scoggins

Personal Rep Of The Estate Of Anthony D Robinson

Legal Heir To David M Scoggins

Special Admin Of The Estate Of David C Scoggins

Personal Rep Of The Estate Of Charles E Shipman

Personal Rep Of The Estate Of Donald E Sims

Administrator Of The Estate Of Rodney L Spence

Administrator Of The Estate Of Ann Taylor Spence

Personal Rep Of The Estate Of Eugene L Sylvester

Element Sic Technologies Or Corp

First Mode Holdings Inc

Platinum Guild International Usa Jewelry Inc

Lightbox Jewelry Inc

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Forevermark Us Inc

Anglo American Crop Nutrients Usa Llc

Charter Consolidated Ltd

Esab Corporation

Central Mining & Investment Corporation Ltd

Administrator Of The Estate Of Bradley D Taylor

Personal Rep Of The Estate Of Horace E Taylor

Personal Rep Of The Estate Of Melvin G Welch

Successor In Interest To Richard J Boetsch

Personal Rep Of The Estate Of Hoyle S Bostian

Personal Rep Of The Estate Of Leon B Bowery

Cape Industrial Services Ltd

Administratrix Of The Estate Of Wallace B Chambers

Personal Rep Of The Estate Of Lewis C Childers

Executor Of The Estate Of Ronald Cook

Cape Holdco Ltd

The Law Debenture Corporation Plc

Mohed Altrad

Altrad Uk Ltd

Cape Uk Holdings Newco Ltd

Personal Rep Of The Estate Of Paul R Mckelvey

Independent Executor Of The Estate Of Jimmie R Milam

Personal Rep Of The Estate Of Ted E Mitchell

Executor Of The Estate Of Richard A Monlux

Executor Of The Estate Of Everette R Olive

Executor Of The Estate Of Mary M Creekmore

Administrator Of The Estate Of Robin M Efird

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Special Admin Of The Estate Of Dennis J Fitzgerald

Executor Of The Estate Of Jerry K Flynn

Personal Rep Of The Estate Of Michael L Gee

Executrix Of The Estate Of Dwight Gonce

Anglo American Corporation Of South Africa Ltd

Personal Rep Of The Estate Of Robert J Green

Personal Rep Of The Estate Of Christopher Greene

Co-Personal Rep Of The Estate Of Kenneth D Harding

Altrad Services Ltd

Altrad Investment Authority S A S

Executor Of The Estate Of John K Patterson Jr

Co-Executors Of The Estate Of Shelby L Payne

Co-Executors Of The Estate Of Shelby L Payne

Trustee For The Next-Of-Kin For Ronald M Peifer

Executor Of The Estate Of Patricia L Perkins

Executor Of The Estate Of Vonnie K Agner

Executrix Of The Estate Of Nicholas Barone

Co-Executors Of The Estate Of Marshall E Pike

Co-Executors Of The Estate Of Marshall E Pike

Successor In Interest To David M Scoggins

Co-Personal Rep Of The Estate Of Kenneth D Harding

Personal Rep Of The Estate Of Jerry G Hartsell

Independent Executor Of The Estate Of Shirley A Hilster

Personal Rep Of The Estate Of Lesley D Hunt

Executor Of The Estate Of James H Kennon

Personal Rep Of The Estate Of Richard D King

ELECTRONICALLY FILED - 2024 Nov 12 4:54 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Executor Of The Estate Of Steven D Kotzerke

Personal Rep Of The Estate Of Michael H Lamm

Personal Rep Of The Estate Of Nikolaus J Marcher

Legal Heir To Nikolaus J Marcher

Cape Industries Ltd

Cape Asbestos Company Ltd

Anglo American Plc

De Beers Plc

De Beers Centenary Ag

De Beers Consolidated Mines Ltd

De Beers S A

De Beers Uk Ltd

De Beers Jewellers Us Inc

De Beers Jewellers Us Inc

Cape Plc

# Certificate of Electronic Notification

| Recipients |
| --- |
| **John Kassel** - Notification transmitted on 11-18-2024 03:59:59 PM. |
| **Jamie Rutkoski** - Notification transmitted on 11-18-2024 03:59:59 PM. |
| **Theile McVey** - Notification transmitted on 11-18-2024 03:59:59 PM. |

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

<p style="color:red; text-align:center;">****** IMPORTANT NOTICE - READ THIS INFORMATION *****</p>
<p style="color:red; text-align:center;">NOTICE OF ELECTRONIC FILING [NEF]</p>

–

**A filing has been submitted to the court RE:** 2024CP4006639

| | |
|---|---|
| **Official File Stamp:** | 11-18-2024 03:59:34 PM |
| **Court:** | CIRCUIT COURT |
| | Common Pleas |
| | Richland |
| **Case Caption:** | Augusts A Adams , plaintiff, et al vs Cape Plc , defendant, et al |

**Event(s):**

Notice/Notice of Appearance    **Filed by or on behalf of:**

Charles William Branham, III

This notice was automatically generated by the Court's auto-notification system.

–

**The following people were served electronically:**

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Jamie Rae Rutkoski for Augusts A Adams, Joan M Love, Margaret B Tibbs, John A Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara Sylvester, Terry Sylvester, Della Jeanette Kennedy, George R Spayd, Jr, Michael L Sims, Danielle B Shipman, James E Love, Jr, Anna Marie S Pritchett, Glenda K Sellars, Larry G Sellars, Kathleen Scoggins, Schantel R Green, Shannon Lynne Tesseniar, David D Scoggins, Deborah Robichaud, Alyce M Scoggins, Victoria A Roberts, Richard Long, Paulette W Ross, Jackie D Roberts, Jerry P Ross, Bessie E Ray, Joyce J Robinson, Robert B Ray, Jason Andrew Pike, Shane Chadwick Pike, Bridget Pierce, Mary Barnhart, Sandra Strickland Link, Linwood W Pierce, Donald Barnhart, Jr, Christine A Arsenith, George J Arsenith, Cynthia Anderson, Allan N Anderson, Jr, Tommy D Agner, Sr, Diane Adams, Curtis R Perkins, Patricia H Pelfrey, Michael D Link, Richard R Pelfrey, Dorene L Peifer, Shannon Payne Lancaster, Kelly Payne Clark, Judith D Patterson, Michelle Olive, Karen Reissfelder, Leonard O'Loughlin, Arvella Mullins, Gary Mullins, Robert P Leblanc, Elaine M Monlux, Dorothy Mogg, Nelson W Mogg, Martha M Wilson, Sharon M Milam, David P Mckelvey, Patrice Mcguire, Philip J Mcguire, Patricia Lamm, Virginia C Lackey, Gary S Lackey, Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan K Mccarty, Berenice M Kelly, Theodore L Kelly, Sr, Kristi R Johnson, Michael D Johnson, Zachary D Hunt, Misti K Crawley, Shirley Ann Caprin, Joan Hartsell, Cindy Hartsell Martin, Kristen R Helton, Michelle L Mccormick, Rachel P Greene, Evelyn V Green, Rhonda V Mcdowell, Terry L Green, Sr, Patricia C Gosnell, George N Gosnell, Sandra M Gonce, Dale Giroir, Glenda T Giroir, Amy Gee, Donald Mcdowell, Ricky Dean Flynn, Wendy M Fitzgerald, Patricia A Ferrell, Charles Ferrell, Linda Efird, Robbie M Efird, Vera C Davis, James F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus

Marcher, Linda A Cook, Linda G Christensen,
David E Christensen, Lenora Childers, Alicia
Knight, Belvia R Brookshire, Craig R Hagan,
Ronald J Brookshire, Tracy Bowery Meyer,
Brenda E Bostian, Leah Sandford, Richard Tree,
Karen J Lynn, Kathryn Barone, Robert W Lynn,
Louise K Wright, Bruce S Wright, Nancy N
Williams, Richard A Williams, Harry Wilkinson,
Rosalie Wilkinson, Donna B Welch

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

John D. Kassel for Augusts A Adams, Joan M
Love, Margaret B Tibbs, John A Tibbs, Shirley
Butts Taylor, Sandra F Taylor, Sara Sylvester,
Terry Sylvester, Della Jeanette Kennedy, George
R Spayd, Jr, Michael L Sims, Danielle B
Shipman, James E Love, Jr, Anna Marie S
Pritchett, Glenda K Sellars, Larry G Sellars,
Kathleen Scoggins, Schantel R Green, Shannon
Lynne Tesseniar, David D Scoggins, Deborah
Robichaud, Alyce M Scoggins, Victoria A
Roberts, Richard Long, Paulette W Ross, Jackie
D Roberts, Jerry P Ross, Bessie E Ray, Joyce J
Robinson, Robert B Ray, Jason Andrew Pike,
Shane Chadwick Pike, Bridget Pierce, Mary
Barnhart, Sandra Strickland Link, Linwood W
Pierce, Donald Barnhart, Jr, Christine A Arsenith,
George J Arsenith, Cynthia Anderson, Allan N
Anderson, Jr, Tommy D Agner, Sr, Diane Adams,
Curtis R Perkins, Patricia H Pelfrey, Michael D
Link, Dorene L Peifer, Shannon Payne Lancaster,
Kelly Payne Clark, Judith D Patterson, Michelle
Olive, Karen Reissfelder, Leonard O'Loughlin,
Arvella Mullins, Gary Mullins, Robert P Leblanc,
Elaine M Monlux, Dorothy Mogg, Nelson W
Mogg, Martha M Wilson, Sharon M Milam, David
P Mckelvey, Patrice Mcguire, Philip J Mcguire,
Patricia Lamm, Virginia C Lackey, Gary S Lackey,
Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan
K Mccarty, Berenice M Kelly, Theodore L Kelly,
Sr, Kristi R Johnson, Michael D Johnson, Zachary
D Hunt, Misti K Crawley, Shirley Ann Caprin,
Joan Hartsell, Cindy Hartsell Martin, Kristen R
Helton, Michelle L Mccormick, Rachel P Greene,
Evelyn V Green, Rhonda V Mcdowell, Terry L
Green, Sr, Patricia C Gosnell, George N Gosnell,
Sandra M Gonce, Dale Giroir, Glenda T Giroir,
Amy Gee, Donald Mcdowell, Ricky Dean Flynn,
Wendy M Fitzgerald, Patricia A Ferrell, Charles
Ferrell, Linda Efird, Robbie M Efird, Vera C Davis,
James F Davis, Jay S Creekmore, Don R Cox,
Sr, Klaus Marcher, Linda A Cook, Linda G

Christensen, David E Christensen, Lenora
Childers, Alicia Knight, Belvia R Brookshire, Craig
R Hagan, Ronald J Brookshire, Tracy Bowery
Meyer, Brenda E Bostian, Leah Sandford,
Richard Tree, Karen J Lynn, Kathryn Barone,
Robert W Lynn, Louise K Wright, Bruce S Wright,
Nancy N Williams, Richard A Williams, Harry
Wilkinson, Rosalie Wilkinson, Donna B Welch

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Theile Branham McVey for Augusts A Adams, Joan M Love, Margaret B Tibbs, John A Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara Sylvester, Terry Sylvester, Della Jeanette Kennedy, George R Spayd, Jr, Michael L Sims, Danielle B Shipman, James E Love, Jr, Anna Marie S Pritchett, Glenda K Sellars, Larry G Sellars, Kathleen Scoggins, Schantel R Green, Shannon Lynne Tesseniar, David D Scoggins, Deborah Robichaud, Alyce M Scoggins, Victoria A Roberts, Richard Long, Paulette W Ross, Jackie D Roberts, Jerry P Ross, Bessie E Ray, Joyce J Robinson, Robert B Ray, Jason Andrew Pike, Shane Chadwick Pike, Bridget Pierce, Mary Barnhart, Sandra Strickland Link, Linwood W Pierce, Donald Barnhart, Jr, Christine A Arsenith, George J Arsenith, Cynthia Anderson, Allan N Anderson, Jr, Tommy D Agner, Sr, Diane Adams, Curtis R Perkins, Patricia H Pelfrey, Michael D Link, Richard R Pelfrey, Dorene L Peifer, Shannon Payne Lancaster, Kelly Payne Clark, Judith D Patterson, Michelle Olive, Karen Reissfelder, Leonard O'Loughlin, Arvella Mullins, Gary Mullins, Robert P Leblanc, Elaine M Monlux, Dorothy Mogg, Nelson W Mogg, Martha M Wilson, Sharon M Milam, David P Mckelvey, Patrice Mcguire, Philip J Mcguire, Patricia Lamm, Virginia C Lackey, Gary S Lackey, Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan K Mccarty, Berenice M Kelly, Theodore L Kelly, Sr, Kristi R Johnson, Michael D Johnson, Zachary D Hunt, Misti K Crawley, Shirley Ann Caprin, Joan Hartsell, Cindy Hartsell Martin, Kristen R Helton, Michelle L Mccormick, Rachel P Greene, Evelyn V Green, Rhonda V Mcdowell, Terry L Green, Sr, Patricia C Gosnell, George N Gosnell, Sandra M Gonce, Dale Giroir, Glenda T Giroir, Amy Gee, Donald Mcdowell, Ricky Dean Flynn, Wendy M Fitzgerald, Patricia A Ferrell, Charles Ferrell, Linda Efird, Robbie M Efird, Vera C Davis, James F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus

Marcher, Linda A Cook, Linda G Christensen, David E Christensen, Lenora Childers, Alicia Knight, Belvia R Brookshire, Craig R Hagan, Ronald J Brookshire, Tracy Bowery Meyer, Brenda E Bostian, Leah Sandford, Richard Tree, Karen J Lynn, Kathryn Barone, Robert W Lynn, Louise K Wright, Bruce S Wright, Nancy N Williams, Richard A Williams, Harry Wilkinson, Rosalie Wilkinson, Donna B Welch

**The following people have not been served electronically by the Court. Therefore, they must be served by traditional means:**

Anglo American Us Holdings Inc

Element Six Us Corp

Element Six Technologies Us Corp

Executor Of The Estate Of Gary P Robichaud

Legal Heir To David M Scoggins

Personal Rep Of The Estate Of Anthony D Robinson

Legal Heir To David M Scoggins

Special Admin Of The Estate Of David C Scoggins

Personal Rep Of The Estate Of Charles E Shipman

Personal Rep Of The Estate Of Donald E Sims

Administrator Of The Estate Of Rodney L Spence

Administrator Of The Estate Of Ann Taylor Spence

Personal Rep Of The Estate Of Eugene L Sylvester

Element Sic Technologies Or Corp

First Mode Holdings Inc

Platinum Guild International Usa Jewelry Inc

Lightbox Jewelry Inc

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Forevermark Us Inc

Anglo American Crop Nutrients Usa Llc

Charter Consolidated Ltd

Esab Corporation

Central Mining & Investment Corporation Ltd

Administrator Of The Estate Of Bradley D Taylor

Personal Rep Of The Estate Of Horace E Taylor

Personal Rep Of The Estate Of Melvin G Welch

Successor In Interest To Richard J Boetsch

Personal Rep Of The Estate Of Hoyle S Bostian

Personal Rep Of The Estate Of Leon B Bowery

Cape Industrial Services Ltd

Administratrix Of The Estate Of Wallace B Chambers

Personal Rep Of The Estate Of Lewis C Childers

Executor Of The Estate Of Ronald Cook

Cape Holdco Ltd

The Law Debenture Corporation Plc

Mohed Altrad

Altrad Uk Ltd

Cape Uk Holdings Newco Ltd

Personal Rep Of The Estate Of Paul R Mckelvey

Independent Executor Of The Estate Of Jimmie R Milam

Personal Rep Of The Estate Of Ted E Mitchell

Executor Of The Estate Of Richard A Monlux

Executor Of The Estate Of Everette R Olive

Executor Of The Estate Of Mary M Creekmore

Administrator Of The Estate Of Robin M Efird

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Special Admin Of The Estate Of Dennis J Fitzgerald

Executor Of The Estate Of Jerry K Flynn

Personal Rep Of The Estate Of Michael L Gee

Executrix Of The Estate Of Dwight Gonce

Anglo American Corporation Of South Africa Ltd

Personal Rep Of The Estate Of Robert J Green

Personal Rep Of The Estate Of Christopher Greene

Co-Personal Rep Of The Estate Of Kenneth D Harding

Altrad Services Ltd

Altrad Investment Authority S A S

Executor Of The Estate Of John K Patterson Jr

Co-Executors Of The Estate Of Shelby L Payne

Co-Executors Of The Estate Of Shelby L Payne

Trustee For The Next-Of-Kin For Ronald M Peifer

Executor Of The Estate Of Patricia L Perkins

Executor Of The Estate Of Vonnie K Agner

Executrix Of The Estate Of Nicholas Barone

Co-Executors Of The Estate Of Marshall E Pike

Co-Executors Of The Estate Of Marshall E Pike

Successor In Interest To David M Scoggins

Co-Personal Rep Of The Estate Of Kenneth D Harding

Personal Rep Of The Estate Of Jerry G Hartsell

Independent Executor Of The Estate Of Shirley A Hilster

Personal Rep Of The Estate Of Lesley D Hunt

Executor Of The Estate Of James H Kennon

Personal Rep Of The Estate Of Richard D King

Executor Of The Estate Of Steven D Kotzerke

Personal Rep Of The Estate Of Michael H Lamm

Personal Rep Of The Estate Of Nikolaus J Marcher

Legal Heir To Nikolaus J Marcher

Cape Industries Ltd

Cape Asbestos Company Ltd

Anglo American Plc

De Beers Plc

De Beers Centenary Ag

De Beers Consolidated Mines Ltd

De Beers S A

De Beers Uk Ltd

De Beers Jewellers Us Inc

De Beers Jewellers Us Inc

Cape Plc

ELECTRONICALLY FILED - 2024 Nov 18 4:00 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** ) | | **IN THE COURT OF COMMON PLEAS** |
| ) | | |
| **COUNTY OF RICHLAND** ) | | **FOR THE FIFTH JUDICIAL CIRCUIT** |

| | | |
|---|---|---|
| **AUGUSTUS A. ADAMS** and | ) | **C/A NO. 2024-CP-40-06639** |
| **DIANE ADAMS;** | ) | |
| | ) | |
| **TOMMY D. AGNER, SR.** | ) | |
| as Executrix of the Estate of | ) | In Re: |
| **VONNIE K. AGNER,** deceased; | ) | Asbestos Personal Injury Litigation |
| | ) | Coordinated Docket |
| **JULIE K. ALLEN,** individually | ) | |
| and as Executor of the Estate of | ) | |
| **DONALD K. ALLEN,** deceased; | ) | Multi-Plaintiff Cause of Action: |
| | ) | Includes Living and Deceased Plaintiffs |
| **ALLAN N. ANDERSON, JR.** and | ) | |
| **CYNTHIA ANDERSON;** | ) | |
| | ) | <u>**FIRST AMENDED SUMMONS**</u> |
| **GEORGE J. ARSENITH** and | ) | |
| **CHRISTINE A. ARSENITH;** | ) | |
| | ) | |
| **KATHERYN NICHOLE GRAHAM** as the | ) | |
| Personal Representative of the Estate of **JAMES** | ) | |
| **M. BAILEY,** and **KATHRYN W. BAILEY,** | ) | |
| individually and as Surviving Spouse of **JAMES** | ) | |
| **M. BAILEY,** deceased; | ) | |
| | ) | |
| **DONALD BARNHART, JR.** and | ) | |
| **MARY BARNHART;** | ) | |
| | ) | |
| **KATHRYN BARONE,** individually | ) | |
| and as Executrix of the Estate of | ) | |
| **NICHOLAS BARONE,** deceased; | ) | |
| | ) | |
| **RICHARD TREE,** individually | ) | |
| and as successor-in-interest to | ) | |
| **RICHARD J. BOETSCH,** deceased, and | ) | |
| **LEAH SANDFORD,** individually; | ) | |
| | ) | |
| **BRENDA E. BOSTIAN,** individually | ) | |
| and as Personal Representative of the Estate of | ) | |
| **HOYLE S. BOSTIAN,** deceased; | ) | |
| | ) | |
| **TRACY BOWERY MEYER,** | ) | |
| as Personal Representative of the Estate of | ) | |

1

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**LEON B. BOWERY**, deceased;                                      )
                                                                    )
**RONALD J. BROOKSHIRE** and                                        )
**BELVIA R. BROOKSHIRE;**                                           )
                                                                    )
**JERRY V. CAMPBELL** and                                           )
**DARLENE R. CAMPBELL;**                                            )
                                                                    )
**ALICIA KNIGHT**, individually                                     )
and as Administratrix of the Estate of                              )
**WALLACE B. CHAMBERS**, deceased;                                  )
                                                                    )
**LENORA CHILDERS**, individually                                   )
and as Personal Representative of the Estate of                     )
**LEWIS C. CHILDERS**, deceased;                                    )
                                                                    )
**DAVID E. CHRISTENSEN** and                                        )
**LINDA G. CHRISTENSEN;**                                           )
                                                                    )
**LINDA A. COOK**, individually                                     )
and as Executrix for the Estate of                                  )
**ROLAND COOK**, deceased;                                          )
                                                                    )
**DON R. COX, SR.;**                                                )
                                                                    )
**JAY S. CREEKMORE**, individually                                  )
and as Executor of the Estate of                                    )
**MARY M. CREEKMORE,** deceased;                                    )
                                                                    )
**DOROTHY J. DANOS**, individually                                  )
and as the statutory heir of the late                               )
**EMILE J. DANOS**, deceased;                                       )
                                                                    )
**JAMES F. DAVIS** and                                              )
**VERA C. DAVIS;**                                                  )
                                                                    )
**ROBBIE M. EFIRD**                                                 )
as Administrator of the Estate of                                   )
**ROBIN M. EFIRD**, deceased, and                                   )
**LINDA EFIRD**, individually;                                      )
                                                                    )
**CHARLES FERRELL** and                                             )
**PATRICIA A. FERRELL;**                                            )
                                                                    )
**WENDY M. FITZGERALD**, individually                               )
and as Special Administrator of the Estate of                       )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**DENNIS J. FITZGERALD**, deceased;                               )
                                                                  )
**RICKY DEAN FLYNN,**                                             )
as the Executor of the Estate of                                  )
**JERRY K. FLYNN**, deceased;                                     )
                                                                  )
**AMY GEE**, individually                                         )
and as Personal Representative of the Estate of                   )
**MICHAEL L. GEE**, deceased;                                     )
                                                                  )
**GLENDA T. GIROIR** and                                          )
**DALE GIROIR;**                                                  )
                                                                  )
**JEROME GOLEM** and                                              )
**ANDREA GOLEM;**                                                 )
                                                                  )
**SANDRA M. GONCE**, individually                                 )
and as Executrix of the Estate of                                 )
**DWIGHT GONCE**, deceased;                                       )
                                                                  )
**JOE ELDRA GOODWIN,**                                            )
individually, and as the Personal Representative                  )
of the Estate of **DOROTHY JEAN FOX**                             )
**GOODWIN,** deceased;                                            )
                                                                  )
**GEORGE N. GOSNELL** and **PATRICIA C.**                         )
**GOSNELL;**                                                      )
                                                                  )
**PAMELA G. GREEN;**                                              )
                                                                  )
**TERRY L. GREEN, SR.,**                                          )
as Personal Representative of the Estate of                       )
**ROBERT J. GREEN**, deceased, and                                )
**EVELYN V. GREEN**, individually;                                )
                                                                  )
**RACHEL P. GREENE**, individually                                )
and as Personal Representative of the Estate of                   )
**CHRISTOPHER GREENE**, deceased;                                 )
                                                                  )
**MICHELLE L. MCCORMICK** and                                     )
**KRISTEN R. HELTON**, as Co-Personal                             )
Representatives of the Estate of                                  )
**KENNETH D. HARDING**, deceased;                                 )
                                                                  )
                                                                  )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**CINDY HARTSELL MARTIN**, individually )
and as Personal Representative of the Estate of )
**JERRY G. HARTSELL**, deceased, and )
**JOAN HARTSELL**, individually; )
)
**SHIRLEY ANN CARPIN**, )
as Independent Executor of the Estate of )
**SHIRLEY A. HILSTER**, deceased; )
)
**JULIE HORN**, individually )
and as the Administrator of the Estate of )
**BILLY D. HORNE, SR.,** deceased; )
)
**STEPHEN C. HORTON** and )
**GLORIA J. HORTON;** )
)
**MISTI K. CRAWLEY** and )
**ZACHARY D. HUNT**, as )
Personal Representatives of the Estate of )
**LESLEY D. HUNT**, deceased; )
)
**MICHAEL D. JOHNSON** and )
**KRISTI R. JOHNSON;** )
)
**ROGER E. JOHNSON** and )
**CATHY JOHNSON;** )
)
**SHEA JONAS KING**, individually )
and as the Administrator CTA of the Estate of )
**RONNIE J. JONAS;** )
)
**THEODORE L. KELLY, SR.** and )
**BERENICE M. KELLY;** )
)
**SUSAN K. McCARTY** )
as Executor of the Estate of )
**JAMES H. KENNON**, deceased; )
)
**GREGORY N. TARBUCK, JR.** )
as Personal Representative of the Estate of )
**RICHARD D. KING**, deceased; )
)
**MEGAN D. KING** and **MEGAN A. KING**, )
individually and as Co-Executors of the Estate )
of **THOMAS G. KING**, deceased; )
)

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**JOANNE KLINK,** Individually and as Trustee
for the next-of-kin for **JAMES J. KLINK,**
deceased;

**JOLENE R. KOTZERKE**, individually as the
surviving spouse and Executrix for the Estate of
**STEVEN D. KOTZERKE**, deceased;

**SCOTT KRAGENBRING,** as trustee for the
next-of-kin of **OWEN AUBNER
KRAGENBRING,** deceased;

**GARY S. LACKEY** and
**VIRGINIA C. LACKEY;**

**PATRICIA LAMM**, individually
and as Personal Representative of the Estate of
**MICHAEL H. LAMM**, deceased;

**ROGER HALL,** Individually and as
Administrator of the Estate of **CLARENCE
RAY LANE**, deceased;

**ROBERT P. LEBLANC;**

**MICHAEL D. LINK** and
**SANDRA STRICKLAND LINK;**

**RICHARD LONG;**

**JAMES E. LOVE, JR.** and
**JOAN M. LOVE;**

**ROBERT W. LYNN** and
**KAREN J. LYNN;**

**CRAIG R. HAGAN**,
as Personal Representative of the Estate of
**NIKOLAUS J. MARCHER**, deceased, and
**KLAUS MARCHER**, individually and as legal
heir to **NIKOLAUS J. MARCHER**, deceased;

**JOEL P. MARTIN,** Individually and as Trustee
for the next-of-kin for **JANET M. MARTIN,**
deceased;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

5

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**DONALD MCDOWELL** and
**RHONDA V. MCDOWELL;**

**PHILIP J. MCGUIRE** and
**PATRICE MCGUIRE;**

**CLARENCE MCKEE;**

**DAVID P. MCKELVEY,**
as Personal Representative of the Estate of
**PAUL R. MCKELVEY**, deceased;

**SHARON M. MILAM,** individually
and as Independent Executrix of the Estate of
**JIMMIE R. MILAM**, deceased;

**MARTHA M. WILSON**, individually
and as Personal Representative of the Estate of
**TED E. MITCHELL**, deceased;

**NELSON W. MOGG** and
**DOROTHY MOGG;**

**ELAINE M. MONLUX**, individually as the
surviving spouse and Executrix for the Estate of
**RICHARD A. MONLUX**, deceased;

**EDWARD R. MORGAN, SR.** and
**DOROTHY A. MORGAN;**

**JOSHUA J. MOSS**, individually and as
Personal Representative of the Estate of
**GARY JAY MOSS**, deceased;

**GARY MULLINS** and
**ARVELLA MULLINS;**

**LEONARD O'LOUGHLIN** and
**KAREN REISSFELDER;**

**MICHELLE OLIVE**, individually
and as Executrix of the Estate of
**EVERETT R. OLIVE**, deceased;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**KEITH W. PARK,** individually and as the                    )
Personal Representative of the Estate of                      )
**ISABELLA PARK,** deceased;                                  )
                                                              )
**JUDITH D. PATTERSON**, individually                         )
and as Executrix of the Estate of                             )
**JOHN K. PATTERSON, JR.**, deceased;                         )
                                                              )
**KELLY PAYNE CLARK** and                                     )
**SHANNON PAYNE LANCASTER**,                                  )
as Co-Executors of the Estate of                              )
**SHELBY L. PAYNE**, deceased;                                )
                                                              )
**DORENE L. PEIFER,** individually                            )
and as Trustee for the next-of-kin for                        )
**RONALD M. PEIFER**, deceased;                               )
                                                              )
**RICHARD R. PELFREY** and                                    )
**PATRICIA H. PELFREY;**                                      )
                                                              )
**CURTIS R. PERKINS**, Individually                           )
and as Executor of the Estate of                              )
**PATRICIA L. PERKINS**, deceased;                            )
                                                              )
**NANCY L. PICKLESIMER**,                                     )
individually and as Executrix of the Estate of                )
**ROBERT B. PICKLESIMER**, deceased;                          )
                                                              )
**LINWOOD W. PIERCE** and                                     )
**BRIDGET PIERCE;**                                           )
                                                              )
**SHANE CHADWICK PIKE** and **JASON**                         )
**ANDREW PIKE**, as Co-Executors of the Estate                )
of **MARSHALL E. PIKE**, deceased;                            )
                                                              )
**ROBERT B. RAY** and                                         )
**BESSIE E. RAY;**                                            )
                                                              )
**DONNA R. RHODES**, Individually and as                      )
Executrix of the Estate of **CLAYTON E.**                     )
**RHODES, JR.**, deceased;                                    )
                                                              )
**JACKIE D. ROBERTS** and                                     )
**VICTORIA A. ROBERTS;**                                      )
                                                              )
                                                              )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**DEBORAH ROBICHAUD**, individually as the )
surviving spouse and Executrix for the Estate of )
**GARY P. ROBICHAUD**, deceased; )
)
**SHARON LYNN TESSENIAR**, )
as Personal Representative of the Estate of )
**ANTHONY D. ROBINSON**, deceased, and )
**JOYCE J. ROBINSON**, individually; )
)
**JERRY P. ROSS** and )
**PAULETTE W. ROSS;** )
)
**DARLEEN CARDWELL and RICHARD** )
**ROZYLOWICZ**, as Co-Personal )
Representatives of the Estate of **JOHN J.** )
**ROZYLOWICZ**, deceased; )
)
**ALYCE M. SCOGGINS**, individually )
and as successor-in-interest to )
**DAVID M. SCOGGINS**, deceased; )
**DAVID D. SCOGGINS**, and **SCHANTEL R.** )
**GREEN**, individually and as legal heirs to )
**DAVID M. SCOGGINS**, deceased; )
)
**KATHLEEN SCOGGINS**, individually )
and as Special Administrator to the Estate of )
**DAVID C. SCOGGINS**, deceased; )
)
**LARRY G. SELLARS** and )
**GLENDA K. SELLARS;** )
)
**ANNA MARIE S. PRITCHETT,** )
as Personal Representative of the Estate of )
**CHARLES E. SHIPMAN**, deceased, and )
**DANIELLE B. SHIPMAN**, individually; )
)
**MICHAEL L. SIMS,** )
as Personal Representative of the Estate of )
**DONALD E. SIMS**, deceased; )
)
**GEORGE R. SPAYD, JR.;** )
)
**DELLA JEANETTE KENNEDY**, individually )
and as Administrator of the Estate of )
**RODNEY L. SPENCE**, deceased, )
and as Administrator of the Estate of )

8

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**ANN TAYLOR SPENCE**, deceased;                )
                                                 )
**TERRY SYLVESTER**,                             )
as Personal Representative of the Estate of      )
**EUGENE L. SYLVESTER,** deceased, and           )
**SARA SYLVESTER**, individually;                )
                                                 )
**PAUL R. TALLEY** and                           )
**SUSAN B. TALLEY;**                             )
                                                 )
**SANDRA F. TAYLOR**, individually               )
and as Administrator of the Estate of            )
**BRADLEY D. TAYLOR**, deceased;                 )
                                                 )
**SHIRLEY BUTTS TAYLOR**, individually           )
and as Personal Representative of the Estate of  )
**HORACE E. TAYLOR**, deceased;                  )
                                                 )
**SCOTT R. TAYLOR**, individually                )
and as Personal Representative of the Estate of  )
**JACK TAYLOR**, deceased;                       )
                                                 )
**JOHN A. TIBBS** and                            )
**MARGARET B. TIBBS;**                           )
                                                 )
**DOUGLAS WARD**, individually                   )
and as Successor-in-Interest to                  )
**DEBORAH WARD**, deceased;                      )
**SARAH WARD**, individually, and                )
**KATHERINE GUTIERREZ**, individually;           )
                                                 )
**DONNA B. WELCH**, individually and as          )
Personal Representative of the Estate of         )
**MELVIN G. WELCH**, deceased;                   )
                                                 )
**ROSALIE WILKINSON** and                        )
**HARRY WILKINSON;**                             )
                                                 )
**RICHARD A. WILLIAMS** and                      )
**NANCY N. WILLIAMS;**                           )
                                                 )
**BRUCE WILSON,** on his own behalf and          )
Personal Representative for the Estate of        )
**DEBRA K. WILSON,** deceased;                   )
                                                 )
                                                 )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**LINDA G. WILSON**, individually and as )
Personal Representative of the Estate of )
**WILBUR DONALD WILSON**, deceased; )
)
**BRUCE S. WRIGHT** and )
**LOUISE K. WRIGHT;** )
)
**CAROLYN JOYCE ZACCONE** and )
**JAMES ZACCONE;** )
)
          Plaintiffs, )
v. )
)
**CAPE PLC** )
by and through its court appointed Receiver )
Peter Protopapas, sued as successor-in-interest to )
CAPE INDUSTRIES LTD. (f/k/a CAPE )
ASBESTOS COMPANY LTD.) and its )
subsidiaries and global affiliates )
)
**ANGLO AMERICAN PLC** )
individually and as successor-in-interest to )
ANGLO AMERICAN CORPORATION OF )
SOUTH AFRICA LTD. )
)
**DE BEERS PLC** )
)
**DE BEERS CENTENARY AG** )
)
**DE BEERS CONSOLIDATED MINES LTD.** )
)
**DE BEERS S.A.** )
)
**DE BEERS UK LTD.** )
)
**DE BEERS JEWELLERS LTD.** )
)
**DE BEERS JEWELLERS US, INC.** )
)
**ANGLO AMERICAN US HOLDINGS INC.** )
)
**ELEMENT SIX US CORP.** )
)
**ELEMENT SIX TECHNOLOGIES US** )
**CORP.** )
)

10

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**ELEMENT SIX TECHNOLOGIES (OR) CORP.**                    )
                                                           )
                                                           )
**FIRST MODE HOLDINGS, INC.**                              )
                                                           )
**PLATINUM GUILD INTERNATIONAL (U.S.A.) JEWELRY INC.**     )
                                                           )
                                                           )
**LIGHTBOX JEWELRY INC.**                                  )
                                                           )
**FOREVERMARK US INC.**                                    )
                                                           )
**ANGLO AMERICAN CROP NUTRIENTS (U.S.A.), LLC**            )
                                                           )
                                                           )
**CHARTER CONSOLIDATED LTD.**                              )
                                                           )
**ESAB CORPORATION**                                       )
                                                           )
**CENTRAL MINING & INVESTMENT CORPORATION LTD.**           )
                                                           )
                                                           )
**CAPE HOLDCO LTD.**                                       )
                                                           )
**THE LAW DEBENTURE CORPORATION PLC**                      )
                                                           )
                                                           )
**CAPE INDUSTRIAL SERVICES GROUP LTD.**                    )
                                                           )
                                                           )
**MOHED ALTRAD**                                           )
                                                           )
**ALTRAD UK LTD.**                                         )
                                                           )
**CAPE UK HOLDINGS NEWCO LTD.**                            )
                                                           )
**ALTRAD SERVICES LTD.**
(f/k/a CAPE INDUSTRIAL SERVICES LTD.)                      )
                                                           )
**ALTRAD INVESTMENT AUTHORITY S.A.S.**                     )
                                                           )
                                                           )
                Defendants.                                )
                                                           )
_____                     )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

## **FIRST AMENDED SUMMONS**

TO DEFENDANTS ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the Plaintiffs' counsel, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service.  If you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Respectfully submitted,

_/s/ Charles W. Branham, III_
Charles W. Branham, III (SC Bar No. 106178)
**DEAN OMAR BRANHAM SHIRLEY, LLP**
302 N. Market Street, Suite 300
Dallas, Texas 75202
T: 214-722-5990
F: 214-722-5991
tbranham@dobslegal.com
Other email: tgilliland@dobslegal.com

and

_/s/ Theile B. McVey_
Theile B. McVey (SC Bar No. 16682)
Jamie D. Rutkoski (SC Bar No. 103270)
**KASSEL MCVEY ATTORNEYS AT LAW**
1330 Laurel Street
Columbia, South Carolina 29202
T: 803-256-4242
F: 803-256-1952
tmcvey@kassellaw.com
jrutkoski@kassellaw.com
Other email:  emoultrie@kassellaw.com

**ATTORNEYS FOR PLAINTIFFS**

December 12, 2024
Columbia, South Carolina.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

STATE OF SOUTH CAROLINA  )     IN THE COURT OF COMMON PLEAS
                         )
COUNTY OF RICHLAND       )     FOR THE FIFTH JUDICIAL CIRCUIT


AUGUSTUS A. ADAMS and            )     C/A NO. 2024-CP-40-06639
DIANE ADAMS;                     )
                                 )
TOMMY D. AGNER, SR.              )
as Executor of the Estate of     )     In Re:
VONNIE K. AGNER, deceased;       )     Asbestos Personal Injury Litigation
                                 )     Coordinated Docket
JULIE K. ALLEN, individually     )
and as Executrix of the Estate of )
DONALD K. ALLEN, deceased;       )     Multi-Plaintiff Cause of Action:
                                 )     Includes Living and Deceased Plaintiffs
ALLAN N. ANDERSON, JR. and       )
CYNTHIA ANDERSON;                )
                                 )
GEORGE J. ARSENITH and           )     **<u>FIRST AMENDED COMPLAINT</u>**
CHRISTINE A. ARSENITH;           )
                                 )
KATHERYN NICHOLE GRAHAM as the   )     (Jury Trial Demanded)
Personal Representative of the Estate of **JAMES** )
**M. BAILEY,** and **KATHRYN W. BAILEY**, )
individually and as Surviving Spouse of **JAMES** )
**M. BAILEY,** deceased;         )
                                 )
DONALD BARNHART, JR. and         )
MARY BARNHART;                   )
                                 )
KATHRYN BARONE, individually     )
and as Executrix of the Estate of )
NICHOLAS BARONE, deceased;       )
                                 )
RICHARD TREE, individually       )
and as successor-in-interest to  )
RICHARD J. BOETSCH, deceased, and )
LEAH SANDFORD, individually;     )
                                 )
BRENDA E. BOSTIAN, individually  )
and as Personal Representative of the Estate of )
HOYLE S. BOSTIAN, deceased;      )
                                 )
TRACY BOWERY MEYER,              )
as Personal Representative of the Estate of )

1

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**LEON B. BOWERY**, deceased;                     )
                                                  )
**RONALD J. BROOKSHIRE** and                      )
**BELVIA R. BROOKSHIRE;**                          )
                                                  )
**JERRY V. CAMPBELL** and                          )
**DARLENE R. CAMPBELL;**                            )
                                                  )
**ALICIA KNIGHT**, individually                    )
and as Administratrix of the Estate of            )
**WALLACE B. CHAMBERS**, deceased;                 )
                                                  )
**LENORA CHILDERS**, individually                  )
and as Personal Representative of the Estate of   )
**LEWIS C. CHILDERS**, deceased;                   )
                                                  )
**DAVID E. CHRISTENSEN** and                       )
**LINDA G. CHRISTENSEN;**                          )
                                                  )
**LINDA A. COOK**, individually                    )
and as Executrix for the Estate of                )
**ROLAND COOK**, deceased;                         )
                                                  )
**DON R. COX, SR.;**                                )
                                                  )
**JAY S. CREEKMORE**, individually                 )
and as Executor of the Estate of                  )
**MARY M. CREEKMORE,** deceased;                   )
                                                  )
**DOROTHY J. DANOS**, individually                 )
and as the statutory heir of the late             )
**EMILE J. DANOS**, deceased;                      )
                                                  )
**JAMES F. DAVIS** and                             )
**VERA C. DAVIS;**                                  )
                                                  )
**ROBBIE M. EFIRD**                                )
as Administrator of the Estate of                 )
**ROBIN M. EFIRD**, deceased, and                  )
**LINDA EFIRD**, individually;                     )
                                                  )
**CHARLES FERRELL** and                            )
**PATRICIA A. FERRELL;**                            )
                                                  )
**WENDY M. FITZGERALD**, individually              )
and as Special Administrator of the Estate of     )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**DENNIS J. FITZGERALD**, deceased;  )
  )
**RICKY DEAN FLYNN,**  )
as the Executor of the Estate of  )
**JERRY K. FLYNN**, deceased;  )
  )
**AMY GEE**, individually  )
and as Personal Representative of the Estate of  )
**MICHAEL L. GEE**, deceased;  )
  )
**GLENDA T. GIROIR** and  )
**DALE GIROIR;**  )
  )
**JEROME GOLEM** and  )
**ANDREA GOLEM;**  )
  )
**SANDRA M. GONCE**, individually  )
and as Executrix of the Estate of  )
**DWIGHT GONCE**, deceased;  )
  )
**JOE ELDRA GOODWIN,**  )
individually, and as the Personal Representative  )
of the Estate of **DOROTHY JEAN FOX**  )
**GOODWIN,** deceased;  )
  )
**GEORGE N. GOSNELL** and **PATRICIA C.**  )
**GOSNELL;**  )
  )
**PAMELA G. GREENE;**  )
  )
**TERRY L. GREEN, SR.,**  )
as Personal Representative of the Estate of  )
**ROBERT J. GREEN**, deceased, and  )
**EVELYN V. GREEN**, individually;  )
  )
**RACHEL P. GREENE**, individually  )
and as Personal Representative of the Estate of  )
**CHRISTOPHER GREENE**, deceased;  )
  )
**MICHELLE L. MCCORMICK** and  )
**KRISTEN R. HELTON**, as Co-Personal  )
Representatives of the Estate of  )
**KENNETH D. HARDING**, deceased;  )
  )
  )
  )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**CINDY HARTSELL MARTIN**, individually )
and as Personal Representative of the Estate of )
**JERRY G. HARTSELL**, deceased, and )
**JOAN HARTSELL**, individually; )
)
**SHIRLEY ANN CARPIN**, )
as Independent Executor of the Estate of )
**SHIRLEY A. HILSTER**, deceased; )
)
**JULIE HORN**, individually )
and as the Administrator of the Estate of )
**BILLY D. HORNE, SR.,** deceased; )
)
**STEPHEN C. HORTON** and )
**GLORIA J. HORTON;** )
)
**MISTI K. CRAWLEY** and )
**ZACHARY D. HUNT**, as )
Personal Representatives of the Estate of )
**LESLEY D. HUNT**, deceased; )
)
**MICHAEL D. JOHNSON** and )
**KRISTI R. JOHNSON;** )
)
**ROGER E. JOHNSON** and )
**CATHY JOHNSON;** )
)
**SHEA JONAS KING**, individually )
and as the Administrator CTA of the Estate of )
**RONNIE J. JONAS;** )
)
**THEODORE L. KELLY, SR.** and )
**BERENICE M. KELLY;** )
)
**SUSAN K. McCARTY** )
as Executor of the Estate of )
**JAMES H. KENNON**, deceased; )
)
**GREGORY N. TARBUCK, JR.** )
as Personal Representative of the Estate of )
**RICHARD D. KING**, deceased; )
)
**MEGAN D. KING** and **MEGAN A. KING**, )
individually and as Co-Executors of the Estate )
of **THOMAS G. KING**, deceased; )
)

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**JOANNE KLINK,** Individually and as Trustee                  )
for the next-of-kin for **JAMES J. KLINK,**                    )
deceased;                                                      )
                                                               )
**JOLENE R. KOTZERKE**, individually as the                    )
surviving spouse and Executrix for the Estate of               )
**STEVEN D. KOTZERKE**, deceased;                              )
                                                               )
**SCOTT KRAGENBRING,** as trustee for the                      )
next-of-kin of **OWEN AUBNER**                                 )
**KRAGENBRING,** deceased;                                     )
                                                               )
**GARY S. LACKEY** and                                         )
**VIRGINIA C. LACKEY;**                                        )
                                                               )
**PATRICIA LAMM**, individually                                )
and as Personal Representative of the Estate of                )
**MICHAEL H. LAMM**, deceased;                                 )
                                                               )
**ROGER HALL,** Individually and as                            )
Administrator of the Estate of **CLARENCE**                    )
**RAY LANE**, deceased;                                        )
                                                               )
**ROBERT P. LEBLANC;**                                         )
                                                               )
**MICHAEL D. LINK** and                                        )
**SANDRA STRICKLAND LINK;**                                    )
                                                               )
**RICHARD LONG;**                                              )
                                                               )
**JAMES E. LOVE, JR.** and                                     )
**JOAN M. LOVE;**                                              )
                                                               )
**ROBERT W. LYNN** and                                         )
**KAREN J. LYNN;**                                             )
                                                               )
**CRAIG R. HAGAN**,                                            )
as Personal Representative of the Estate of                    )
**NIKOLAUS J. MARCHER**, deceased, and                         )
**KLAUS MARCHER**, individually and as legal                   )
heir to **NIKOLAUS J. MARCHER**, deceased;                     )
                                                               )
**JOEL P. MARTIN,** Individually and as Trustee                )
for the next-of-kin for **JANET M. MARTIN,**                   )
deceased;                                                      )
                                                               )

5

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**DONALD MCDOWELL** and )
**RHONDA V. MCDOWELL;** )
)
**PHILIP J. MCGUIRE** and )
**PATRICE MCGUIRE;** )
)
**CLARENCE MCKEE;** )
)
**DAVID P. MCKELVEY,** )
as Personal Representative of the Estate of )
**PAUL R. MCKELVEY**, deceased; )
)
**SHARON M. MILAM,** individually )
and as Independent Executrix of the Estate of )
**JIMMIE R. MILAM**, deceased; )
)
**MARTHA M. WILSON**, individually )
and as Personal Representative of the Estate of )
**TED E. MITCHELL**, deceased; )
)
**NELSON W. MOGG** and )
**DOROTHY MOGG;** )
)
**ELAINE M. MONLUX**, individually as the )
surviving spouse and Executrix for the Estate of )
**RICHARD A. MONLUX**, deceased; )
)
**EDWARD R. MORGAN, SR.** and )
**DOROTHY A. MORGAN;** )
)
**JOSHUA J. MOSS**, individually and as )
Personal Representative of the Estate of )
**GARY JAY MOSS**, deceased; )
)
**GARY MULLINS** and )
**ARVELLA MULLINS;** )
)
**LEONARD O'LOUGHLIN** and )
**KAREN REISSFELDER;** )
)
**MICHELLE OLIVE**, individually )
and as Executrix of the Estate of )
**EVERETT R. OLIVE**, deceased; )
)
)

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**KEITH W. PARK,** individually and as the )
Personal Representative of the Estate of )
**ISABELLA PARK,** deceased; )
  )
**JUDITH D. PATTERSON**, individually )
and as Executrix of the Estate of )
**JOHN K. PATTERSON, JR.**, deceased; )
  )
**KELLY PAYNE CLARK** and )
**SHANNON PAYNE LANCASTER**, )
as Co-Executors of the Estate of )
**SHELBY L. PAYNE**, deceased; )
  )
**DORENE L. PEIFER,** individually )
and as Trustee for the next-of-kin for )
**RONALD M. PEIFER**, deceased; )
  )
**RICHARD R. PELFREY** and )
**PATRICIA H. PELFREY;** )
  )
**CURTIS R. PERKINS**, Individually )
and as Executor of the Estate of )
**PATRICIA L. PERKINS**, deceased; )
  )
**NANCY L. PICKLESIMER**, )
individually and as Executrix of the Estate of )
**ROBERT B. PICKLESIMER**, deceased; )
  )
**LINWOOD W. PIERCE** and )
**BRIDGET PIERCE;** )
  )
**SHANE CHADWICK PIKE** and **JASON** )
**ANDREW PIKE**, as Co-Executors of the Estate )
of **MARSHALL E. PIKE**, deceased; )
  )
**ROBERT B. RAY** and )
**BESSIE E. RAY;** )
  )
**DONNA R. RHODES**, Individually and as )
Executrix of the Estate of **CLAYTON E.** )
**RHODES, JR.**, deceased; )
  )
**JACKIE D. ROBERTS** and )
**VICTORIA A. ROBERTS;** )
  )
  )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**DEBORAH ROBICHAUD**, individually as the                )
surviving spouse and Executrix for the Estate of          )
**GARY P. ROBICHAUD**, deceased;                          )
                                                           )
**SHARON LYNN TESSENIAR**,                                )
as Personal Representative of the Estate of               )
**ANTHONY D. ROBINSON**, deceased, and                    )
**JOYCE J. ROBINSON**, individually;                      )
                                                           )
**JERRY P. ROSS** and                                     )
**PAULETTE W. ROSS;**                                     )
                                                           )
**DARLEEN CARDWELL and RICHARD**                          )
**ROZYLOWICZ**, as Co-Personal                            )
Representatives of the Estate of **JOHN J.**              )
**ROZYLOWICZ**, deceased;                                 )
                                                           )
**ALYCE M. SCOGGINS**, individually                       )
and as successor-in-interest to                           )
**DAVID M. SCOGGINS**, deceased;                          )
**DAVID D. SCOGGINS**, and **SCHANTEL R.**                )
**GREEN**, individually and as legal heirs to             )
**DAVID M. SCOGGINS**, deceased;                          )
                                                           )
**KATHLEEN SCOGGINS**, individually                       )
and as Special Administrator to the Estate of             )
**DAVID C. SCOGGINS**, deceased;                          )
                                                           )
**LARRY G. SELLARS** and                                  )
**GLENDA K. SELLARS;**                                    )
                                                           )
**ANNA MARIE S. PRITCHETT,**                              )
as Personal Representative of the Estate of               )
**CHARLES E. SHIPMAN**, deceased, and                     )
**DANIELLE B. SHIPMAN**, individually;                    )
                                                           )
**MICHAEL L. SIMS,**                                      )
as Personal Representative of the Estate of               )
**DONALD E. SIMS**, deceased;                             )
                                                           )
**GEORGE R. SPAYD, JR.;**                                 )
                                                           )
**DELLA JEANETTE KENNEDY**, individually                  )
and as Administrator of the Estate of                     )
**RODNEY L. SPENCE**, deceased,                           )
and as Administrator of the Estate of                     )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**ANN TAYLOR SPENCE**, deceased;    )
   )
**TERRY SYLVESTER,**    )
as Personal Representative of the Estate of    )
**EUGENE L. SYLVESTER,** deceased, and    )
**SARA SYLVESTER**, individually;    )
   )
**PAUL R. TALLEY** and    )
**SUSAN B. TALLEY;**    )
   )
**SANDRA F. TAYLOR**, individually    )
and as Administrator of the Estate of    )
**BRADLEY D. TAYLOR**, deceased;    )
   )
**SHIRLEY BUTTS TAYLOR**, individually    )
and as Personal Representative of the Estate of    )
**HORACE E. TAYLOR**, deceased;    )
   )
**SCOTT R. TAYLOR**, individually    )
and as Personal Representative of the Estate of    )
**JACK TAYLOR**, deceased;    )
   )
**JOHN A. TIBBS** and    )
**MARGARET B. TIBBS;**    )
   )
**DOUGLAS WARD**, individually    )
and as Successor-in-Interest to    )
**DEBORAH WARD**, deceased;    )
**SARAH WARD**, individually, and    )
**KATHERINE GUTIERREZ**, individually;    )
   )
**DONNA B. WELCH**, individually and as    )
Personal Representative of the Estate of    )
**MELVIN G. WELCH**, deceased;    )
   )
**ROSALIE WILKINSON** and    )
**HARRY WILKINSON;**    )
   )
**RICHARD A. WILLIAMS** and    )
**NANCY N. WILLIAMS;**    )
   )
**BRUCE WILSON,** on his own behalf and    )
Personal Representative for the Estate of    )
**DEBRA K. WILSON,** deceased;    )
   )
   )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**LINDA G. WILSON**, individually and as          )
Personal Representative of the Estate of          )
**WILBUR DONALD WILSON**, deceased;          )
                                                  )
**BRUCE S. WRIGHT** and          )
**LOUISE K. WRIGHT;**          )
                                                  )
**CAROLYN JOYCE ZACCONE** and          )
**JAMES ZACCONE;**          )
                                                  )
                     Plaintiffs,          )
v.          )
                                                  )
**CAPE PLC**          )
by and through its court appointed Receiver          )
Peter Protopapas, sued as successor-in-interest to          )
CAPE INDUSTRIES LTD. (f/k/a CAPE          )
ASBESTOS COMPANY LTD.) and its          )
subsidiaries and global affiliates          )
                                                  )
**ANGLO AMERICAN PLC**          )
individually and as successor-in-interest to          )
ANGLO AMERICAN CORPORATION OF          )
SOUTH AFRICA LTD.          )
                                                  )
**DE BEERS PLC**          )
                                                  )
**DE BEERS CENTENARY AG**          )
                                                  )
**DE BEERS CONSOLIDATED MINES LTD.**          )
                                                  )
**DE BEERS S.A.**          )
                                                  )
**DE BEERS UK LTD.**          )
                                                  )
**DE BEERS JEWELLERS LTD.**          )
                                                  )
**DE BEERS JEWELLERS US, INC.**          )
                                                  )
**ANGLO AMERICAN US HOLDINGS INC.**          )
                                                  )
**ELEMENT SIX US CORP.**          )
                                                  )
**ELEMENT SIX TECHNOLOGIES US**          )
**CORP.**          )
                                                  )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**ELEMENT SIX TECHNOLOGIES (OR) CORP.**                     )
                                                            )
                                                            )
**FIRST MODE HOLDINGS, INC.**                               )
                                                            )
**PLATINUM GUILD INTERNATIONAL (U.S.A.) JEWELRY INC.**      )
                                                            )
                                                            )
**LIGHTBOX JEWELRY INC.**                                   )
                                                            )
**FOREVERMARK US INC.**                                     )
                                                            )
**ANGLO AMERICAN CROP NUTRIENTS (U.S.A.), LLC**             )
                                                            )
                                                            )
**CHARTER CONSOLIDATED LTD.**                               )
                                                            )
**ESAB CORPORATION**                                        )
                                                            )
**CENTRAL MINING & INVESTMENT CORPORATION LTD.**            )
                                                            )
                                                            )
**CAPE HOLDCO LTD.**                                        )
                                                            )
**THE LAW DEBENTURE CORPORATION PLC**                       )
                                                            )
                                                            )
**CAPE INDUSTRIAL SERVICES GROUP LTD.**                     )
                                                            )
                                                            )
**MOHED ALTRAD**                                            )
                                                            )
**ALTRAD UK LTD.**                                          )
                                                            )
**CAPE UK HOLDINGS NEWCO LTD.**                             )
                                                            )
**ALTRAD SERVICES LTD.**                                    )
(f/k/a CAPE INDUSTRIAL SERVICES LTD.)                       )
                                                            )
**ALTRAD INVESTMENT AUTHORITY S.A.S.**                      )
                                                            )
                                                            )
                 Defendants.                                )
                                                            )
                                                            )

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs in the above caption are identified above and on Exhibit A, hereto. Exhibit A details the injured party name, Personal Representative (if applicable), disease, date of diagnosis, date of death (if applicable) and relevant years of exposure and details of alleged exposure to asbestos attributable to Defendants.

Plaintiffs as named above and on Exhibit A, in their just and legal capacities, name Defendants CAPE PLC, by and through its court appointed Receiver, Peter D. Protopapas, as successor-in-interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) ("CAPE PLC" or "Cape"); Anglo American PLC (individually and as successor-in-interest to Anglo American Corporation of South Africa Ltd.), De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers S.A., De Beers UK Ltd., De Beers Jewellers Ltd., De Beers Jewellers US, Inc., Anglo American US Holdings Inc., Element Six US Corp., Element Six Technologies US Corp., Element Six Technologies (OR) Corp., First Mode Holdings, Inc., Platinum Guild International (U.S.A.) Jewelry Inc., Lightbox Jewelry Inc., Forevermark US Inc., Anglo American Crop Nutrients (U.S.A.), LLC, Charter Consolidated Ltd., ESAB Corporation, Central Mining & Investment Corporation Ltd., Cape Holdco Ltd., The Law Debenture Corporation PLC, Cape Industrial Services Group Ltd., Mohed Altrad, Altrad UK Ltd., Cape UK Holdings NewCo Ltd., Altrad Services Ltd. (f/k/a Cape Industrial Services Ltd.), and Altrad Investment Authority S.A.S. (each a "Defendant" and collectively, and with CAPE PLC the "Defendants") and its subsidiaries and global affiliates, for compensatory and punitive damages, by and through their attorneys, and come before this court and alleges as follows:

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

## GENERAL ALLEGATIONS

1.    This action is brought pursuant to the laws of South Carolina for the following causes of action: 1) Negligence; 2) Product Liability: Strict Liability - S.C. Code Ann. § 15-73-10, et seq.; 3) Vicarious Liability of Defendants Based upon Respondeat Superior; 4) Negligence Imparted to Contractor Defendants; 5) Product Liability: Breach of Implied Warranties - S.C. Code Ann. § 36-2-314; 6) Negligence Per Se; 7) Fraudulent Misrepresentation; 8) the South Carolina Unfair Trade Practices Act- S.C. Code Ann. § 39-5-10, *et. seq*.; and 9) Loss of Consortium.

2.    In some instances, Plaintiffs also bring this cause of action pursuant to the Wrongful Death Act, S.C. Gen. Stat. 15-51-10 *et seq*., as well as the Survival Action, S.C. Code Ann. § 15-5-90, for the wrongful death of the specified Plaintiffs on Exhibit A, on behalf of all persons entitled to recover damages.

3.    Collective Plaintiffs (hereinafter, "Plaintiffs") were all diagnosed with asbestos related diseases caused by exposure to asbestos dust and fibers including but not limited to mesothelioma or lung cancer. Plaintiffs' exposure occurred during the course of their employment with and around asbestos-containing products and/or though asbestos fibers carried home on family members' persons and clothing.

4.    This Court has personal jurisdiction over CAPE PLC and its alter egos/successors in interest because CAPE PLC is deemed to have its principle place of business is located in South Carolina.  In addition, Plaintiffs' claims arise from Defendants' conduct in:

(a)    Transacting business in this State, including the sale, supply, purchase, and/or use of asbestos and/or asbestos-containing products, within this State; and/or

(b)    Contracting to supply services or things in the State; and/or

(c)    Commission of a tortious act in whole or in part in this State; and/or

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

(d)    Having an interest in, using, or possessing real property in this State; and/or

(e)    Entering into a contract to be performed in whole or in part by either party in this State; and/or

(f)    Exposing Decedent to asbestos dust, fibers and/or particles generated from the ordinary and foreseeable use of the asbestos-containing products it sold, supplied, distributed, incorporated, and/or otherwise placed in the stream of commerce in the State of South Carolina; and/or

(g)    Cape, PLC is in receivership, the order of appointment which encompasses the subsidiaries of the Defendants, including specifically, but not limited to North American Asbestos Company located in the State of South Carolina.

5.    Upon information and belief, each of the Defendants is subject to this Court's jurisdiction because, among other things, this action arises from the acts of each Defendant, and/or their agents, co-conspirators, predecessors in interest, and/or amalgamated corporate parents: (i) transacting business in the State; (ii) contracting to supply services or things in the State; (iii) committing a litany of tortious acts in whole or in part in the State; (iv) causing injuries and deaths in the State by acts or omissions outside the State, while regularly conducting or soliciting business, engaging in a persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered in the State; (v) having an interest in, using, or possessing real property in the State; (vi) entering into a contract to be performed in whole or in part by either party in the State; and/or (vii) producing, manufacturing, or distributing goods with the reasonable expectation (or in this case, the actual knowledge) that those goods are to be used or consumed in the State and were so used or consumed. *See* S.C. Code §§ 36-2-803(A)(1)–(5), (7)–(8).

6.    Plaintiffs' cumulative exposure to asbestos as a result of acts and omissions of Defendants and their defective products/actions, individually and together, was a substantial factor in causing Plaintiffs' asbestos related diseases and other related injuries and therefore under South Carolina law, is the legal cause of Plaintiffs' injuries and damages.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

7.     Plaintiffs, nor their family members, were aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease or the hazards associated with bringing home asbestos fibers on one's clothing and person.

8.     Plaintiffs and/or their family members, worked with, or in close proximity to others who worked with, asbestos-containing materials including but not limited to asbestos-containing products and other asbestos-containing materials manufactured and/or sold by Defendants identified above.

9.     Defendants are liable for damages stemming from their own tortious conduct or the tortious conduct of an "alternate entity" as hereinafter defined.  Defendants are liable for the acts of their "alternate entity" and each of them, in that there has been a corporate name change, Defendants are the successor by merger, by successor in interest, or by other acquisition or operation of law including, but not limited to theories of alter-ego or amalgamation of interests, resulting in a virtual destruction of Plaintiffs' remedy against each such "alternate entity"; Defendants, have acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such "alternate entities" have acquired the assets, product line, or a portion thereof of each such Defendants; Defendants caused the destruction of Plaintiffs' remedy against each such "alternate entity"; each such Defendants has the ability to assume the risk-spreading role of each such "alternate entity;" and that each such Defendants enjoys the goodwill originally attached to each "alternate entity."

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| CAPE PLC | Successor-in-interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) ("CAPE PLC" or "Cape"); Anglo American PLC (individually and as successor-in-interest to Anglo American Corporation of South Africa Ltd.), De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De |

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
|  | Beers S.A., De Beers UK Ltd., De Beers Jewellers Ltd., De Beers Jewellers US, Inc., Anglo American US Holdings Inc., Element Six US Corp., Element Six Technologies US Corp., Element Six Technologies (OR) Corp., First Mode Holdings, Inc., Platinum Guild International (U.S.A.) Jewelry Inc., Lightbox Jewelry Inc., Forevermark US Inc., Anglo American Crop Nutrients (U.S.A.), LLC, Charter Consolidated Ltd., ESAB Corporation, Central Mining & Investment Corporation Ltd., Cape Holdco Ltd., The Law Debenture Corporation PLC, Cape Industrial Services Group Ltd., Mohed Altrad, Altrad UK Ltd., Cape UK Holdings NewCo Ltd., Altrad Services Ltd. (f/k/a Cape Industrial Services Ltd.), and Altrad Investment Authority S.A.S. |

10.     Plaintiffs have been informed and believe, and thereon allege, that at all times herein mentioned, Defendants or their "alternate entities" were or are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of South Carolina, or the laws of some other state or foreign jurisdiction, and that said Defendants were and/or are authorized to do business in the State of South Carolina, and that said Defendants have regularly conducted business in the State of South Carolina.

11.     Plaintiffs have been informed and believe, and thereon allege, that progressive lung disease, mesothelioma and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a period of time.

12.     As a direct and proximate result of the conduct as alleged within, Plaintiffs suffered permanent injuries, including, but not limited to, mesothelioma and other lung damage, as well as

the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to his damage in the sum of the amount as the trier of fact determines is proper.

13.     As a direct and proximate result of the conduct as hereinafter alleged, Plaintiffs incurred liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time. Plaintiff requests leave to supplement this Court and all parties accordingly when the true and exact cost of Plaintiffs' medical treatment is ascertained.

14.     As a further direct and proximate result of the conduct as hereinafter alleged, Plaintiffs incurred, and will incur, loss of profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiffs.  Plaintiffs pray leave to supplement this Court and all parties accordingly to conform to proof at the time of trial.

15.     Plaintiffs hereby disclaim each and every claim or cause of action which does or may arise from any United States Military service or on any federal enclave.  This disclaimer is not related solely to actions taken by or at the direction of a federal officer, but is, rather broader. Plaintiffs are not making any claims and are not alleging any causes of action against any entity for any asbestos exposure of any kind which occurred as a result of and military service of the injured parties herein named.  Moreover, Plaintiffs further disclaim each and every claim or cause of action arising from any exposure to asbestos as a result of Plaintiffs' presence on or at any federal enclave.  Plaintiffs further disclaim each and every claim or cause of action arising under the United States Constitution and under any Federal Law or Regulation.  Finally, Plaintiffs disclaim each and every claim or cause of action which may be asserted under federal admiralty or maritime law.  Courts across the Country have found that such disclaimers are proper and within

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

the province of the Plaintiffs to disclaim.  Any removal by any Defendants on the basis of the disclaimed claims will result in a motion for sanctions and seeking attorneys' fees.

## **THE PARTIES**

16.     Plaintiffs are identified above and on Exhibit A, hereto.  Exhibit A details the injured party name, Personal Representative (if applicable), disease, date of diagnosis, date of death (if applicable) and relevant years of exposure and details of alleged exposure to asbestos attributable to Defendants.

17.     Defendants, **CAPE PLC**, as successor-in-interest to CAPE INDUSTRIES LTD. (f/k/a CAPE ASBESTOS COMPANY LTD.) and its subsidiaries and global affiliates, was and is a United Kingdom public limited company with its principal place of business in England.  At all times material hereto, CAPE PLC was authorized to do business in the State of South Carolina while engaged, directly or indirectly, in the business of mining, designing, manufacturing, processing, importing, converting, compounding, supplying, installing, replacing, repairing, using, and/or retailing substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, raw asbestos fibers and products resulting from use of the fiber. CAPE PLC is sued as a Product Defendants. Furthermore, this Defendants has done and does substantial business in the State of South Carolina, including the sale and distribution of its dangerous and/or defective products and services. The exposures to this Defendant's products, actions, inactions, and/or other activities, which caused or contributed to cause Plaintiffs' disease and injury, occurred in South Carolina. Plaintiffs' claims against CAPE PLC arise out of this Defendant's business activities in the State of South Carolina. CAPE PLC may be served through its court appointed Receiver who maintains his principle place of business in Richland County South Carolina. *See* CAPE PLC Receivership Order.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

18.     Plaintiffs are informed and believe that Defendant **Anglo American PLC** (individually and as successor-in-interest to Anglo American Corporation of South Africa Ltd.) is a corporation organized under the laws of England, United Kingdom, with its principal place of business located in London, England, United Kingdom.

19.     Plaintiffs are informed and believe that Defendant **De Beers PLC** is a corporation organized under the laws of the Bailiwick of Jersey, with its principal place of business located in St. Helier, Jersey.

20.     Plaintiffs are informed and believe that Defendant **De Beers Centenary AG** is a corporation organized under the laws of Switzerland, with its principal place of business in Emmenbrücke, Switzerland.

21.     Plaintiffs are informed and believe that Defendant **De Beers Consolidated Mines Ltd.** is a corporation organized under the laws of the Republic of South Africa, with its principal place of business in Kimberly, Northern Cape, South Africa.

22.     Plaintiffs are informed and believe that Defendant **De Beers S.A.** is a corporation organized under the laws of the Grand Duchy of Luxembourg, with its principal place of business in the Grand Duchy of Luxembourg.

23.     Plaintiffs are informed and believe that Defendant **De Beers UK Ltd**. is a corporation organized under the laws of England, United Kingdom, with its principal place of business in London, England, United Kingdom.

24.     Plaintiffs are informed and believe that Defendant **De Beers Jewellers Ltd**. is a corporation organized under the laws of England, United Kingdom, with its principal place of business in London, England, United Kingdom.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

25.     Plaintiffs are informed and believe that Defendant **De Beers Jewellers US, Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Fairfield County, Connecticut.

26.     Plaintiffs are informed and believe that Defendant **Anglo American US Holdings Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in New Castle County, Delaware.

27.     Plaintiffs are informed and believes that Defendant **Element Six US Corp.** is a corporation organized under the laws of the State of New York, with its principal place of business in Harris County, Texas.

28.     Plaintiffs are informed and believe that Defendant **Element Six Technologies US Corp**. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Santa Clara County, California.

29.     Plaintiffs are informed and believes that Defendant **Element Six Technologies (OR) Corp.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Multnomah County, Oregon.

30.     Plaintiffs are informed and believe that Defendant **First Mode Holdings, Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in King County, Washington.

31.     Plaintiffs are informed and believe that Defendant **Platinum Guild International (U.S.A.) Jewelry Inc.** is a corporation organized under the laws of the State of New York, with its principal place of business in New York County, New York.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

32.     Plaintiffs are informed and believe that Defendant **Lightbox Jewelry Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Kent County, Delaware.

33.     Plaintiffs are informed and believe that Defendant **Forevermark US Inc.** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Fairfield County, Connecticut.

34.     Plaintiffs are informed and believe that Defendant **Anglo American Crop Nutrients (U.S.A.), LLC** is a corporation organized under the laws of the State of Colorado, with its principal place of business in Burleigh County, North Dakota.

35.     Plaintiffs are informed and believe that Defendant **Charter Consolidated Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business located in Essex, England, United Kingdom.

36.     Plaintiffs are informed and believe that Defendant **ESAB Corporation** is a corporation organized under the laws of the State of Delaware, with its principal place of business in Montgomery County, Maryland.

37.     Plaintiffs are informed and believe that Defendant **Central Mining & Investment Corporation Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business located in Essex, England, United Kingdom.

38.     Plaintiffs are informed and believe that Defendant **Cape Holdco Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

39.     Plaintiffs are informed and believe that Defendant **The Law Debenture Corporation PLC** is a corporation organized under the laws of England, United Kingdom, with its principal place of business in London, England, United Kingdom.

40.     Plaintiffs are informed and believes that Defendant **Cape Industrial Services Group Ltd**. is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

41.     Plaintiffs are informed and believe that Defendant **Mohed Altrad** is an individual who resides in Montpelier, France.

42.     Plaintiffs are informed and believe that Defendant **Altrad UK Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

43.     Plaintiffs are informed and believe that Defendant **Cape UK Holdings NewCo Ltd.** is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

44.     Plaintiffs are informed and believe that Defendant **Altrad Services Ltd.** (f/k/a Cape Industrial Services Ltd.) is a corporation organized under the laws of England, United Kingdom, with its principal place of business in Warrington, England, United Kingdom.

45.     Plaintiffs are informed and believe that Defendant **Altrad Investment Authority S.A.S.** is a corporation organized under the laws of France, with its principal place of business in Florensac, France.

46.     Plaintiffs believe that one or more additional companies were likewise involved in the alleged acts described herein and are liable for the same alleged harms under the same or similar theories of liability ("Additional Defendants"). Those Additional Defendants may include

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

one or more companies operated or managed by organizations located in the United States, United Kingdom, South Africa, Luxembourg, Lichtenstein, Switzerland, or other jurisdictions, which have been used to obfuscate responsibilities with and control over Cape PLC during the relevant period alleged herein, which were or are alter ego entities of Cape PLC, or which otherwise facilitated, took part in, or benefited from the liability-avoidance scheme described herein. When the identities of these Additional Defendants become known to Plaintiffs, this Complaint may be amended *nunc pro tunc* to state the identities of such Additional Defendants.

## VENUE

47.     Venue is proper in this Court as it is the Receiver Court which appointed the Receiver for CAPE, PLC and pursuant to the *Barton* Doctrine, all claims against the Receiver must be filed in the receiver court. Further, on March 3, 2019, pursuant to the Order of the Supreme Court of South Carolina, Order Number 2017-03-03-01, the Honorable Jean H. Toal was appointed to have jurisdiction in all circuits in the State to dispose of all pretrial matters and motions, as well as trials, arising out of asbestos and asbestos litigation filed within the state court system. Thus, the Honorable Jean H. Toal will have jurisdiction over this matter.

## BACKGROUND FACTS

48.     Although this complaint arises out of events commencing many decades ago and continuing for decades, those events led to and resulted in asbestos-related disease that continues to be diagnosed in and suffered by residents of South Carolina, all across the United States and around the world, to this day. As described in detail below, Defendants (including their predecessors in interest) are directly responsible for injuries caused by these events, especially by the sale and use of asbestos or asbestos-containing products throughout the United States, including in South Carolina.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

49.     Cape PLC is the successor in interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) and its subsidiaries and global affiliates (collectively, "Cape"), which was and is a private company organized and existing under the laws of the United Kingdom, with its principal place of business in England. At all times relevant, Cape was deeply involved in all elements of the global asbestos industry, mining hundreds of thousands of tons of raw asbestos in Apartheid-era South Africa and then selling asbestos fiber to scores of manufacturers of asbestos-containing products in the United States—substantial quantities of which were used in South Carolina.

50.     Cape's historic operations involved a complex scheme to sell millions and millions of dollars of asbestos—knowing with certainty that it would kill and maim tens of thousands of Americans—while, at the same time, developing and executing on a ploy to escape any legal or financial responsibility to the people harmed by intentionally depleting its U.S.-based subsidiary of attachable assets. It is sadly unsurprising that Cape, acting with various other foreign entities, concocted this scheme, because Cape boldly admitted that it had **no** "moral responsibility" to the people injured or killed by Cape's asbestos products. CAPE000486. Executing on that scheme, Cape allowed default judgments against it in asbestos lawsuits across the United States, and simply absconded, leaving no assets for recovery. Ultimately, as averred below, Cape and its affiliated domestic and foreign entities got extraordinarily wealthy off the suffering and deaths of tens of thousands, and then cheated the system to escape responsibility for its and their tortious misconduct.

51.     How does a company like Cape pull off such a scheme? Because Cape was part of a South African mining empire that enjoyed unparalleled political power, resource wealth, commercial and legal deviousness, and wholesale antipathy towards ethical business practices and any decent concept of responsibility. More specifically, Cape was the industrial gem of the Anglo

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

and De Beers mining houses, which were controlled by the powerful Oppenheimer family of Johannesburg. *See, e.g.*, Laurie Flynn, *Studded with Diamonds and Paved with Gold: Miners, Mining Companies and Human Rights in Southern Africa* 180 (1992) [hereinafter, "Flynn (1992)"] ("Cape Industries, a British-registered part of Harry Oppenheimer's Anglo American empire . . . [was] among the biggest asbestos producers from the beginning").

52.    As averred herein, those Defendants are responsible for a scheme that included, without limitation, the following acts:

(a)    Failing to follow corporate formalities among affiliated entities, with a select few entities and individuals dominating the management and operations of Cape and its parent company, Charter Consolidated Ltd.;

(b)    Leveraging that common ownership and control of numerous mining and other investment entities to effectively dominate the South African economy and global market for certain forms of asbestos;

(c)    Creating and operating a byzantine web of entities with the deliberate purpose of avoiding public scrutiny and escaping the liabilities of the affiliated companies and their shareholders;

(d)    Siphoning funds from entities within that web, including Cape's sole American subsidiary, to maximize the financial return to Cape's overseas owners, eliminate liabilities, and escape responsibility by neutralizing the risk of asset attachment by tort creditors; and

(e)    Destroying corporate records and publicly misrepresenting the nature of Cape's business and liability-avoidance scheme in the United States, all designed to avoid responsibility to the tens of thousands of people injured by Cape asbestos.

53.    Each of the named Defendants facilitated and caused Cape's U.S.-based sales and liability-avoidance scheme, or otherwise acted as successors in interest to or beneficiaries of entities involved in that scheme, and, thus, are responsible for the alleged bodily injury underlying the claims against Cape PLC across the United States, including specifically in South Carolina.

**I.    Cape was established as part of a South African mining empire.**

25

54.    <u>Cape: A De Beers-Affiliated Project.</u> From its beginning, Cape was formed to act in coordination with powerful mining interests in South Africa. Specifically, in 1891, Francis Oats— a director and eventual chairman of De Beers Consolidated Mines Ltd. (collectively with its affiliates and successors in interest, as named as Third-Party Defendants herein, "De Beers")— formed the Cape Mineral Syndicate to exploit asbestos reserves that had been recently re-discovered in the Orange River Valley in South Africa. Two years later, on December 28, 1893, the Cape Asbestos Company Ltd. was organized in the United Kingdom for the express purpose of: (i) taking over the Cape Mineral Syndicate's mining operations, and (ii) manufacturing asbestos products in England. As a De Beers-affiliated company, Cape was co-founded by Oats and his close business associate, Ludwig Breitmeyer (also a future De Beers director), while another De Beers director, Rudolf Hinrichsen, was installed as Cape's first chairman. Jock McCulloch, *African Issues: Asbestos Blues: Labour, Capital, Physicians & the State in South Africa* 43 (Indiana Univ. Press 2002) [hereinafter, "McCulloch (2002)"]. Thus, from its founding, Cape's operations and ownership were integrated with the interests of De Beers.

55.    <u>Wernher, Beit & Co.</u> In the 1890s, Breitmeyer was "a partner in the London [mining finance] firm of Wernher, Beit & Co.," which—with its branch in South Africa, *i.e.*, Hermann, Eckstein & Co.—"became famous as the Corner House" Group. *Cape Asbestos (1893–1953): The Story of The Cape Asbestos Company Limited* 16 (1953) [hereinafter, "Cape Diamond Jubilee"]; Sir J. Percy Fitzpatrick, *South African Memories* 14 (1932). The Corner House Group was the most powerful mining finance house in South Africa at the time and was founded by London- based "Randlords" Alfred Beit and Julius Wernher. *See* Martin Meredith, *Diamonds, Gold and War: The British, the Boers, and the Making of South Africa* 187 (2007) [hereinafter "Meredith (2007)"] ("At first, Eckstein's office in Johannesburg was called 'Beit's building'; but

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

it later became known as Eckstein's Corner and then as the Corner House; and what it represented was the most powerful group of financiers in southern Africa."); *id.* at 294 (noting that "foreign mining magnates" such as Wernher and Beit "were dubbed by the British press" as "the Randlords," who "indulge[d] in luxury lifestyles in Britain" from their fortunes made in Africa).[1]

56.     Role at De Beers and Cape. The members of the Corner House Group, particularly Alfred Beit, were fundamental to the amalgamation of diamond-mining interests that occurred with the formation of De Beers Consolidated Mines Ltd. in 1888. *See id.* at 247 ("The mastermind behind the amalgamation of the diamond mines in Kimberly was not [Cecil] Rhodes but . . . Alfred Beit – 'Little Alfred' – to whom he invariably turned for solutions.").[2] In turn, Ludwig Breitmeyer served as alternate director on the De Beers board for Alfred Beit, while being intimately involved in Cape's founding and becoming Cape's first long term Chairman (from 1894 until his death in 1930). *See* Cape Diamond Jubilee (1953) at 6, 16 (noting Breitmeyer became Cape's Chairman after the first one died). In that role, Breitmeyer managed Cape in the company's infancy, while it was funded and controlled by members of the Corner House Group (*i.e.*, the key members of De Beers). *See id.* at 12, 16.

57.     Breitmeyer's Personal Rise. While acting as Cape's Chairman, Breitmeyer was part of the Corner House Group's continued dominance over mining in South Africa into the 1920s (until that role was overtaken by a relative newcomer, *see infra* ¶ 49). For example, in 1905, on

---

[1] *See also, e.g.*, Sir J. Percy Fitzpatrick, *South African Memories* 157 (1932) ("In few countries . . . did any single business firm bulk as big [as] . . . Wernher, Beit & Co. Their great wealth and power on the diamond fields, where . . . they were the real backers of [Cecil] Rhodes in his great work [*e.g.*, the amalgamation of interests at De Beers], and on the Witwatersrand gold fields, where under the name of H. Eckstein & Co., their position, power and influence were overwhelmingly predominant, made them of necessity a very great factor in [South Africa].").

[2] *See also, e.g.*, Sir J. Percy Fitzpatrick, *South African Memories* 27, 33, 90 (1932) ("Alfred Beit has been very generally regarded as the ablest businessman South Africa has ever known. He was very much more than just a financier … There can be no doubt whatever that Beit was Rhodes's financial genius, and without him the great creations which are credited to Rhodes would not have been accomplished. … When the big amalgamation was completed and the De Beers Consolidated created, Rhodes, Beit and Wernher were made life-governors with a share in ultimate profits, which   . . . proved of enormous value afterwards.").

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

information and belief, Breitmeyer was involved in the organization of the Central Mining & Investment Corp. Ltd. ("Central Mining") to take over the assets and business interests of Wernher, Beit & Co., which included interests in Cape Asbestos. *See, e.g.*, Duncan Innes, *Anglo American and the Rise of Modern South Africa* 55 (1984) [hereinafter "Innes (1984)"] ("[T]he House of Wernher Beit expanded considerably at this time, changing its name to Central Mining in 1905[.]").[3] In 1912, moreover, Breitmeyer became a full-time De Beers director. *See* Hedley A. Chilvers, *The Story of De Beers* 307 (1939) ("BREITMEYER, L. Director from December 5, 1912, to the date of his death, March 13, 1930. Was alternate to A. Beit from May 14, 1888, to June 25, 1889, and from May 18, 1891, to February 6, 1896."); De Beers 1930 Annual Report, at 3 (Oct. 13, 1930) (Sir Ernest Oppenheimer, as the new De Beers Chairman, reporting "regret to record the death . . . of [a] valued friend and colleague, Mr. L. Breitmeyer, who had been a Director of the Company for the past 18 years").

58.     The Oppenheimer–Anglo Takeover of De Beers. In or around 1925, at a critical juncture in South African mining history, Breitmeyer sought to take control of De Beers, but was thwarted by Sir Ernest Oppenheimer—who, soon after, became De Beers' chairman. *See* Hedley A. Chilvers, *The Story of De Beers* 227 (1939) ("Offers for the purchase of the Company's diamonds were received in 1925 from L. Breitmeyer and friends and from Sir Ernest Oppenheimer and friends for a period of five years from January 1, 1926. The offer of the latter was accepted"); De Beers 1930 Annual Report, at 3 (Oct. 13, 1930) (noting leadership of Oppenheimer). Critical to his success as the new De Beers chairman, Ernest Oppenheimer also controlled the Anglo

---

[3] *See also Archives Hub: Papers of the Central Mining and Investment Corporation*, https://archiveshub.jisc.ac.uk/search/archives/780f1a0a-48ec-3e42-8e82-53503070110e; *Company Information: Central Mining & Investment Corporation Limited (The)*, https://find-and-update.company-information.service.gov.uk/company/00084511.

American Corporation of South Africa Ltd. (collectively with its affiliates and successors in interest, including Anglo American PLC, "Anglo"), which Oppenheimer formed in September 1917 to bring about an "amalgamation between" various mines and other business interests. *See* David Pallister et al., *South Africa Inc.: The Oppenheimer Empire (Revised & Updated Ed.)* 54–55 (Yale Univ. Press 1988) [hereinafter, "Pallister (1988)"].

59.     Anglo's Interest in Cape. In the aftermath of the Oppenheimer-led takeover of De Beers, Breitmeyer maintained his directorship at De Beers and his Chairmanship at Cape. *See, e.g.*, De Beers 1930 Annual Report, at 3 (Oct. 13, 1930) (noting long, continued role as De Beers director); Cape Diamond Jubilee (1953) at 6 (chronology of Cape's initial leadership). However, Breitmeyer died soon after (in 1930), with Central Mining or other affiliates of the Corner House Group continuing to control Cape.[4] On information and belief, however, soon after the Oppenheimer-led takeover of De Beers, Anglo and its affiliated entities developed direct and indirect ties (including by assuming contracts and liabilities) in various businesses affiliated with the Corner House Group, including Central Mining and Cape. *See cf.* Hedley A. Chilvers, *The Story of De Beers* 227 (1939) ("The new (Oppenheimer) Syndicate took over in October the stock of diamonds of the old (Breitmeyer) Syndicate and all contracts and liabilities."). And at minimum, Anglo's "involvement in Cape Asbestos grew during the Second World War," because by then, Central Mining had become affiliated as an "Oppenheimer company" and was also Cape's "majority shareholder." Geoffrey Tweedale & Laurie Flynn, *Piercing the Corporate Veil: Cape Industries and Multinational Corporate Liability for a Toxic Hazard, 1950–2004*, 8 Enterprise & Society 268, 274 (2007) [hereinafter, "Tweedale & Flynn (2007)"]. Moreover, by 1949, "Central

---

[4] *See, e.g.*, McCulloch (2002) at 8 (observing that by 1944, "the major shareholders [in Cape] were the Central Mining and Investment Corporation of London and the estate of the late Alfred Beit," who had died nearly four decades prior in 1906); Cape Diamond Jubilee (1953) at 35, 48, 61 (referencing Central Mining and other affiliates of the Corner House Group involved with leadership and operations at Cape).

[Mining] had a majority on the board of directors of Cape," *id.*, and by 1958 (at the latest), Anglo had executed a "take over [of] Central Mining," Pallister (1988) at 120.

60.     <u>Cape as Part of an Empire.</u> In other words, by the middle of the twentieth century, Cape was the asbestos-mining leg of an amalgamated mining empire based out of South Africa that included the De Beers diamond monopoly and mining powerhouse of Anglo associated with the Oppenheimer business dynasty.[5]

61.     <u>Benefits of Anglo Affiliation.</u> Cape's affiliations—especially with Anglo—were key to Cape's success, because Anglo (i) acted as "South Africa's largest and most influential corporation," (ii) dominated the mining industry, and (iii) "ma[de] up the core of the country's economy." Pallister (1988) at 25 ("The old adage that what is good for General Motors in the United States is far more apposite to Anglo and South Africa. Certainly Anglo controls a far greater proportion of the South African economy than [GM] could ever hope to achieve in the USA."). For example, Central Mining (as controlled by Anglo) leveraged its expertise and methods in gold mining to improve the performance at Cape mines by seconding employees to Cape in South Africa—but with Anglo, not Cape, paying their compensation. *See* McCulloch (2002) at 51–52 (detailing "claims that seconded staff kept their original medical aid and pension entitlements [of Central Mining], and their salaries were paid by the parent company Anglo American").[6]

62.     <u>The Deviousness of Its Business Structure.</u> Exhibiting extraordinary business and legal deviousness, the Oppenheimer family (along with their close associates) structured and

---

[5] While started by Sir Ernest Oppenheimer, leadership at Anglo was passed down to his son, Harry Oppenheimer, who is now succeeded by the founder's grandson, Nicholas ("Nicky") Oppenheimer, reportedly the third wealthiest man in Africa. *See* Rob LaFranco *The Forbes Billionaires List: Africa's Billionaires* (Jan. 30, 2023), https://www.forbes.com/lists/africa- billionaires/?sh=5a12a2a724d5.

[6] In turn, in later years (*see infra* ¶ 54), Charter could "call on the comprehensive technical services of Anglo," which Charter acknowledged "contributed greatly to the examination and evaluation of the many mining and prospecting projects initiated by or brought to" Charter. *See* Charter 1966 Annual Report, at 24 (May 31, 1966).

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

coordinated "a web of secret companies" to avoid financial liabilities, including tax liabilities. Pallister (1988) at 25; *see also* Stefan Kanfer, *The Last Empire: De Beers, Diamonds, and the World* 292, 316–17 (1995) [hereinafter, "Kanfer (1995)"] (noting that the Anglo businesses were often investigated for "illegally doing business in the [United] States"). Outwardly, however, the Oppenheimer family and its associates did not acknowledge the true extent of cross-associations between their various companies—which in the aggregate allowed the Oppenheimer family to dominate the South African economy. *See, e.g.*, A.J.W. Owston Tr. 31–32 (Aug. 22, 1984) (Charter executive director and Anglo employee claiming not to know who controls Anglo or De Beers, but admitting the greater group enjoyed having "inside South Africa dozens of subsidiaries in all kinds of activities").[7]

63.     The Creation of Charter. After World War II, the Oppenheimer family sought to extend its business holdings internationally, including by consolidating companies with ownership and control of Cape. Thus, in 1965, Central Mining merged with two other mining and investment companies (The British South Africa Company and The Consolidated Mines Selection Company Ltd.) to form Charter Consolidated Ltd. ("Charter"). Anglo created Charter to serve as Anglo's "international investment arm," Pallister (1988) at 345, thereby creating an Oppenheimer-controlled corporate triumvirate—with Charter being the third of "three essential companies" of what insiders called "the greater group," *i.e.*, Anglo, De Beers, and Charter. *See* A.J.W. Owston Tr. 31–32, 66 (Aug. 22, 1984); J.A.B. Nichols Tr. 10, 61(Aug. 29, 1984). [8]

---

[7] *See also* Pallister (1988) at 25 ("Technically there are simply two major South African publicly quoted companies, the Anglo American Corporation of South Africa . . . and De Beers Consolidated Mines, with an admitted close working relationship and various cross-holdings with other companies. Because the boards of [Anglo] and De Beers present their companies as independent entities on stock exchanges and to business partners and governments around the world, they can never formally admit that the two operate as inseparable twins.").

[8] *See    also,    e.g.,    Charter Website: History* (Dec.    12,    2008), https://web.archive.org/web/20081212114613/http://www.charter.ie/chtr_int/about/history/; (noting that "[v]arious companies within the Anglo American Corporation of South Africa have held an interest in Charter Consolidated shares").

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639



64. <u>Charter's 1969 "Takeover" of Cape.</u> Although Charter had both direct and indirect interests in Cape from its founding, it purported to only have a minority interest initially, before quickly accumulating shares and acquiring majority ownership by 1969. *See* Charter 1965 Annual Report, at 5 (May 19, 1965) (listing Cape as a "principal interest[]" of Charter at its founding); Charter 1968 Annual Report, at 34 (May 28, 1968) (reporting 19.5% interest in Cape and the "mining and manufacture of asbestos"); Charter 1969 Annual Report, at 7, 25, 31 (June 3, 1969) (reporting 25.3% interest in Cape and efforts to obtain majority ownership through takeover offers to other unidentified Cape shareholders). On information and belief, in 1969 and prior years, Charter or other Anglo-affiliated entities purchased Cape shares from other companies associated (previously) with the Corner House Group, including, without limitation, Rand Mines Ltd., Rand Mines Holdings Ltd., or their affiliates, in which Charter and Anglo also held large ownership interests. *See* Charter 1969 Annual Report, at 28, 32 (June 3, 1969) (noting 15.9% interest in Rand Mines Ltd. and 23.6% interest in Transvaal Consolidated Land & Exploration Company Ltd.). Indeed, at its founding, Charter touted its close relationship with these and other members of the Corner House Group. *See, e.g.*, Charter 1965 Annual Report, at 7 (May 19, 1965) (noting shared

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

interests involving Charter, Central Mining, and Rand Mines Ltd. under section of report titled "CORNER HOUSE GROUP"); Innes (1984) at 212–13 (stating that "as part of the Corner House Group, Rand Mines had become one of the country's leading mining houses," but eventually fell under the control of Anglo by the early 1960s); *see also* Meredith (2007) at 302 (detailing the founding of Rand Mines in 1893, which was formed by the contribution of mining claims and "five existing companies" by H. Eckstein & Co., with "the partners in Eckstein, including Beit and Wernher in London," receiving shares in the new entity).

65.    <u>Charter: A Shell Game.</u> In the end, Charter's purported "takeover" of Cape was nothing more than a continuation of other Oppenheimer-affiliated entities' control of Cape over the prior decades,[9] and serves as only one example of the many corporate shell games used by the Oppenheimer business empire to obscure their financial interests globally.

66.    <u>One Main Office for One Enterprise.</u> Similarly, the corporate separation between Charter and Anglo was superficial. By way of example only, Charter and Anglo shared common office space at 40 Holborn Viaduct in London, employed personnel who routinely switched roles between the entities, and each had boards that were dominated by the Oppenheimer family and their business associates/servants. *See, e.g.*, E.G. Rudland Tr. 7–8, 21–22 (Apr. 7, 1981) (describing overlapping personnel and directorships); House of Commons, Expenditure Comm., Session 1973–74, *Fifth Report: Wages and Conditions of African Workers Employed by British Firms in South Africa* 22–23 (Jan. 22, 1974) [hereinafter, "House of Commons Rep."] (noting that Charter "even allow[s] Anglo American to supply directors for Charter representation on boards"); Peter Schmeisser, *Harry Oppenheimer's Empire: Going for Gold*, N.Y. Times, Mar. 19, 1989

---

[9] *See, e.g.*, Charter 1966 Annual Report, at 7 (May 31, 1966) (noting Central Mining "acquired interests in . . . asbestos, . . . besides a number of industrial interests in the United Kingdom"); Charter 1970 Annual Report, at 16 (June 18, 1970) (noting that "there has long been a close association [of Cape] with Charter through one of its forerunners," *i.e.*, Central Mining).

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

[hereinafter, "Schmeisser Article"] (noting common office space of De Beers, Anglo, and Charter in London, as well as overlapping directors among the Oppenheimer companies); Charter 1965 Annual Report, at 10 (May 19, 1965) (as part of the Charter merger, there was an "[i]ntegration of the London staffs" of the three merged companies, with the new organization located at 40 Holborn Viaduct); Charter 1966 Annual Report, at 24 (May 31, 1966) (noting merged companies were also combined "with the London staffs of Anglo . . . and Consolidated Share Registrars Limited" to create a "wholly owned subsidiary, Charter Consolidated Services Limited," which also took over the office lease and "provide[d] staff and services in London, not only for all companies in the Charter . . . group, but also for the Anglo . . . , De Beers and Corner House groups").

67. <u>Charter's Role in the Empire.</u> Consistent with this scheme, Charter operated such that its "every move was made in the interests of De Beers and Anglo"—furthering the amalgamated Oppenheimer empire's effort "to extend [its] grasp to North America," while allowing it to "unobtrusively buy, spawn or control" varied and sizeable business interests around the world through a "series of . . . cross-holdings." Kanfer (1995) at 291–92, 315 (describing Charter as one side of a "pyramid" of global business interests).[10]

68. <u>Domination of Charter.</u> The Oppenheimers consistently sat on Charter's board of directors after its founding,[11] while at the same time dominating Charter's share ownership.[12]

---

[10] *See also, e.g.*, Schmeisser Article ("The structure of Oppenheimer's empire is dizzyingly complex and nearly impenetrable to outsiders. He wields his power indirectly, through pyramided holding companies, interlocking shareholdings and a myriad of cross-directorships. As a result of this operating strategy, few people are aware that in the last two decades scores of businesses in the United States [and elsewhere] have been founded or purchased with Oppenheimer capital and are managed by Oppenheimer loyalists while maintaining no legal ties to South Africa.").

[11] *See, e.g.*, Charter 1967 Annual Report, at 4 (June 9, 1967) (noting Oppenheimer's role as chairman, beginning a two-year term in that role); Charter 1971 Annual Report, at 3 (June 1, 1971) (noting Sir Philip Oppenheimer's role as Deputy Chairman and a member of the executive committee).

[12] *See, e.g.*, Anglo 1979 Annual Report, at 69 (June 22, 1979) (indicating that both Harry and Nicky Oppenheimer had 18,333,268 beneficial shares in Anglo, with the next highest directorship holding being 30,000 shares); Charter 1968 Annual Report, at 10 (May 28, 1968) (indicating that Harry Oppenheimer dominated ownership of Charter with 5,004,600 shares).

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Indeed, Charter's management was a long continuation of Randlord-style business, in which the "real proprietors" and "owners" of a business (such as the Oppenheimer family) participate primarily in profits, while local affiliated entities (such as Charter and Cape) profit by the grace of the Randlords—with an "unwritten obligation of honour to respect [Randlord] wishes and position." Sir J. Percy Fitzpatrick, *South African Memories* 90–91 (1932) (Corner House Group representative in Johannesburg detailing this norm between De Beers and Corner House Group members). Thus, it was clear to all, including Members of Parliament, that "[w]here Anglo American lead, Charter Consolidated are prepared to follow." House of Commons Rep. at 23.

69.    Charter's Investment in South Africa. By the early 1970s, Charter became the largest English corporate investor in South Africa—albeit, one investing primarily in Anglo-affiliated entities, including its own parent Anglo (in which Charter had a 10% equity stake). *Id.* at 22. Uniquely, in contrast to other corporate investors who sought majority ownership (and thus control) over their South African businesses, Charter had a minority stake (usually around 10%) in most of its South African investments, with one notable exception: its majority ownership of Cape. *Id.* at 22 & n.1.

70.    Charter's Interest in Cape. Charter's "largest industrial subsidiary company" was Cape, with Charter even seconding and compensating key personnel for Cape's management. J.N. Clarke Tr. 14, 17–18 (Apr. 21, 1983); *see also, e.g.*, G.A. Higham Tr. 7–9, 28, 87 (Oct. 3, 1984) (Cape Chairman admitting that Charter had been paying his compensation for years and that he acts as Chairman for "a number of Charter's [other] industrial subsidiaries" as well). In other words, although most of Charter's assets were tied up in minority investment interests—effectively operating as a holding company—Cape was Charter's primary operating company and "principal industrial subsidiary." *See* Charter 1972 Annual Report, at 15 (May 30, 1972) (also emphasizing

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Cape's profitability). In turn, Charter used its "close association" with other South African companies, namely Anglo, to "exercise . . . influence" in Apartheid-era South Africa, *see* House of Commons Rep. at 22—thereby allowing Cape to profitably mine and export asbestos to the United States for decades.

71.    <u>Clear Takeaway, Despite Complexity.</u> Ultimately, although the facts are complex, it is clear that through an "Anglo holding company" (*i.e.*, Charter), Cape and its subsidiaries were part of the "Anglo American Group of Companies"[13] that dominated the South African mining economy during the twentieth century. Innes (1984) at 271, 283 (listing Cape among other Anglo subsidiaries in a published history about Anglo and its importance in South Africa); *see also, e.g.*, Schmeisser Article (reporting that the Oppenheimer family "has dominated the South African economy for nearly half of [the twentieth] century" and that "Anglo American, which accounts for more than 50 percent of the stocks traded on the Johannesburg stock exchange, permeates every conceivable corner of the South African marketplace").

72.    <u>A Profitable Mid-Century Business.</u> In turn, Cape reflected the Oppenheimer empire's shared commercial interest[14] in the high-growth, highly profitable asbestos industry after World War II. *See, e.g.*, Jock McCulloch & Geoffrey Tweedale, *Defending the Indefensible: The Global Asbestos Industry and Its Fight for Survival* 37 (Oxford Univ. Press 2008) [hereinafter,

---

[13] As explained by Anglo, the "term 'group' has a wider meaning in the South African mining industry than its statutory definition of a parent company and its subsidiaries . . . . The mining finance houses in South Africa have traditionally operated 'the group system', whereby the parent house not only administers companies that are not necessarily subsidiaries, but provides them with a full range of administrative and technical services and is able, by virtue of its financial strength and standing, to assure them of capital for expansion and development. Thus the Anglo American Corporation Group comprises a large number of companies that are closely linked to [Anglo] but which are not generally subsidiaries or controlled companies as defined in the statutes." Anglo 1974 Annual Report, at 3 (Apr. 28, 1975).

[14] *See, e.g.*, Anglo 1976 Annual Report, at 7 (Mar 25, 1977) (reporting that Anglo had "important interests in the production of . . . asbestos" through Charter); De Beers 1978 Annual Report, at 48– 49, 52 (Mar. 30, 1979) (referencing "strengthening [of] De Beers' earnings base," which through Anglo and Charter, "the London-based mining finance house," included interests in "asbestos . . . and other minerals, and in industrial enterprises in the United Kingdom"); Charter 1972 Annual Report, at 39 (May 30, 1972) ("In mining, the Anglo American Corporation group and its close associate De Beers Consolidated Mines Limited have important interests in the production of . . . asbestos.").

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

"McCulloch & Tweedale (2008)"] (observing that "the major [asbestos] companies derived the bulk of their profits from" asbestos mines); Charter 1970 Annual Report, at 12, 16 (June 18, 1970) (reporting a "substantial jump in trading profits for the year . . . due to the inclusion of earnings from Cape Asbestos").[15]

73.    <u>Goal of Corporate Complexity.</u> Although the precise "connection between Cape, Charter, Central Mining and Anglo American is complex," McCulloch (2002) at 51–52, that complexity reflects an intentional scheme to obfuscate corporate relationships and ownership interests while minimizing the amalgamated business empire's liability risks, including for asbestos (as well as taxes).[16]

74.    <u>The Point of Charter.</u> Specifically, Charter was designed to serve as a corporate cushion—a products-liability patsy—for Anglo that could (i) promptly purge itself of substantial cash (through dividends based on new profits, or by otherwise reallocating assets among holding companies through more complex transactions) to Oppenheimer-affiliated entities, and (ii) add a "formal" degree of separation between Anglo and Cape, *i.e.*, a profitable asbestos business, but one they knew would injure tens of thousands and thus created a substantial risk of liability in the future. *See infra* ¶¶ 81–88 (detailing working conditions and known disease in South Africa and England); *see also cf.* Jock McCulloch & Pavla Miller, *Mining Gold and Manufacturing*

---

[15] *See also, e.g.*, Charter 1970 Annual Report, at 31 (June 18, 1970) (reporting that the sale of asbestos fibre contributed the most to the company's trading profit); Charter 1972 Annual Report, at 3 (May 30, 1972) (noting among top "[f]eatures of the year" that Cape's "profits increased from £2,528,000 to £3,098,000"); Charter 1977 Annual Report, at 47 (June 9, 1977) (noting £9,831,000 pre-tax trading profit from mining and sale of asbestos fibre and 28.2% profit margin from the same, *i.e.*, the highest among Charter's manufacturing subsidiaries).

[16] As described later, *infra* ¶¶ 89–105, when the victims of this scheme began to sue and win verdicts, Anglo implemented additional—but still wholly superficial—corporate changes to further distance itself from its asbestos business and mitigate its U.S. liability risk, with Cape Asbestos (i) dropping *Asbestos* from its name, (ii) ceasing to appoint Cape officials to the board of its American subsidiary (NAAC) as a "sensible precaution," (iii) interjecting another entity (Cape Industries Overseas Ltd.) between NAAC and Cape, to add yet *another* degree of superficial separation between Anglo and its U.S. asbestos business, and (iv) purporting to close NAAC and sell its South African asbestos mines, for the purpose of evading creditors, while Anglo continued to profit from the sale of asbestos through other entities.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

*Innocence: Occupational Lung Disease and the Buying and Selling of Labour in Southern Africa* 390–91 (2023) (noting "Charter's controlling share in Cape gave Anglo American a commercial interest in the asbestos industry" and "Anglo American's board reason to monitor" alleged liabilities of Cape).

75.      <u>Infamous Recognition for Success.</u> Through these corporate maneuvers, Cape, as "part of the great South African conglomerates of De Beers and Anglo-American Corporation, provides a classic example of . . . tactics" centered on hiding behind a corporate-veil fiction, *i.e.*, "us[ing] complex and confusing corporate structures to distance themselves from liability." McCulloch & Tweedale (2008) at 181 (also describing recognition by judicial tribunals that "Cape operated worldwide as a single economic unit" and provided "false testimony" about its organization).

76.      <u>Control as the Key to Success.</u> The Oppenheimer "family's control [of these enterprises] and its personal wealth" was consistently the "key" to coordinating the management of their businesses, including Charter and Cape. *See* Pallister (1988) at 41 (noting that apart from Oppenheimer kin, the "powerful inner cabinet that [took] the most sensitive and important decisions" for the global empire was limited to (i) two individuals who had each served as Chairmen of Charter, and (ii) former personal assistants who were "considered to be part of the 'family'").

77.      <u>Domination of the South African Mining Economy.</u> In the end, the amalgamated Oppenheimer empire, as effectuated by De Beers, Anglo, and Charter primarily, was astonishingly successful in its domination of the South African mining economy—making up 10% of South Africa's GDP and 30% of its exports in 1973, while controlling or producing 40% of South Africa's gold, 80% of the world's diamonds, a sixth of the world's copper, and most of

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

South Africa's coal. Tweedale & Flynn (2007) at 274; *see also, e.g.*, Charter 1972 Annual Report, at 39 (May 30, 1972) (reporting Anglo's dominance of gold, coal, and uranium mining in South Africa).

78.    <u>Control of Asbestos Supply.</u> In fact, Cape controlled 90% of the global supply of amosite[17] asbestos and dominated the distribution of other types of asbestos as well—effectively enjoying a monopoly over a then-highly sought industrial resource. *See Hammond v. N. Am. Asbestos Corp.*, 454 N.E. 2d 210, 217 (Ill. 1983); *see also* McCulloch & Tweedale (2008) at 28 (describing industrial preference for amosite "in the construction and repair of ships").

## II.    **Cape Created NAAC to Facilitate Its Asbestos Scheme**.

79.    <u>A U.S. Subsidiary to Fuel Growth.</u> As part of the Oppenheimer empire's global expansion, on October 14, 1953, Cape established the North American Asbestos Corporation ("NAAC") as a direct subsidiary domiciled in Illinois. *See, e.g.*, CAPE001511. Although Cape had been profitable for years, including "return[ing] a strong dividend" for shareholders (*i.e.*, Oppenheimer-affiliated interests) from 1936 to 1951, "the company's most bountiful years were the two decades until 1976"—the period when Cape operated NAAC to provide raw asbestos fiber to customers in the United States, the company's most important market. McCulloch (2002) at 68.

80.    <u>U.S. Industry Connections.</u> Previously, Cape had already been marketing its asbestos to numerous U.S.-based customers, including having an important business relationship with, among other companies, Union Asbestos & Rubber Co. (UNARCO) since the 1930s to create "Unibestos" insulation. For the sake of continuity, and to leverage established client connections, Cape Chairman Ronald Dent selected UNARCO Vice President, Bob Cryor, to be NAAC's first President—a role that Cryor filled until his death from mesothelioma in 1970. *See, e.g.*,

---

[17] The name for this unique form of asbestos is derived from its association with a Cape business division in South Africa—*i.e.*, AMOSA, Asbestos Mines of South Africa. Flynn (1992) at 192.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

*Cameron v. Owens-Corning Fiberglas, Corp.*, 695 N.E.2d 572, 578 (1998).[18]

81.   <u>NAAC's Role at Cape.</u> Cape designed NAAC to operate as Cape's wholly controlled instrumentality for the "purpose of expediting and facilitating the movement" of asbestos from South African mines into the United States (including South Carolina).[19] To facilitate this, NAAC had both marketing and distribution roles: (i) serving as Cape's sales agency in the United States, with sole authority to offer Cape products and responsibility for transmitting information about customer needs to Cape mines, and (ii) ensuring the proper distribution of asbestos products from Africa "all the way through to the customer's plant," including to locations in South Carolina or through South Carolina ports.[20] NAAC "effect[ively] . . . put the Mines at every U.S. port." CAPE000988–89. By 1970, NAAC was the "largest U.S. importer of Amphibole Fibres," which were "re-distributed from . . . warehouse locations in East Coast, Gulf Coast and West Coast Ports." CAPE000878–79.

82.   <u>Cape's Business in South Carolina.</u> In coordination with, and at the direction of, the amalgamated global Cape/Oppenheimer network, NAAC sold millions and millions of dollars of asbestos mined from South Africa to numerous U.S.-based clients, which used or distributed asbestos products in South Carolina. *See, e.g.*, CAPE000994–95 (NAAC letter identifying certain clients). NAAC's own records show that Cape sold asbestos to companies in

[18] Important to Cape, Cryor also had established relationships with executives at Johns-Manville Corp. (one of Cape's most important customers). Indeed, Johns-Manville Corp. trusted Cryor so much as to admit to him a company policy of not telling employees about their asbestos disease— out of fear that they would stop working and file claims, and instead choosing to withhold the information and let workers die to "save a lot of money." Paul Brodeur, *Outrageous Misconduct: The Asbestos Industry on Trial* 276–77 (1985).
[19] *See* CAPE000110–12 (1982 court filing describing NAAC's history); CAPE000177 (identifying NAAC as the sole U.S.-based entity of the Cape mining division); CAPE000869 (1973 letter describing NAAC as "a division of Cape Asbestos Co. Ltd., with corporate offices in London").
[20] *See* CAPE000263–66 (describing intended business of NAAC); CAPE000333 (1975 Cape cover letter of NAAC director resignations); CAPE000729 (appointment announcement describing NAAC as "specialize[d] in marketing and distribution of Blue and Amosite asbestos in the United States, Canada, Mexico and the Caribbean"); CAPE000988–89 (1969 NAAC memorandum describing customer services).

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

South Carolina, including to Raybestos Manhattan, Inc. in North Charleston and Westinghouse Electric Corp. in Hampton, as well as to facilities on the South Carolina–Georgia border (*e.g.*, Babcock & Wilcox in Augusta, GA and Dow Chemical in Savannah, GA). *See also, e.g.*, S. Purrington Tr. 9–10, 64 (Aug. 25, 1986) (NAAC clerical worker from 1961 to 1978 identifying Dow Chemical as one of NAAC's three primary customers).

83.     The Disastrous Impact on South Carolinians. In turn, those Cape products caused individuals (including residents of South Carolina) to be exposed to asbestos and suffer bodily injury, which has resulted in myriad suits against Cape ("Asbestos Suits").

84.     Goal of National Distribution. In addition, Cape and NAAC implemented a "conscious pattern of product distribution [of asbestos] nationally"—particularly, amosite, over which Cape had a monopoly. *See In re: Asbestosis Cases*, Case No. 78-CP-06-105, Order, at 3 (S.C. Common Pleas Apr. 7, 1980) [hereinafter, "S.C. 1980 Order"] (rejecting objection to the exercise of personal jurisdiction over NAAC in South Carolina); *see also* Flynn (1992) at 188 ("What Cape did [in the United States of America] is not dissimilar to the situation where someone fires a gun into a crowd of people. You may not know which of them will be killed but you know for certain that some of them will be killed.").

85.     Prevalence of Cape's Asbestos. Cape's amosite (along with Cape's other types of mined asbestos) was an ingredient in the most popular and dominant asbestos products in the market, which were used in virtually every state, including products "used in [South Carolina]." *See* S.C. 1980 Order, at 3; *see also, e.g.*, Raybestos-Manhattan 1963 Annual Report, at 2 (Mar. 13, 1964) (Cape's major customer in South Carolina touting: "Whoever you are, whatever your business, a [Raybestos-Manhattan] product touches your life."); *Parker v. Bell Asbestos Mines, Ltd.*, 607 F. Supp. 1397, 1403–04 (E.D. Pa. 1985) (rejecting argument that Charter was entitled to

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

dismissal, given possibility that plaintiff could "prove that Charter controls Cape, and that Cape has deliberately avoided liability to American plaintiffs, [such that] it will be fair to ask Charter to stay and defend Cape's position"). In short, Cape deliberately and purposefully availed itself of the entirety of the United States market for asbestos fiber, including the South Carolina market.

86.     <u>Management at NAAC.</u> The volume of Cape's asbestos supply to the United States was breathtaking given the ostensibly small footprint of NAAC, "which was essentially a one-man operation" consisting of an operational lead supported by four office clerical personnel.[21] All key decisions, however, including with respect to the fulfillment of specific purchase orders, were closely coordinated with and directed by other Cape entities, or made by a board comprised of Cape executives and lawyers (until Cape executives resigned in 1975, in what they described at the time as a "sensible precaution" against U.S. litigation). *E.g.*, CAPE000333.[22]

87.     <u>A Pawn in the Oppenheimer Empire.</u> In selecting directors to participate in this worldwide scheme, Cape Chairman Ronald Dent—also a director for Charter and several other Charter-owned companies, apart from NAAC and Cape—valued "the type of man who would fit into our scheme of things . . . without causing embarrassment all around." CAPE000261–62; *see also* Charter 1972 Annual Report, at 33 (May 30, 1972) (noting Dent's role as a Charter director and ownership of Cape shares, which were also directly owned by other Charter directors).

88.     <u>Domination of American Subsidiary.</u> NAAC's operations and decision-making were wholly dominated by Cape and its owners, including Charter and other affiliated mining/investment interests in South Africa. How dominated was NAAC? The company could not "borrow one dollar without [Cape's] approval" and was routinely forced to withdraw cash to pay

---

[21] *See* CAPE000110–12 (describing NAAC's lean staffing); CAPE001514 ("Despite the volume of sales and profits of NAAC, our operation is a very small one, with only a total of 5 employees.").
[22] *See also, e.g.*, CAPE001528 (listing six directors in 1970).

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

dividends to Cape, thereby minimizing NAAC's available assets that could be reached by American creditors.[23] Astoundingly, NAAC's then-President Bob Cryor admitted that NAAC relegated its interests to Cape as "part of a coordinated group with responsibilities to the whole" group. CAPE000931–32.

89.     <u>NAAC's Failure to Purchase Adequate Insurance.</u> Cape's domination also influenced and controlled NAAC's risk management decision-making, including its purchase of insurance. Officially, Cape had a company-wide policy to purchase insurance "at minimum cost consistent with adequate cover." CAPE0001465. But in reality, NAAC felt "pressure from [its] Home Office in London [that] forced [it] to seek lower rates" and choose carriers and policy terms based solely on short-term cost. *See* NAAC Letter to J. Kirk of Talbot Bird & Co. (Nov. 17, 1959). Because of Cape's domination of NAAC, and as a part of the liability-avoidance scheme, Cape directed NAAC to buy wholly inadequate insurance coverage to address its massive future products- liability exposure.

### III.     <u>Cape Led Efforts in the U.S. and Internationally to Hide the Risks of Asbestos</u>.

90.     <u>Known History of Illness in South Africa.</u> Early in its history—even before setting up operations in the United States—Cape's management and ownership knew of the serious health hazards posed by their South African asbestos, as illness was endemic among Cape's own employees. For example, because child labor was extensively used in the South African asbestos mining industry and Cape lacked basic industrial hygiene measures, Cape was responsible for causing "radiologic asbestosis with cor pulmonale [*i.e.*, heart failure]" in Black children "before the age of 12." Dr. Gerrit <u>Schepers</u>, "Discussion," *Ann. N.Y. Acad. Sci.*, 132:246 (1965).[24]

---

[23] *See, e.g.*, CAPE001507 (1976 letter noting borrowing limit); CAPE000816 (1976 board minutes showing payment of $250,000 dividend).
[24] Years later, Dr. Schepers provided a detailed account of his time at a Cape mine in Penge, South Africa, including seeing (i) "a big strong man with a sjambok whip," whose apparent job was "to hit a hessian sack on the ground below

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

91.     <u>Infamy for South African Conditions.</u> Indeed, Cape's operations in South Africa were so infamous that they became a case study—literally—in corporate irresponsibility. *See* Patricia Werhane et al., *Case Study: South African Mining and Asbestos-Related Diseases*, Univ. of Va. Darden School of Bus., at 7 (Apr. 11, 2006) ("[L]ong after the hazards of asbestos were well known to the company as well as the mining community in general, Cape took advantage of lax labor legislation . . . [and also] benefited from cheap labor. Whole families, including children as young as 12 years, were involved in the mining and milling operations at Cape's facilities, and workers handled asbestos with their bare hands. Not only Cape workers, but also those who lived in the communities around Cape mines were exposed to high levels of asbestos that were sometimes 30 times higher than the legal limit in Britain. One of Cape's asbestos mills at Prieska was in the center of town, close to a church and school. One medical doctor stated that he diagnosed 900 mesothelioma victims, including his own son."). Cape allowed these "work practices" to continue because they "were profitable for employers and Cape's management readily acknowledged the importance of the mines to its success." McCulloch & Tweedale (2008) at 44–45.

92.     <u>Known History of Illness in England.</u> Likewise, Cape's operations in England were infamous for lacking basic hygiene measures, such that a medical examination of 80 workers in 1928 "showed that nearly all had 'definite evidences' of asbestosis." Geoffrey Tweedale, *Magic Mineral to Killer Dust: Turner & Newall and the Asbestos Hazard* 20 (Oxford Univ. Press 2000) [hereinafter, "Tweedale (2000)"]; *see also, e.g.*, Flynn (1992) at 180 ("[Cape's] British factories

---

the end of a chute," and (ii) inside the battered sack, a "boy of ten or twelve," whose job was "to get inside the bag and trample down the fluffy asbestos. He was cheaper than machinery or safe sacks. He was covered from top to toe in asbestos dust so I grabbed him and took him off to the X-ray machine. The X-ray showed he was already suffering from asbestosis. I was told that Cape employed a lot more children and I gave instructions to my technician that he was to round up all the children in the village with the little Cape Asbestos copper identification bands riveted around their wrists – identification tags, just like slaves, so they couldn't run off. A number of the other children had asbestosis too. The conditions were unbelievable." Flynn (1992) at 192–93.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

had been shown to be so negligently run that they brought death, disease and injury to the communities around them"). Among Cape's managers and owners, the danger of asbestos exposure was well known, with scientific studies repeatedly re-establishing a link between exposure to asbestos and illness.[25]

93.  <u>Apathy to Personal Suffering.</u> Nevertheless, the dangers of asbestos were hidden from Cape employees (and the general public) and atrocious conditions at Cape facilities continued for decades—causing widespread disease and later becoming focal points of damning exposés on the asbestos industry. *See* Tweedale (2000) at 238, 251, 255–56 (noting various documentaries showing, among other things, a Cape manager who "always kept a black tie in his desk for funerals").

94.  <u>Lobbying and Perpetuating Misinformation in the United States.</u> Yet, while having knowledge of these health hazards, and while peddling a toxic product throughout the United States (including in South Carolina), Cape used misinformation to influence public and corporate opinions about asbestos—working with government officials to protect South African (*i.e.*, Oppenheimer) business interests.[26] Cape acted as head cheerleader for the continuation of the asbestos trade, taking a keen interest in organizing efforts to downplay knowledge of the health hazards posed.[27]

---

[25] *See, e.g.*, R. Gaze Tr. 2, 111 (June 5, 1975) (Cape official admitting knowledge of asbestosis risk "since the first day [he] was employed" there in 1943); J. Christopher Wagner et al., *Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province*, 17 Brit. J. Indus. Med. 260, 261–62 (1960) (study published by South African researchers linking mesothelioma with occupational and non-occupational exposure to Cape asbestos); Richard Doll, *Mortality from Lung Cancer in Asbestos Workers*, 12 Brit. J. Indus. Med. 81, 86 (1955) (concluding from data that "lung cancer was a specific industrial hazard of certain asbestos workers"); *see also* McCulloch & Tweedale (2008) at 8–9, 119–20 (listing various studies of, or laws concerning, asbestos disease from 1898 to 1964, and noting that "[f]ew medical authors ever expressed doubt about the relationship between malignant mesotheliomas and asbestos exposure, and by 1953, the issue seemed to be fairly well resolved").

[26] *See, e.g.*, CAPE000955 (official of South African mining holding company, Cape Asbestos South Africa (Pty.) Ltd., writing to NAAC as a fellow member "of the Cape Asbestos Group and the Charter Consolidated Group," and introducing as a resource the Commercial Counseller at the South African Embassy in Washington, DC).

[27] *See, e.g.*, CAPE000130 (Cape Asbestos Fibres Limited prioritizing efforts to "organize a body of medical opinion that is prepared to stand up" to critical opinions).

95. <u>Examples of U.S. Misinformation Efforts.</u> For example, in 1954, the year after NAAC's establishment, Cape became a member of the U.S.-based Asbestos Textile Institute, which organized regular meetings to discuss developments in the asbestos industry, including the prospect of governmental regulation. Above all other companies, Cape was especially keen to suppress knowledge about the risks of asbestos. Thus, when Johns-Manville proposed labeling on bags of asbestos in 1968, Cape had a "bitter" response, suggesting that such a step should never be taken unilaterally by one producer. *Dring v. Cape: Key Points from Documents Obtained by the Asbestos Victims Support Groups Forum UK*, at 23 (*available at* https://asbestosforum.org.uk/cape-documents/) [hereinafter, "Dring Documents"]. And once Johns-Manville finally decided to adopt a warning label, Cape proposed use of an inaccurate warning that inhalation of only "substantial quantities" of asbestos could be harmful. *Id.* at 21.

96. <u>Lobbying and Perpetuating Misinformation in England.</u> In England in the 1950s and 1960s, Cape joined forces with other companies in the British asbestos industry to establish the Asbestosis Research Council and the Asbestos Information Committee, which worked to "publish several reassuring booklets on the use of asbestos." Tweedale (2000) at 174, 191. In addition, in or around 1966–68, Cape lobbied the British Occupational Hygiene Society to weaken protections for workers from a "no dust policy" to a "maximum allowable concentration approach," while continuing its misinformation campaign in the public and its strong-arm tactics designed to deter other manufacturers from introducing warning labels. Dring Documents, at 1.

97. <u>Hiding the Truth to Profit.</u> A linchpin of these schemes was Cape's role in providing misleading reassurances to the government and public about the dangers of asbestos, which conflicted with Cape's own internal data on the health risks of asbestos. Ultimately, when faced with a decision of shutting down the business (particularly, its South African mines) or

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

"suppress[ing] knowledge of disease," Cape "chose[] the latter" and "worked hard to keep information about mesothelioma secret." McCulloch & Tweedale (2008) at 120.

## IV.    Cape Implemented a Strategy to Evade Liability in the United States

98.    _Initial Maneuvers to Evade Liability Risk._ In the early 1970s, after the onset of asbestos- related products-liability litigation, _see, e.g._, _Borel v. Fibreboard Paper Prods. Corp._, 493 F.2d 1076 (5th Cir. 1973) (successful suit by insulation worker, widely acknowledged to have precipitated a wave of asbestos litigation in the 1970s), Cape and its affiliated entities undertook numerous actions in a deliberate effort to escape responsibility for the harm caused by Cape asbestos products.[28] For example, Cape went through tortured machinations to make it _appear_ it was reducing oversight over NAAC, but in reality, NAAC continued to operate as a controlled instrumentality under Cape's domination.[29] And these changes were the result of careful assessments by Cape officials—with the help of its lawyers and other advisors—regarding how to minimize the liability exposure of not only Cape, but Cape's parent (Charter) and its other South African affiliates. _See_ CAPE000141 (NAAC counsel advising Cape on risk of judgments attaching to Charter assets).

99.    _Public Downplaying of Responsibility._ At first, at least in their public statements, Charter and Cape "strenuously contested" their liability and concluded that "no material liability is likely to arise as a result of the actions," because "[i]n the opinion of American legal advisers,

---

[28] _See, e.g._, CAPE000351–56 (1975 lawyer letter referring to "attempt to limit NAAC's and Cape's exposure to future United States litigation").

[29] _See_ CAPE000123 (NAAC discouraging Cape visits to the U.S. in 1978 or else negate "maneuvers" related to "continued problems with product liability litigation"); CAPE000152 (1975 letter suggesting to "disassociate the Parent Company as fully as possible from the operating companies"); CAPE000154 (1975 letter raising whether to "do something to change the identity of NAAC in order to avoid exposing the company unnecessarily," while doing "everything possible to maintain a successful selling operation in the United States"); CAPE000166–67 (1974 lawyer letter suggesting that "no one from Cape be an officer of NAAC since we want it to be as independent as possible in order to avoid any contention that it is the alter ego of Cape and that Cape is doing business in the United States"); CAPE000333 (1975 Cape Asbestos letter stating "that it would be a sensible precaution against Cape's involvement in any future proceedings for [Cape personnel] to resign from the N.A.A.C. Board," and enclosing resignation letters).

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

the amounts claimed are highly speculative and conjectural and have only a tenuous basis in law or in fact." Charter 1975 Annual Report, at 30 (June 3, 1975).

100. <u>Implementing Liability-Avoidance Strategy.</u> In parallel, and central to that claim and their plan to avoid liability, Cape directed a campaign of litigation avoidance by refusing to accept process or appear in any U.S. proceedings. That campaign continues unabated today, as evidenced by Cape's failure to respond to the Second Amended Summons in this action, which was served pursuant to Article 10 of the Hague Convention on March 8, 2022.[30]

101. <u>Opinion of Moral Irresponsibility.</u> More broadly, according to Cape executives, this strategy was warranted because they "really cannot be said to have a moral responsibility [to respond to the suits] and are simply victims of the US product liability cult." Tweedale & Flynn (2007) at 283; CAPE000486.

102. <u>Financials Based on Immoral Opinion.</u> In addition, despite knowing the liability risk, Cape and its affiliates—including its parent company, Charter—refused to make any provision for or reserve of cash to address that liability. *See* CAPE000781 (1971 correspondence regarding Charter's annual report). Indeed, for most of NAAC's existence under Charter, Charter refused to even acknowledge NAAC, despite listing various other Cape subsidiaries in England, South Africa, and other countries as among Cape's subsidiaries. *See, e.g.*, Charter 1970 Annual Report, at 10 (June 18, 1970) (listing Cape entities in South Africa, England, and Ireland).

103. <u>Cape Liquidates NAAC as Part of Its Liability-Avoidance Scheme.</u> Ultimately, to avoid liability to the tens of thousands of people injured or killed by its asbestos, Cape decided to

---

[30] *See* CAPE000550–51 (NAAC personnel opining in 1978 "that it is most unlikely that any plaintiff would bother to pursue collection of any default judgments against Cape"); CAPE000702 (NAAC counsel in 1979 confirming receipt of correspondence stating that "U.K. and South African lawyers confirm that any resulting judgments will not be enforceable against Cape's U.K. and South African assets" and that "the potential loss of all NAAC's outstanding assets is not material in the Cape Group context").

liquidate NAAC, effective January 31, 1978 (though articles of dissolution were filed later, on or around May 19, 1978). *See, e.g.*, CAPE001035 (April 1978 letter noting liquidation and requesting, "for safety's sake," that Cape officials stop sending accounting memoranda to former NAAC officials). Existing commercial debts of NAAC were paid, with any remaining assets transferred upstream to NAAC's direct parent company at the time, Cape Industries Overseas Ltd.—a U.K. entity wholly owned by Cape Industries Ltd. (formed in 1975 to create the *appearance* of separation). *See* CAPE000593 (noting conveyance of assets); CAPE000149 (noting new entity).

104.    Liquidation Despite Continued Profitability. The decision to liquidate NAAC occurred notwithstanding consistent years of record profits from Cape's sale of asbestos fiber in the United States. *See, e.g.*, Charter 1976 Annual Report, at 7, 38–39 (June 8, 1976) (reporting £10.2 million of operating profit "in spite of difficult trading conditions," with the "greatest increase" in improved profit "arising in the mining division, which raised total tonnage both mined and sold," even despite "substantial price increases"); Charter 1977 Annual Report, at 7, 11, 13 (June 9, 1977) (reporting another "record year" from Cape with pre-tax profit of £14.2 million, with the "mining division again perform[ing] exceptionally well").

105.    NAAC's Minimal Assets at Liquidation. As part of its overall scheme, and in light of Cape's funneling of cash from NAAC to overseas entities over many years, NAAC's assets at liquidation were minimal, as an absolute matter, and especially when compared to the total wealth of Cape and the broader Oppenheimer empire.[31]

---

[31] *See, e.g.*, CAPE000701 (Cape counsel writing in 1979 with respect to whether the remaining assets in the NAAC liquidating trust should be written off, soon after its creation); CAPE000702 (1979 correspondence noting that NAAC's auditor "agree[d] that the potential loss of all NAAC's outstanding assets is not material in the Cape Group context" (capitalization altered)); CAPE000722 (1978 correspondence noting judgment non-enforceability and "[auditor] advice to [Cape] that the loss of NAAC's outstanding assets is not material in the Cape Group context").

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

106.    <u>Accepting Defaults to Perpetuate the Liability-Avoidance Scheme.</u> NAAC's liquidation was central to Cape's liability-avoidance strategy, and was predicated on legal advice that no British or South African court would enforce a judgment against a Cape entity if it never appeared again in the United States.[32] That strategy, more broadly, was taken right out of the Oppenheimer empire's operational playbook in the United States: (i) profit greatly from a business (including for the sale of asbestos), (ii) extract those profits from the United States to foreign entities, across an ever-changing, byzantine corporate structure, (iii) undercapitalize the United States operating entity, (iv) liquidate ownership interests when they sensed liability was imminent, while otherwise maintaining that there was no physical presence in the United States, and (v) retain overseas the massive financial fruits of their unlawful schemes, which, as to asbestos sales, were at the expense of dead and dying Americans, including South Carolinians. *See, e.g.*, Kanfer (1995) at 317–18 (describing De Beers' abrupt sale of equity in an American company to avoid antitrust liability, which had previously been hidden by "the usual thicket of [European] registrations," such that "financial facts were buried in the records of some 300 interlocking corporations").

107.    <u>Continuation of the Asbestos Business.</u> Even before NAAC's dissolution, Cape contemplated ways to continue the flow of asbestos to U.S. customers and asbestos profits out of the United States, despite the formality of liquidating NAAC.[33]

108.    <u>Creation of New American and Foreign Entities.</u> To facilitate this ruse, Gerry Morgan (NAAC's final President) formed Continental Products Corporation ("CPC") to act as a commission agent for the future sales of asbestos from South Africa in the United States.

---

[32] *See, e.g.*, CAPE000141–43 (1975 legal letter advising Cape on default-judgment risk); CAPE000566 (1978 memorandum agreeing that it would be in the "best interests of Cape companies other than NAAC" to make "no response" to litigation); CAPE000617–19 (summarizing 1984 deposition testimony regarding litigation strategy).
[33] *See, e.g.,* CAPE000728 (1977 meeting memorandum involving Cape officials "to discuss liquidation of NAAC and formation of new off-shore company to service North American market").

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Conveniently, CPC used the same NAAC address in Chicago, Illinois, and received funding from Cape in London. And CPC acted with South African mines to sell through a Lichtenstein-based entity named Associated Mines Company ("AMC") associated with Cape or other Oppenheimer-affiliated business interests. *See, e.g.*, CAPE000386; CAPE000531 (announcement of CPC as "Agent to handle the North American requirements for Amosite and Crocidolite asbestos fibre").

109.    <u>Transfer of IP Rights to New Entities.</u> Brazenly, Cape even directed the transfer of certain intellectual property owned by NAAC for future use by CPC and AMC. *See, e.g.,* M. Meyer Tr. 14–18 (May 18, 1982) (describing the assignment of the "Noramite" trademark for certain asbestos mats and plastics).

110.    <u>Objective of New Entities.</u> Ultimately, the "purpose of this corporate arrangement [was] to eliminate or reduce as much as possible the exposure in the United States of [South African mining companies] to lawsuits brought against it under theories of strict liability concerning products liability on the sale of asbestos in the United States." CAPE000377–79.

111.    <u>Selling Mines as Part of the Liability-Avoidance Scheme.</u> Outside of the United States, Cape took additional steps to disassociate itself from asbestos generally, despite its long-held role "as a major world producer of asbestos fibre" and "the Cape name [being] synonymous with asbestos." Cape 1980 Review, at 2. On June 29, 1979, Cape sold "the whole of [its] asbestos mining interest in South Africa" to Transvaal Consolidated Land and Exploration Company Ltd. ("Transvaal"), *id.*, earning proceeds of £15.1 million to "finance the group's expansion in other areas of its business," Charter 1979 Annual Report, at 12 (July 4, 1979).

112.    <u>Anglo's Continued Interest in Asbestos.</u> Although Charter asserted that "mining subsidiaries in South Africa were sold *outside* the group," *id.* at 35 (emphasis added), its own annual reports from prior years establish that Charter had previously owned the purchasing

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

entity, Transvaal, and still had a financial interest in Transvaal, including through either another Anglo entity or Charter's interest in Barlow Rand Ltd. *See* Charter 1965 Annual Report, at 3, 5 (May 19, 1965) (listing Transvaal as a "principal interest[]," along with Rand Mines Ltd.); Charter 1972 Annual Report, at 12 (May 30, 1972) (referencing merger between Rand Mines Ltd. and Thos Barlow & Sons Ltd. in June 1971, resulting in Charter acquiring a 3.86% interest in the merged company, Barlow Rand Ltd., in exchange for its previous 15.9% interest in Rand Mines Ltd.); Charter 1973 Annual Report, at 8 (June 21, 1973) (reporting that Charter sold its interest in Transvaal in April 1972 "to companies in the Anglo American Corporation group").[34]

113.    Cape's Business Pivot. In 1982, Cape purported to cease all manufacturing of asbestos products.[35] Unfathomably, even for a collective of companies as devious as these, Cape refocused its business on—wait for it—asbestos removal. This is not fiction; it has been proudly touted by Cape.[36]

114.    The Scheme Was Contemptibly Successful. Within years of executing the liability-avoidance scheme, business historians recognized that "Cape Industries"—as part of Charter, *i.e.*, Anglo's international/industrial investment arm—was "astonishingly adept at extricating itself from the [asbestos] business without paying huge compensation." Pallister (1988) at 345.

---

[34] *See also, e.g.*, Joseph Lelyveld, *The Many Faces of Barlow Rand Ltd.*, N.Y. Times, Apr. 11, 1982 (noting Barlow Rand was "the second-biggest industrial and mining group in South Africa," after "the vast Anglo-American Corporation and its chairman, Harry F. Oppenheimer, whose place in the moneyed portion of [South African] society makes him a one-man aristocracy"); Flynn (1992) at 194 ("In the end the company became so worried about the extent of Anglo American's liabilities for deaths and injuries that they sold the mines, including Penge, to Barlow Rand, another company with strong connections to Harry Oppenheimer.").

[35] *Cape Website: Our History* (May 17, 2013),
https://web.archive.org/web/20130517130040/http://www.capeplc.com/about-cape/our-history.aspx.

[36] *Cape Website: Our Services, Insulation* (Oct. 20, 2012),
https://web.archive.org/web/20121020173812/http://www.capeplc.com/services-and-markets/our-services/insulation.aspx.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

## V.     The Oppenheimers Implemented a Strategy to Further Evade Responsibility.

115.    <u>Empire Restructuring to Mitigate Risk.</u> Tellingly, while Cape implemented its liability- avoidance strategy, the Oppenheimer family similarly made changes to its investments to remove power and assets from Charter and relegate it to the periphery of the empire. On information and belief, these changes were motivated because the Oppenheimers and their partners (i) understood that Charter, like Cape, faced substantial financial exposure for asbestos-related liabilities in the United States, and (ii) were concerned those liabilities would also attach to Anglo and De Beers. *See, e.g.*, Charter 1980 Annual Report, at 34 (June 24, 1980) (reporting that Charter had been named a defendant in U.S. asbestos litigation "in its capacity as the holding company of" Cape and had been told that certain U.S. corporations would seek to hold Charter liable for their own liability).

116.    <u>The Oppenheimers' Transfer of Shares.</u> For example, beginning in the late 1970s, the Oppenheimer family began to substantially sell or otherwise divest their direct financial interests in Charter. *See, e.g.*, Charter 1977 Annual Report, at 47 (June 9, 1977) (indicating decrease in direct interest of Harry Oppenheimer); Charter 1983 Annual Report, at 41 (June 21, 1983) (indicating "nil" interest of the two listed Oppenheimers by April 1982).

117.    <u>Minorco's Rise.</u> Around 1980—*i.e.*, soon after Cape's sale of asbestos mines—the Minerals and Resources Corporation ("Minorco") "over[took] Charter as the group's overseas flagship." Pallister (1988) at 122; *see also* Donald G. McNeil Jr., *A Diamond Cartel May Be Forever; The Hereditary Leader of De Beers Pursues Post-Apartheid Growth*, N.Y. Times,

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Jan. 12, 1999 [hereinafter, "McNeil Article"] (reporting that Minorco had been created previously to evade anti-Apartheid sanctions).[37]

118.   Charter's Fall. As part of that pivot to Minorco, there was a "divestiture by Charter of its strategic holdings in Anglo American, De Beers and Anglo American Investment Trust," which was a "very major step" in reorganizing the amalgamated Oppenheimer business empire and reducing (but not eliminating) Anglo's "interference" with Charter. *See* A.J.W. Owston Tr. 67 (Aug. 22, 1984). As part of this divestiture, Charter "disposed of nearly all [its] investments in South Africa and adjoining territories," which involved a "major restructuring" that Charter acknowledged "substantially changed" its "assets and business interests." Charter 1980 Annual Report, at 5, 9 (June 24, 1980). Although Charter was purported to have received "a substantial amount of cash" from that sale, proceeds were used to repay debt and acquire Minorco shares. *See id.* at 5–6.

119.   Charter's Exile. Due to these restructurings, Anglo stopped acknowledging Charter as a material part of the Oppenheimer business empire—as it had been effectively replaced by Minorco. *Compare* Anglo 1977 Annual Report, at 3 (Mar. 25, 1977) (organizational chart portraying Charter on equal footing to Anglo and De Beers), *with* Anglo 1983 Annual Report, at 5 (June 28, 1983) (updated organizational chart making no reference to Charter at all). By the end of the 1980s, the Oppenheimers had stopped serving on the Charter board of directors all together, after unwinding themselves from Charter's assets and associated liabilities. *See* Charter 1989 Annual Report, at 46 (June 10, 1989) (no Oppenheimer listed for the Charter board of directors).

---

[37]   *Available at* https://www.nytimes.com/1999/01/12/business/international-business-diamond-cartel-may-be-forever-hereditary-leader-de-beers.html.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

120.   <u>A Weakened Charter.</u> For its part, after disposing of its South African investments, Charter touted a renewed focused on its operating subsidiaries in the United Kingdom, rather than acting primarily as a holding company for Oppenheimer business interests. *See, e.g.*, Charter 1986 Annual Report, at 2 (July 3, 1986) ("Charter has undergone a major change in recent years. The business has been extensively reshaped and much of the capital employed is now in operating companies."). However, without the backing of Anglo as a corporate patron, and with Cape no longer directly engaged with its main historical business—*i.e.,* mining and selling asbestos—both Charter and Cape were unable to achieve growth and profitability comparable to what they enjoyed in decades earlier as part of the Oppenheimer business empire.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

## VI.    **In Subsequent Years, There Have Been Changes to Third-Party Defendants.**

121.    <u>Changes to the Former Asbestos-Mining Empire.</u> Following Cape's escape from the United States, it changed its name and organization, and so did its affiliated companies and other actors that were part of the Cape liability-avoidance scheme. Certain of those entities and persons are named as Third-Party Defendants in this action, including as successors in interest and beneficiaries of Cape's liability-avoidance scheme, co-responsible for Cape's tortious conduct.



122.    <u>Changes to Cape.</u> Since the 1970s, Cape Asbestos Company Ltd. has undergone several changes to its organization, including (i) changing its name to Cape Industries Ltd. in 1974 (*i.e.*, removing "Asbestos" from its name, soon after the onset of asbestos products-liability litigation); (ii) re-registering as a public company and changing its name to Cape Industries PLC in 1981; (iii) shortening its name to Cape PLC in 1989; (iv) changing its name to Cape Intermediate Holdings PLC in 2011; and (v) re-registering as a private company to become Cape Intermediate Holdings Ltd. in 2013. And as of 2016, Cape Holdco Ltd. (controlled by Cape Industrial Services Group Ltd.) and The Law Debenture Corporation PLC were registered as Persons with Significant Control of Cape.

123. <u>Unmet Responsibilities.</u> Although Cape in the prior decades had entered into certain agreements to compensate for illness and death resulting overseas from its products (such as entering into a "Scheme of Arrangement" with former employees in 2006), Cape has done **nothing** about its massive unpaid responsibility for the death and illness caused by its asbestos products in South Carolina and elsewhere in the United States.

124. <u>Altrad's Acquisition and Subsequent Ownership of Cape.</u> On or around October 9, 2017, Altrad Investment Authority S.A.S. (a French company), through Altrad UK Ltd. (controlling Cape UK Holdings Newco Ltd.), acquired and has since controlled Cape. Those entities are owned and controlled by the multinational Altrad Group, which has renamed certain Cape entities as well, including Altrad Services Ltd. (f/k/a Cape Industrial Services Ltd.).

125. <u>Altrad's U.S. Subsidiaries.</u> In addition, the Altrad Group acquired Sparrows Offshore Group Ltd. in 2022, which established the Altrad Group's presence in the United States through its (i) operations in the southern United States, and (ii) ownership of U.S.-registered entities, including Hawk BidCo US Inc., Arranco US, LLC, Sparrows Offshore, LLC, and the Sparrows Group, LLC.[38]

126. <u>Altrad's Owner.</u> The Altrad Group—and thus Cape—is controlled by its French–Syrian President and Founder, Mohed Altrad, a/k/a the "Scaffolding King." *See* Altrad 2022 Annual Report, at 36 (Feb. 9, 2023);[39] *see also* Gaspard Sebag & Tara Patel, *Billionaire Scaffolding 'King' Guilty of Bribing Rugby Boss*, Bloomberg (Dec. 13, 2022) (reporting Mr. Altrad's recent corruption conviction, punished with an 18-month suspended jail term and €50,000 fine).[40]

---

[38] *See, e.g.*, *Altrad Completes Acquisition of Engineering and Maintenance Specialist Sparrows Group*, Altrad (July 12, 2022), https://www.altrad.com/en/newsreader/altrad-completes-acquisition-of-engineering-and-maintenance-specialist-sparrows-group.html; *Sparrows Website: Global Locations*,

[39] *Available at* https://newsmanager.altrad.com/files/altrad-group/news/2023/02/09_annual-report-2022/annual-report_2022_en_double_br-min.pdf.

[40] *Available at* https://www.bloomberg.com/news/articles/2022-12-13/scaffolding-billionaire-convicted-of-corruption-over-sponsorship#xj4y7vzkg.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

127. <u>Altrad Defendants.</u> Ultimately, each of the entities identified herein along with Mohed Altrad, are either successors in interest to Cape and its numerous subsidiary and affiliated entities, or beneficiaries from Cape's liability-avoidance scheme, or both, and are collectively referred to as the "Altrad Defendants."

| ALTRAD AND CAPE-AFFILIATED ENTITIES ("ALTRAD DEFENDANTS") | |
|---|---|
| <u>Cape Subsidiaries / Control</u>:<br>• Cape Holdco Ltd.<br>• The Law Debenture Corp. PLC<br>• Cape UK Holdings NewCo Ltd.<br>• Cape Indus. Servs. Grp. Ltd.<br>• Altrad Servs. Ltd. (f/k/a Cape Indus. Servs. Ltd.) | <u>Altrad Ownership</u>:<br>• Mohed Altrad<br>• Altrad Inv. Auth. S.A.S<br>• Altrad UK Ltd. |

128. <u>Involvement of Affiliated Oppenheimer Businesses.</u> At all times relevant to Cape's business in the United States and its perpetuation of the liability-avoidance scheme, Cape was owned, controlled, operated by, and dominated in furtherance of and in concert with Oppenheimer business interests in South Africa, the United Kingdom, and elsewhere—to those entities' substantial financial benefit.

129. <u>Oppenheimer Defendants.</u> Those dominating, conspiring, facilitating, or otherwise financially benefiting entities include Anglo American Corporation of South Africa Ltd. (as predecessor in interest to Anglo American PLC) and De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers S.A., De Beers UK Ltd., and De Beers Jewellers Ltd. Those entities currently have presence, operations, and business in the United States, including in South Carolina, through De Beers Jewellers (US), Inc., Anglo American US Holdings Inc., Element Six U.S. Corporation, Element Six Technologies US Corporation, Element Six Technologies (OR) Corp., First Mode Holdings, Inc., Platinum Guild International (U.S.A.) Jewelry, Inc., Lightbox Jewelry Inc., Forevermark US, Inc., and Anglo American Crop Nutrients (USA), LLC. All of these

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

companies are collectively referred to as the "Oppenheimer Defendants," with Anglo American

PLC acting as ultimate parent company for each. *See, e.g.*, Anglo 2022 Annual Report, at 283

(Feb. 22, 2023).[41]

130.    <u>Increased U.S. Activities.</u> Since closing NAAC and implementing their liability-

avoidance scheme, the Oppenheimer Defendants have increased their business activities in the

United States, with certain of them using courts in the United States to enforce trademarks or other

valuable rights, including under the De Beers name.[42]

| ANGLO AMERICAN PLC ("OPPENHEIMER DEFENDANTS") | |
| --- | --- |
| "De Beers Group" Subsidiaries:<br>• De Beers PLC<br>• De Beers Centenary AG<br>• De Beers Consol. Mines Ltd.<br>• De Beers S.A.<br>• De Beers UK Ltd.<br>• De Beers Jewellers Ltd. | United States Subsidiaries:<br>• De Beers Jewellers (US), Inc.<br>• Anglo Am. US Holdings Inc.<br>• Element Six U.S. Corporation<br>• Element Six Techs. US Corp.<br>• Element Six Techs. (OR) Corp.<br>• First Mode Holdings, Inc.<br>• Platinum Guild Int'l (U.S.A.) Jewelry, Inc.<br>• Lightbox Jewelry Inc.<br>• Forevermark US, Inc.<br>• Anglo Am. Crop Nutrients (USA), LLC |

131.    <u>Changes to Charter.</u> In 1993, after the broader Oppenheimer empire had demoted

Charter's role in the business, Charter re-registered as a public company, becoming Charter PLC.

---

[41]    *Available    at    https://www.angloamerican.com/~/media/Files/A/Anglo-American-Group-v5/PLC/investors/annual-reporting/2022/aa-annual-report-full-2022.pdf.* In 1998, Anglo American Corporation of South Africa Ltd. moved its headquarters to London and re-registered as Anglo American PLC, which involved complex changes to its corporate structure that included absorbing Minorco and moving assets out of South Africa (thereby mitigating the risk of post- Apartheid nationalization). *See* McNeil Article. In November 2011, moreover, the Oppenheimer family sold its direct stake in the De Beers Group to Anglo American PLC for $5.1 billion, while (on information and belief) retaining indirect ownership through other entities. *See, e.g.*, Mark Scott, *Anglo American in Deal to Take Control of De Beers*, N.Y. Times, Nov. 4, 2011.
[42] *See, e.g.*, *De Beers UK Ltd. v. Adwar Casting, Co., Ltd.*, No. 4:10-cv-00843, ECF No. 3 (W.D. Mo. Sept. 15, 2010) (corporate disclosure statement of plaintiff identifying De Beers UK Ltd. as a wholly owned subsidiary of De Beers Centenary AG); *De Beers Centenary AG v. John- Robert:Hasson*, No. 1:10-cv-23024, ECF No. 1 (S.D. Fla. Aug. 23, 2010) (action initiated by De Beers entity).

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

In 1996, Charter sold its interest in Cape for approximately £48 million. In 2008, a new holding company, Charter International PLC, took over Charter PLC,[43] and then, effective January 13, 2012, Colfax Corporation ("Colfax") acquired Charter at a $2.4 billion valuation, with Charter enjoying minimal debt on its balance sheet. *See* Colfax Corp. Form 8-K (Jan. 17, 2022);[44] Colfax Corp. Schedule 14A (Dec. 19, 2011).[45] In making that acquisition, Colfax disclosed Charter's exposure to asbestos-related lawsuits in the United States, but the companies (i) assessed it as not having "a material effect on Charter's financial position," (ii) dismissed any associated expenses as "negligible," and (iii) ultimately made no provision for Charter's asbestos liability. Colfax Corp. Schedule 14A (Dec. 19, 2011).

132.    Charter Defendants. By 2022, Colfax sold its interests in Charter's businesses, including, on information and belief, those associated with Cape-related liabilities—namely, ESAB Corporation. *See Enovis (Formerly Colfax) Completes Spin-Off of ESAB Corporation* (Apr. 5, 2022).[46] On information and belief, ESAB Corporation is currently the parent company of, as well as a successor in interest to, Charter Consolidated Ltd., along with Charter's subsidiary Central Mining & Investment Corporation Ltd., and each is collectively referred to as "Charter Defendants."

## CLAIMS OF THE PLAINTIFFS

133.    Plaintiffs, collectively listed on Exhibit A, individually and as Personal Representatives of various Estates, bring this action for monetary damages because of Plaintiffs contracting an asbestos-related diseases.

---

[43] *See    Charter   Website: History* (Dec.    12,    2008), https://web.archive.org/web/20081212114613/http://www.charter.ie/chtr_int/about/history/.
[44] *Available at* https://www.sec.gov/Archives/edgar/data/1420800/000134100412000060/cfx_8k.htm.
[45] *Available at* https://www.sec.gov/Archives/edgar/data/1420800/000114420411070464/v242942defm14a.htm.
[46] *Available  at*  https://ir.enovis.com/news-releases/news-release-details/enovis-formerly-colfax-completes-spin-esab-corporation.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

134.     Plaintiffs were each diagnosed with asbestos related disease, including but not limited to, mesothelioma and lung cancer, and in some cases, died from these same diseases.

135.     Plaintiffs' asbestos related diseases were each caused by exposure to asbestos during the course of their employment, work careers, and/or through take home exposures to asbestos as a result of their family members' work.

136.     Exposures relevant to Defendants, Cape PLC, as successor-in-interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) and  as a result, to each of the entities named herein, are detailed on Exhibit A.  These exposures involve direct and/or take-home exposure to airborne asbestos fibers released through activities, including but not limited to, the sale, distribution, installation, removal, manipulation, disturbance, and other activates of Defendants at jobsites where Cape PLC, as successor-in-interest to Cape Industries Ltd. (f/k/a Cape Asbestos Company Ltd.) and its subsidiaries and global affiliates, supplied, removed, installed, or contracted for the use of asbestos fibers South Carolina and throughout the United States.

137.     Plaintiffs' cumulative exposure to asbestos as a result of acts and omissions of Defendants and their defective products and materials, individually and together, was a substantial factor in causing Plaintiffs' asbestos related diseases, and therefore under South Carolina law, is the legal cause of Plaintiffs' injuries and damages.

138.     Plaintiffs nor their family members, were aware at the time of exposure, that asbestos or asbestos-containing products presented any risk of injury and/or disease.

139.     Plaintiffs have been informed and believe, and thereon allege, that progressive lung diseases, including mesothelioma and other serious diseases, are caused by inhalation of asbestos fibers and that said diseases result from exposure to asbestos and asbestos-containing products over a period of time.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

140.    As a direct and proximate result of the conduct as alleged within, Plaintiffs suffered permanent injuries, including, but not limited to, mesothelioma, lung cancer, and other lung damage, as well as the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to their damages in the sums of the amounts as the trier of fact determines are proper.

141.    As a direct and proximate result of the conduct as hereinafter alleged, Plaintiffs incurred liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiffs at this time. Plaintiffs request leave to supplement this Court and all parties accordingly when the true and exact cost of Plaintiffs' medical treatments are ascertained.

142.    As a further direct and proximate result of the conduct as hereinafter alleged, Plaintiffs incurred loss of profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiffs. Plaintiffs request leave to supplement this Court and all parties accordingly to conform to proof at the time of trial.

### FOR A FIRST CAUSE OF ACTION
**(Product Liability: Negligence)**

**Plaintiffs Complain of Defendants for a Cause of Action for Negligence Alleging as Follows:**

143.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each and every paragraph of the General Allegations above.

144.    At all times herein mentioned, the named Defendants was an entity and/or the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, or division of an entity, hereinafter referred to collectively as "alternate entities," engaged in the

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

business of researching, studying, manufacturing, fabricating, designing, modifying, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos, other products containing asbestos, and products manufactured for foreseeable use with asbestos products.

145.     At all times herein mentioned, Defendants, and/or its "alternate entities" singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, inadequately warned or failed to warn of the health hazards, failed to provide adequate use instructions for eliminating the health risks inherent in the use of the products, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos, other products containing asbestos, and products manufactured for foreseeable use with asbestos products, in that said products caused personal injuries to Plaintiffs and others similarly situated, (hereinafter collectively called "exposed persons"), while being used for their intended purpose and in a manner that was reasonably foreseeable.

146.     The asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that there was an alternative for asbestos that could have been used as the product or as a component instead of asbestos within a normally asbestos-containing/utilizing product.  Said alternatives would have prevented Defendants' asbestos and asbestos-containing products from causing Plaintiffs' asbestos related disease and in some circumstances, subsequent death, due to an inability of any asbestos-alternative to penetrate the pleural lining of Plaintiffs'

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

lungs, even if inhaled.  Said alternatives came at a comparable cost to Defendants and/or its "alternate entities." Said alternatives were of comparable utility to the asbestos or asbestos-containing products of Defendants and/or its "alternate entities."  The gravity of the potential harm resulting from the use of Defendants' asbestos or asbestos-containing products, and the likelihood such harm would occur to users of its products, far outweighed any additional cost or marginal loss of functionality in creating and/or utilizing an alternative design, providing adequate warning of such potential harm, and/or providing adequate use instructions for eliminating the health risks inherent in the use of their products, thereby rendering the same defective, unsafe and dangerous for use by Plaintiffs and/or their family members.  Defendants and/or its "alternate entities" had a duty to exercise due care in the pursuance of the activities mentioned above and Defendants breached said duty of due care.

147.     Defendants and/or its "alternate entities" knew or should have known, and intended that the aforementioned asbestos and asbestos-containing products would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to grinding sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling by exposed persons, including Plaintiffs and/or their family members, would use or be in proximity to and exposed to said asbestos fibers.

148.     At all times relevant, Defendants and/or its "alternate entities" were aware of its asbestos and asbestos-containing products' defect but failed to adequately warn Plaintiffs or their

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

family members, or others in their vicinity, as well as failed to adequately warn others of the known hazards associated with their products and/or failed to recall or retrofit its products. A reasonable manufacturer, distributor, or seller of Defendants' products would have, under the same or similar circumstances, adequately warned of the hazards associated with their products.

149. Plaintiffs, their family members, and others in their vicinity used, handled or were otherwise exposed to asbestos and asbestos-containing products referred to herein in a manner that was reasonably foreseeable. Plaintiffs' exposures to asbestos and asbestos-containing products occurred at various locations as set forth in this Complaint.

150. Plaintiffs suffer/suffered from asbestos related disease, including but not limited to mesothelioma and lung cancers which are related to exposures to asbestos and asbestos-containing products. Plaintiffs, not their exposed family members, were not aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury or disease.

151. Defendants' conduct and defective products as described in this cause of action were a direct cause of Plaintiffs' injuries, and all damages thereby sustained by Plaintiffs. Therefore, Plaintiffs seek all compensatory damages in order to make them whole, according to proof.

152. Furthermore, the conduct of Defendants and/or its "alternate entities" in continuing to market and sell products which they knew were dangerous to Plaintiffs, their family members, and the public without adequate warnings or proper use instructions was done in a conscious disregard and indifference to the safety and health of Plaintiffs and others similarly situated.

153. In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, failing to recall or retrofit, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing,

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products or products manufactured for foreseeable use with asbestos products, Defendants and/or its "alternate entities" did so with conscious disregard for the safety of "exposed persons" who came in contact with asbestos and asbestos-containing products, in that Defendants and/or its "alternate entities" had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos, asbestos-containing products or products manufactured for foreseeable use with asbestos products, including, but not limited to, asbestosis, mesothelioma, lung cancer, and other lung damages. This knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of Defendants and/or its "alternate entities."

154.    Defendants and its "alternate entities" were aware that members of the general public and other "exposed persons," who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos, asbestos-containing products, or products manufactured for foreseeable use with asbestos products, could cause injury, and Defendants, and its "alternate entities," each of them, knew that members of the general public and other "exposed persons," who came in contact with asbestos and asbestos-containing products or products manufactured for foreseeable use with asbestos products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health and human life.

155.    The above-referenced conduct of Defendants, and its "alternate entities," was motivated by the financial interest of Defendants, its "alternate entities," and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, instructing, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection,

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos, asbestos-containing products and products manufactured for foreseeable use with asbestos products. Defendants, its "alternate entities," and each of them consciously disregarded the safety of "exposed persons" in pursuit of profit. Defendants was consciously willing and intended to permit asbestos and asbestos-containing products to cause injury to "exposed persons" without warning them of the potential hazards and further induced persons to work with and be exposed thereto, including Plaintiffs.

156.    Plaintiffs and other exposed persons did not know of the substantial danger of using Defendants' asbestos, asbestos containing-products, and products manufactured for foreseeable use with asbestos products. The dangers inherent in the use of these products were not readily recognizable by Plaintiffs, their family members, or other exposed persons. Defendants and/or its "alternate entities" further failed to adequately warn of the risks to which Plaintiffs and others similarly situated were exposed.

157.    Defendants and/or its "alternate entities" are liable for the fraudulent, oppressive, and malicious acts of its "alternate entities," and each Defendants' officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of its "alternate entities" as set forth herein.

158.    The herein-described conduct of Defendants, and its "alternate entities," was and is willful, malicious, fraudulent, and outrageous and in conscious disregard and indifference to the safety and health of persons foreseeably exposed.  Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof against all defendants.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

<u>FOR A SECOND CAUSE OF ACTION</u>
**(Product Liability: Strict Liability - S.C. Code Ann. § 15-73-10, et seq.)**

**As a Second and Distinct Cause of Action for Strict Liability, Plaintiffs Complain of Defendants, and Allege as Follows:**

159.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs.

160.    Plaintiffs suffered from asbestos related disease, including, mesothelioma and lung cancer, related to exposure to asbestos, asbestos-containing products and products manufactured for foreseeable use with asbestos products. Plaintiffs, nor their family members, were aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease.

161.    The Defendants' conduct and defective products as described above were a direct cause of Plaintiffs' injuries, and the injuries and damages thereby sustained by Plaintiffs.

162.    Furthermore, the Defendants' conduct and that of its "alternate entities" in continuing to market and sell products which they knew were dangerous to Plaintiffs and the public without adequate warnings or proper use instructions, was done in a conscious disregard and indifference to the safety and health of Plaintiffs and others similarly situated.

163.    Defendants and/or its "alternate entities" knew or should have known, and intended that the aforementioned asbestos and products containing asbestos would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to grinding, sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

asbestos fibers, and that through such foreseeable use and/or handling, "exposed persons," including Plaintiffs, would use or be in proximity to and exposed to said asbestos fibers.

164.    Plaintiffs, their family members, and others in their vicinity used, handled or were otherwise exposed to asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products, referred to herein in a manner that was reasonably foreseeable. Plaintiffs' exposures to asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products occurred at various locations as set forth in this Complaint.

165.    Defendants and/or its "alternate entities" knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

166.    The asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that there was an alternative for asbestos that could have been used as the product or as a component instead of asbestos within a normally asbestos-containing/utilizing product. Said alternatives would have prevented Defendants' asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products from causing Plaintiffs' asbestos related diseases and in some circumstances, subsequent death, due to an inability of any asbestos-alternative to penetrate the pleural lining of the lung, even if inhaled. Said alternatives came at a comparable cost to each of the Defendants and/or its "alternate entities." Said alternatives were of comparable utility to the asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products of Defendants and/or its "alternate entities." The gravity of the potential harm resulting from the use of Defendants'

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

asbestos or asbestos-containing products, and the likelihood such harm would occur, far outweighed any additional cost or marginal loss of functionality in creating and/or utilizing an alternative design, providing adequate warning of such potential harm, and/or providing adequate use instructions for eliminating the health risks inherent in the use of their products, thereby rendering the same defective, unsafe and dangerous for use.

167.     The defect existed in the said products at the time they left the possession of Defendants, and/or its "alternate entities," and each of them. Said products were intended to reach the ultimate consumer in the same condition as it left defendants. Said products did, in fact, cause personal injuries, including mesothelioma, asbestosis, other lung damage, and cancer to "exposed persons," including Plaintiffs herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

168.     Plaintiffs and other exposed persons did not know of the substantial danger of using Defendants' asbestos, asbestos-containing products, or products manufactured for foreseeable use with asbestos products. The dangers inherent in the use of these products were not readily recognizable by Plaintiffs or other exposed persons. Said Defendants and/or its "alternate entities" further failed to adequately warn of the risks to which Plaintiffs and others similarly situated were exposed.

169.     Defendants' defective products as described above were a direct cause of Plaintiffs' injuries, and the damages thereby sustained.

170.     In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products, Defendants, and/or its "alternate entities," and each of them, did so with conscious disregard for the safety of Plaintiffs and other exposed persons who came in contact with the asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products, in that Defendants and/or its "alternate entities" had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products, including, but not limited to, mesothelioma, asbestosis, other lung damages and cancers. This knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of Defendants and/or its "alternate entities."

171.     Defendants and/or its "alternate entities" were aware that members of the public and other exposed persons, who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products could cause injury. Defendants and/or its "alternate entities" further knew that members of the general public and other exposed persons, who came in contact with asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products would assume, and in fact did assume, that exposure to asbestos and asbestos- containing products was safe, when in fact exposure was extremely hazardous to health and human life.

172.     The above-referenced conduct of Defendants and/or its "alternate entities" motivated by the financial interest of Defendants, its "alternate entities," and each of them, in the continuing and uninterrupted research, design, modification, manufacture, fabrication, labeling, instructing, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection,

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products. Defendants and/or its "alternate entities" consciously disregarded the safety of "exposed persons" in their pursuit of profit and in fact consciously intended to cause injury to Plaintiffs and other exposed persons and induced persons to work with, be exposed to, and thereby injured by asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products.

173.    Defendants are liable for the fraudulent, oppressive, and malicious acts of its "alternate entities," and each Defendants' officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and knew, or should have known of, the acts of each of its "alternate entities" as set forth herein.

174.    The conduct of said Defendants, its "alternate entities," and each of them as set forth in this Complaint, was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of exposed persons. Plaintiffs, for the sake of example and by way of punishing said Defendants, seeks punitive damages according to proof against Defendants.

175.    At all times herein mentioned, each of the named Defendants was an entity and/or the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, or division of an entity, hereinafter referred to collectively as "alternate entities," engaged in the business of researching, studying, manufacturing, fabricating, designing, modifying, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing,

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos, other products containing asbestos and products manufactured for foreseeable use with asbestos products.

## FOR A THIRD CAUSE OF ACTION
### (Negligence *Per Se*)

**As a Third Distinct Cause of Action for Negligence *Per Se*, Plaintiffs Complain of Defendants, and Allege as Follows:**

176.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs.

177.    The actions and/or inactions of Defendants also constituted negligence *per se*.

178.    Defendants violated federal and state regulations relating to asbestos exposure. Such violations constitute negligence per se or negligence as a matter of law. Further, each such violation resulted in dangerous and unlawful exposures to asbestos for Plaintiffs. Plaintiffs are not making any claims under federal law; instead, Plaintiffs are simply using the violation of federal standards as proof of liability on state-law theories. Further, the reference to Federal regulations does not create a federal question. *See Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804 (1986). Any removal on this basis will be met with an immediate motion for remand and for sanctions.

179.    The negligence per se of Defendants was a proximate cause of Plaintiffs' injuries.

## FOR A FOURTH CAUSE OF ACTION
### (Product Liability: Breach of Implied Warranties - S.C. Code Ann. § 36-2-314)

**As a Fourth Distinct Cause of Action for Breach of Implied Warranties, Plaintiffs Complain of Defendants and Allege as Follows:**

180.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs.

181.    Defendants and/or their "alternate entities" impliedly warranted that its asbestos materials or asbestos-containing products were of good and merchantable quality and fit for their intended use.

182.    The implied warranty made by the Defendants and/or their "alternate entities" that the asbestos and asbestos-containing products were of good and merchantable quality and fit for the particular intended use, was breached.  As a result of that breach, asbestos was given off into the atmosphere where Plaintiffs and/or their family members carried out duties and was inhaled by Plaintiffs.

183.    As a direct and proximate result of the breach of the implied warranty of good and merchantable quality and fitness for the particular intended use, Plaintiffs were exposed to Defendants' asbestos, asbestos-containing products, and/or products manufactured for foreseeable use with asbestos products and consequently developed mesothelioma, causing Plaintiffs to suffer all damages attendant thereto.

### FOR A FIFTH CAUSE OF ACTION
#### (Fraudulent Misrepresentation)

**For a Fifth  Distinct Cause of Action for Fraudulent Misrepresentation, Plaintiffs Complain of Defendants, and Allege as Follows:**

184.    Plaintiffs repeat and re-alleges the portions of the above paragraphs where relevant.

185.    That during, before and after Plaintiffs' exposures to asbestos products manufactured by Defendants and/or their "alternate entities", the Defendants and/or their "alternate entities" falsely represented facts, including the dangers of asbestos exposure to Plaintiffs in the particulars alleged in the paragraphs above, while Defendants had actual knowledge of said dangers of asbestos exposure to persons such as Plaintiffs. At the same time of

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

these misrepresentations, Defendants knew of the falsity of its representations and/or made the representations in reckless disregard of their truth or falsity.

186.    The foregoing representations were material conditions precedent to Plaintiffs' continued exposure to asbestos-containing products.  Defendants and/or its "alternate entities" each intended that Plaintiffs act upon the representations by continuing his work around, and thereby exposure to, the asbestos products.  Plaintiffs and their family members  were ignorant of the falsity of Defendants' representations and rightfully relied upon the representations.

187.    As a direct and proximate result Plaintiffs' reliance upon Defendants' false representations, Plaintiffs suffered injury and damages as described herein.

## FOR A SIXTH CAUSE OF ACTION
### (Loss of Consortium)

**For a Sixth Distinct Cause of Action for Loss of Consortium, Plaintiffs Complain of Defendants, and Allege as Follows:**

188.    Plaintiffs incorporate by reference, the preceding paragraphs, where relevant.

189.    Deceased Plaintiffs', as identified on Exhibit A, were married and/or otherwise left surviving spouses, family members and heirs at the time of their passing.

190.    Prior to their injuries as alleged, Deceased Plaintiffs were able and did perform spousal and parental duties. As a proximate result thereof, subsequent to the injuries, Deceased Plaintiffs' were unable to perform spousal and parental duties and the work and service usually performed in the care, maintenance and management of the family home. As a proximate result thereof, Plaintiffs were deprived of the consortium of their spouses and family members including the performance of duties, all to Deceased Plaintiffs' damages, in an amount presently unknown to Plaintiffs but which will be proven at time of trial.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

191.    As a direct and proximate result of the acts of Defendants and/or their "alternate entities" and the severe injuries caused to Plaintiffs as set forth herein, Deceased Plaintiffs' spouses and family members suffered loss of consortium, including but not by way of limitation, loss of services, marital relations, parental relations, society, comfort, companionship, love, and affection of their spouses, and suffered severe mental and emotional distress and general nervousness. Plaintiffs pray judgment against Defendants, their "alternate entities" and each of them, as hereinafter set forth.

### FOR A SEVENTH CAUSE OF ACTION
**(Wrongful Death Action, S.C. Code Ann. § 15-51-10, et seq.)**

**For a Seventh Distinct Cause of Action for Wrongful Death, Plaintiffs Complain of Defendants, and Allege as Follows:**

192.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs, where relevant.

193.    Plaintiffs bring this cause of action for Deceased Plaintiffs' wrongful death pursuant to S.C. Code Ann. § 15-51-10, for the benefit of the Estates of each Deceased Plaintiff, and on behalf of the heirs of Deceased Plaintiffs, as defined by S.C. Code § 15-51-20.

194.    As a direct and proximate result of the negligence, recklessness, carelessness, and intentional actions of Defendants as described above, Deceased Plaintiffs' died on the dates indicated on Exhibit A, and their surviving spouses and/or heirs have and will endure pecuniary loss, mental shock and suffering, wounded feelings, grief, sorrow, loss of love, loss of society with the Deceased Plaintiffs, loss of guidance, loss of companionship and deprivation of the use and comfort of the Deceased Plaintiffs' experience, knowledge and judgment in managing the affairs of himself and his beneficiaries, and they have been otherwise seriously damaged.  Moreover, reasonable funeral expenses were incurred, and

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Plaintiffs pray for judgment against Defendants in such amount of actual and punitive damages as the trier of fact may determine.

<div align="center">

**FOR AN EIGHTH CAUSE OF ACTION**
**(Survival Action, S.C. Code Ann. § 15-5-90)**

</div>

**For an Eighth Distinct Cause of Action, known statutorily as a Survival Action, Plaintiffs Complains of Defendants, and Allege as Follows:**

195.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each of the preceding paragraphs, where relevant.

196.    Plaintiffs, as identified on Exhibit A hereto, are represented by their duly appointed Personal Representatives of the Deceased Plaintiffs' Estates, bring this survival action as allowed under S.C. Code Ann. § 15-5-90.

197.    Personal Representatives of the Plaintiffs bring this cause of action for Deceased Plaintiffs' medical, surgical and hospital bills, as well as for Deceased Plaintiffs' conscious pain and suffering prior to his untimely death, as well as for the mental distress of Deceased Plaintiffs due to knowledge of their impending death from these incurable diseases.

198.    As a direct and proximate result of the negligence, recklessness, carelessness, and in some cases intentional actions of Defendants as described, Deceased Plaintiffs endured conscious pain, suffering, mental anguish and distress until his untimely death, and Plaintiffs pray for judgment against Defendants in such amount of actual and punitive damages as the trier of fact may determine is just.

<div align="center">

**FOR A NINTH CAUSE OF ACTION**
**(Alter Ego and Veil Piercing Liability)**
**(Against the Altrad Defendants, Charter Defendants and Oppenheimer Defendants)**

</div>

**For a Ninth Distinct Cause of Action for Alter Ego and Veil Piercing Liability, Plaintiffs Complain of Altrad, Charter and Oppenheimer Defendants, and Allege as Follows:**

199.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

200.     South Carolina recognizes the imposition of liability under an "alter ego" theory based on a factual assessment of several factors, including: (i) common ownership; (ii) financial dependence; (iii) the degree of selection of executive personnel and failure to observe corporate formalities; and (iv) the degree of control over marketing and operational policies.

201.     Likewise, under a veil-piercing theory, South Carolina recognizes attaching liability to a shareholder through a two-part test involving, <u>first</u>, an eight-factor analysis of the shareholder's relationship to the corporation and, <u>second</u>, proof of an element of injustice or fundamental unfairness if the acts of the corporation are not regarded as the acts of the equity owners. As part of the first step, the eight factors are: (i) whether the corporation was grossly undercapitalized; (ii) failure to observe corporate formalities; (iii) non-payment of dividends; (iv) insolvency of the debtor corporation at the time; (v) siphoning of funds of the corporation by the dominant stockholder; (vi) non-functioning of other officers, directors, or stockholders; (vii) absence of corporate records; and (viii) the fact that the corporation was merely a façade for the operations of the dominant stockholder. In turn, to prove fundamental unfairness, the plaintiff must establish that: (i) the defendant was aware of the plaintiff's claim against the corporation, and (ii) thereafter, the defendant acted in a self-serving manner with regard to the property of the corporation and in disregard of the plaintiff's claim in the property.

202.     Numerous facts support the conclusion that, in furtherance of the ends of justice, the Court may exercise personal jurisdiction over the Altrad Defendants, the Charter Defendants and the Oppenheimer Defendants (collectively the "Alter-Ego Defendants") and impose liability on them for acts of Cape, which Alter-Ego Defendants are responsible for having dominated, controlled, facilitated, or benefited from, including, without limitation:

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

    (a)    The sale and distribution of asbestos in the United States, including to facilities in South Carolina or in asbestos-containing products used in South Carolina;

    (b)    The failure to follow corporate formalities between Cape and each of the Alter-Ego Defendants;

    (c)    The common and intentionally obfuscated ownership interests of the Alter-Ego Defendants;

    (d)    The financial, marketing, and operational dependence of Cape on those Alter-Ego Defendants;

    (e)    The domination and control of Alter-Ego Defendants over Cape's and NAAC's executive personnel and boards of directors, which caused, among other things, NAAC to fail to safeguard the interests of personal-injury claimants by placing adequate products-liability insurance;

    (f)    The funneling of assets out of the United States to escape attachment by personal- injury claimants, and the resulting gross undercapitalization of NAAC in the United States;

    (g)    The absence of, and intentional destruction of, corporate records related to the events described herein;

    (h)    The establishment or use of Cape and NAAC as sham entities and a façade for the operations of Oppenheimer interests in South Africa and elsewhere, thereby misrepresenting the true origin of Cape's products (including Cape's use of child laborers), the grave health hazards associated with those products, and the ownership of Cape's business (including ownership by African oligarchs); and

    (i)    The self-serving actions of Alter-Ego Defendants, despite their having knowledge that Cape's asbestos and asbestos-containing products would cause bodily injury to tens of thousands of individuals in the United States, including in South Carolina, and result in claims for reimbursement.

203.    The damages alleged against Cape in the Asbestos Suits resulted from the actions of Alter-Ego Defendants or their predecessors in interest, which dominated, controlled, facilitated, or benefited from Cape's successful asbestos business and liability-avoidance scheme. Accordingly, the proper and appropriate remedy under the circumstances here is for the Court to declare that

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

the Alter-Ego Defendants are alter egos of Cape and thereby liable to Cape and/or the Receiver for Cape for Asbestos Suits.

### FOR A TENTH CAUSE OF ACTION
**(Amalgamation of Interests and Single Business Enterprise Liability)**
**(Against the Defendants Anglo American PLC, De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers UK Ltd., Charter Consolidated Ltd., ESAB Corporation, Central Mining & Investment Corporation Ltd., Altrad Investment Authority S.A.S.)**

**For a Tenth Distinct Cause of Action for Amalgamation of Interests and Single Business Enterprise Liability, Plaintiffs Complain of Defendants, and Allege as Follows:**

204.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

205.    Cape had or has unified, integrated, and intertwined business operations and resources with Anglo American PLC, De Beers PLC, De Beers Centenary AG, De Beers Consolidated Mines Ltd., De Beers UK Ltd., Charter Consolidated Ltd., ESAB Corporation, Central Mining & Investment Corporation Ltd., and Altrad Investment Authority S.A.S.(collectively the "Amalgamation Defendants") to achieve a common business purpose.

206.    In turn, Amalgamation Defendants acted or continue to act with Cape and its affiliated entities as part of an amalgamation of interests and single business enterprise, which gives rise to the claims against them, including through (i) longstanding business activities directed at the United States, including South Carolina, including with respect to the mining, marketing, and distribution of asbestos and other minerals, and/or (ii) implementing or perpetuating an ongoing scheme to evade responsibility for harm caused to South Carolinians, as well as other Americans, by Cape's asbestos, while also financially benefiting from that scheme.

207.    Because the Amalgamation Defendants were or are intertwined with Cape and acting with a common business purpose, there has been bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions with Cape, including their

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

continuing to benefit from Cape's historical sale of asbestos and evasion of its associated liabilities to tort victims within the United States, including South Carolina, by avoiding answering to U.S. creditors and other injured parties for their asbestos-related injuries and harm.

208.    Thus, each Amalgamation Defendants (including predecessors in interest) was or is part of an amalgamated, single business enterprise with respect to the mining, production, manufacture, and distribution of asbestos fiber and/or the perpetuation of Cape's liability-avoidance scheme.

209.    As a result of these relationships, persons have allegedly been harmed, with the damages alleged against Cape in the Asbestos Suits resulting from the actions of the Amalgamation Defendants (including their predecessors in interest).

210.    Accordingly, the proper and appropriate remedy under the circumstances here is for the Court to declare that the Amalgamation Defendants were or are part of an amalgamation of interests and common business enterprise with Cape, and thereby liable to Cape and/or the Receiver for Asbestos Suits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment, joint and several, against Defendants and/or its "alternate entities" in an amount to be proved at trial, as follows:

1.    For Plaintiffs' actual damages according to proof, including pain and suffering, mental distress, as well as medical, surgical and hospital bills;

2.    For loss of income or earnings according to proof;

3.    For loss of care, comfort and society;

4.    For the Deceased Plaintiffs, or pecuniary loss of the beneficiaries/heirs including but not limited to funeral and burial costs, for mental shock and suffering of the beneficiaries/heirs,

for wounded feelings of the beneficiaries/heirs, for grief and sorrow of the beneficiaries/heirs, loss of his companionship and deprivation of the use and comfort of the Decedents' experience, knowledge and judgment in managing the affairs of their beneficiaries;

5.      For punitive damages according to proof;

6.      For Plaintiffs' cost of suit herein;

7.      For damages for breach of implied warranty according to proof;

8.      For damages for fraudulent misrepresentation according to proof;

9.      All economic and non-economic damages allowed pursuant to the Survival and Wrongful Death Act;

10.     For a declaration that the Alter-Ego Defendants are the Alter Ego of Cape;

11.     For a declaration that the Amalgamation Defendants were or are part of an amalgamation of interests and common business enterprise with Cape, and thereby liable to Cape and/or the Receiver for Asbestos Suits; and

10.     For such other and further relief as the Court may deem just and proper, including costs and prejudgment interest as provided by South Carolina law.


[THIS SPACE INTENTIONALLY LEFT BLANK]

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

**A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.**

Respectfully submitted,

*/s/ Charles W. Branham, III*
Charles W. Branham, III (SC Bar No. 106178)
**DEAN OMAR BRANHAM SHIRLEY, LLP**
302 N. Market Street, Suite 300
Dallas, Texas 75202
T: 214-722-5990
F: 214-722-5991
tbranham@dobslegal.com
Other email: tgilliland@dobslegal.com

*and*

*/s/ Theile B. McVey*
Theile B. McVey (SC Bar No. 16682)
Jamie D. Rutkoski (SC Bar No. 103270)
**KASSEL MCVEY ATTORNEYS AT LAW**
1330 Laurel Street
Columbia, South Carolina 29202
T: 803-256-4242
F: 803-256-1952
tmcvey@kassellaw.com
jrutkoski@kassellaw.com
Other email:  emoultrie@kassellaw.com

**ATTORNEYS FOR PLAINTIFFS**

December 12, 2024
Columbia, South Carolina.

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

# EXHIBIT A

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| INJURED PARTY'S NAME | DISEASE | DATE of DX | DATE of DEATH (if Applicable) |
|---|---|---|---|
| Adams, Augustus A. | Meso - PL | 08/17/21 | n/a |
| Agner, Vonnie K. | Meso - PL | 09/05/19 | 07/18/20 |
| Allen, Donald | Meso - PL | 01/17/24 | 06/23/24 |
| Anderson, Jr., Allan N. | Meso - PL | 02/02/23 | n/a |
| Arsenith, George J. | Meso - PL | 04/08/24 | n/a |
| Bailey, James M. | Meso - PL | 06/09/20 | 09/07/21 |
| Barnhart, Jr., Donald | Meso - PL | 05/29/24 | n/a |
| Barone, Nicholas | Meso - PL | 05/13/22 | 06/14/23 |
| Boetsch, Richard J. | Meso - PE | 11/16/20 | 07/03/22 |
| Bostian, Hoyle Steven | Meso - PE | 07/22/21 | 12/05/21 |
| Bowery, Leon B. | Meso - PL | 05/25/21 | 12/15/22 |
| Brookshire, Ronald J. | Lung Cancer | 12/14/23 | n/a |
| Campbell, Jerry | Meso - PL | 03/24/21 | n/a |
| Chambers, Wallace B. | Meso - PE | 03/23/22 | 02/17/23 |
| Childers, Lewis C. | Lung Cancer | 04/02/20 | 05/13/20 |

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | | |
|---|---|---|---|
| Christensen, David E. | Meso - PL | 11/09/22 | n/a |
| Cook, Roland | Meso - PL | 01/11/21 | 03/27/22 |
| Cox, Sr., Don R. | Lung Cancer | 02/03/23 | n/a |
| Creekmore, Mary M. | Meso - PL | 10/29/21 | 09/27/22 |
| Danos, Emile J. | Lung Cancer | 11/14/17 | 10/21/23 |
| Davis, James F. | Meso - PL | 03/10/22 | n/a |
| Efird, Robin M. | Meso - PL | 07/30/19 | 02/07/20 |
| Ferrell, Charles | Lung Cancer | 05/10/23 | n/a |
| Fitzgerald, Dennis J. | Meso - PL | 08/15/19 | 01/17/21 |
| Flynn, Jerry K. | Meso - PL | 01/05/23 | 02/07/23 |
| Gee, Michael L. | Meso - PL | 10/03/22 | 12/12/23 |
| Giroir, Glenda T. | Meso - PL | 10/18/23 | n/a |
| Golem, Jerry | Meso - PL | 02/23/23 | n/a |
| Gonce, Dwight | Meso - PL | 06/16/22 | 12/25/22 |
| Goodwin, Dorothy Jean Fox | Meso - PL | 04/30/20 | 05/18/20 |
| Gosnell, George N. | Meso - PE | Jan/Feb 2024 | n/a |

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | | |
|---|---|---|---|
| Green, Pamela | Lung Cancer | 6/21/21 | n/a |
| Green, Robert J. | Lung Cancer | 10/08/21 | 10/23/21 |
| Greene, Christopher | Meso - PL | 02/05/15 | 12/29/20 |
| Harding, Kenneth D. | Meso - PL | 08/09/23 | 09/11/23 |
| Hartsell, Jerry G. | Meso - PL | 02/28/24 | 06/29/24 |
| Hilster, Shirley A. | Meso - PL | 07/20/20 | 10/11/20 |
| Horne Sr., Billy D. | Meso - PL | 02/18/21 | 05/15/21 |
| Horton, Stephen | Lung Cancer | 10/04/18 | n/a |
| Hunt, Lesley D. | Meso - PL | 02/07/22 | 04/01/23 |
| Johnson, Michael D. | Meso - PL | 05/05/23 | n/a |
| Johnson, Roger E. | Meso - PL | 08/03/23 | n/a |
| Jonas, Ronnie J. | Meso - PL | 12/24/19 | 03/29/20 |
| Kelly, Sr., Theodore L. | Meso - PL | 08/04/22 | n/a |
| Kennon, James H. | Lung Cancer | 03/06/20 | 05/27/20 |
| King, Richard D. | Meso - PL | 06/23/23 | 10/01/23 |
| King, Thomas G. | Meso - PL | 10/20/20 | 12/30/20 |

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | | |
|---|---|---|---|
| Klink, James J. | Meso - PL | 06/30/20 | 11/25/20 |
| Kotzerke, Steven D. | Lung Cancer | 10/13/22 | 09/20/22 |
| Kragenbring, Owen Aubner | Meso - PL | 4/3/17 | 09/09/17 |
| Lackey, Gary S. | Lung Cancer | 06/26/23 | n/a |
| Lamm, Michael H. | Meso - PL | 01/20/22 | 06/06/23 |
| Lane, Clarence Ray | Meso - PL | 12/14/20 | 12/28/20 |
| LeBlanc, Robert P. | Meso - PL | 10/23/23 | n/a |
| Link, Michael D. | Meso - PL | 08/15/22 | n/a |
| Long, Richard | Meso - PL | 04/04/23 | n/a |
| Love, Jr., James E. | Meso - PL | 04/22/21 | n/a |
| Lynn, Robert W. | Meso - PE | 04/08/24 | n/a |
| Marcher, Nikolaus J. | Meso - PL | 04/06/21 | 11/09/22 |
| Martin, Janet M. | Meso - PL | 04/20/20 | 05/19/21 |
| McDowell, Donald | Meso - PL | 08/03/23 | n/a |
| McGuire, Philip J. | Asbestosis & Pleural Plaques | 01/12/07 | n/a |
| McKee, Clarence | Meso - PL | 09/12/24 | n/a |

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | | |
|---|---|---|---|
| McKelvey, Paul R. | Meso - PL | 06/19/19 | 09/03/19 |
| Milam, Jimmie R. | Meso - PL | 10/23/21 | 04/06/22 |
| Mitchell, Ted E. | Lung Cancer | 08/27/21 | 02/17/24 |
| Mogg, Nelson W. | Meso - PL | 10/25/23 | n/a |
| Monlux, Richard A. | Meso - PL | 03/17/23 | 08/07/23 |
| Morgan Sr., Edward R. | Lung Cancer | 02/04/20 | n/a |
| Moss, Gary Jay | Meso - PL | 02/21/20 | 03/24/20 |
| Mullins, Gary | Meso - PL | 06/29/22 | n/a |
| O'Loughlin, Leonard | Meso - PL | 08/17/22 | n/a |
| Olive, Everett R. | Meso - PL | 07/13/22 | 08/07/22 |
| Park, Isabella | Meso - PL | 01/25/21 | 06/09/21 |
| Patterson, Jr., John K. | Meso - PL | 09/17/18 | 12/14/19 |
| Payne, Shelby L. | Meso - PL | 11/29/21 | 04/13/22 |
| Peifer, Ronald M. | Meso - PL | 04/23/21 | 05/26/22 |
| Pelfrey, Richard R. | Meso - PL | 09/17/24 | n/a |
| Perkins, Patricia L. | Meso - PL | 06/22/21 | 06/19/21 |

| Picklesimer, Robert B. | Meso - PL | 03/25/20 | 08/28/20 |
|---|---|---|---|
| Pierce, Linwood W. | Meso - PL | 05/21/21 | n/a |
| Pike, Marshall E. | Meso - PL | 09/30/21 | 06/21/23 |
| Ray, Robert B. | Meso - PL | 02/07/24 | n/a |
| Rhodes, Jr. Clayton E. | Meso - PL | 11/21/20 | 07/10/21 |
| Roberts, Jackie D. | Meso - PL | 09/06/24 | n/a |
| Robichaud, Gary P. | Meso - PL | 03/09/22 | 11/02/23 |
| Robinson, Anthony D. | Meso - PL | 04/22/24 | 06/19/24 |
| Ross, Jerry P. | Meso - PL | 04/04/24 | n/a |
| Rozylowicz, John J. | Meso - PL | 01/31/24 | 07/28/24 |
| Scoggins, David M. | Meso - PL | 09/10/19 | 01/20/21 |
| Scoggins, David C. | Meso - PL | 06/21/22 | 06/12/24 |
| Sellars, Larry G. | Lung Cancer | 09/08/23 | n/a |
| Shipman, Charles E. | Meso - PL | 02/05/21 | 04/25/21 |
| Sims, Donald E. | Lung Cancer | 04/06/20 | 05/24/20 |
| Spayd, Jr., George R. | Meso - PL | 05/16/23 | n/a |

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

| | | | |
|---|---|---|---|
| Spence, Rodney L. | Meso - PL | 08/28/20 | 09/10/20 |
| Sylvester, Eugene L. | Meso - PL | 04/05/23 | 05/12/23 |
| Talley, Paul R. | Meso - PL | 10/11/24 | n/a |
| Taylor, Bradley D. | Meso - PE | 12/01/21 | 06/07/22 |
| Taylor, Horace E. | Lung Cancer | 11/06/17 | 12/05/19 |
| Taylor, Jack | Lung Cancer | 02/10/20 | 06/06/21 |
| Tibbs, John A. | Lung Cancer | 12/15/22 | n/a |
| Ward, Deborah | Meso - PL | 01/27/22 | 09/09/24 |
| Welch, Melvin G. | Meso - PL | 06/27/22 | 04/17/23 |
| Wilkinson, Rosalie | Meso - PL | 04/18/24 | n/a |
| Williams, Richard A. | Meso - PL | 01/12/24 | n/a |
| Wilson, Debra K. | Meso - PL | 12/15/21 | 07/04/22 |
| Wilson, Wilbur Donald | Meso - PL | 02/12/21 | 07/15/21 |
| Wright, Bruce S. | Meso - PL | 11/13/22 | n/a |
| Zaccone, Carolyn Joyce | Meso - PL | 12/17/16 | n/a |

ELECTRONICALLY FILED - 2024 Dec 12 1:20 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

# Certificate of Electronic Notification

| Recipients |
|---|
| **John Kassel** - Notification transmitted on 12-12-2024 01:20:48 PM. |
| **Charles Branham** - Notification transmitted on 12-12-2024 01:20:48 PM. |
| **Jamie Rutkoski** - Notification transmitted on 12-12-2024 01:20:48 PM. |
| **Theile McVey** - Notification transmitted on 12-12-2024 01:20:48 PM. |

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

****** IMPORTANT NOTICE - READ THIS INFORMATION *****

NOTICE OF ELECTRONIC FILING [NEF]

–

**A filing has been submitted to the court RE:** 2024CP4006639

| | |
|---|---|
| **Official File Stamp:** | 12-12-2024 01:20:14 PM |
| **Court:** | CIRCUIT COURT |
| | Common Pleas |
| | Richland |
| **Case Caption:** | Augusts A Adams , plaintiff, et al vs Cape Plc , defendant, et al |
| **Event(s):** | |
| Add Party to Case | |
| **Document(s) Submitted:** | Amended/Amended Summons And Complaint |
| **Filed by or on behalf of:** | Theile Branham McVey |

This notice was automatically generated by the Court's auto-notification system.

–

**The following people were served electronically:**

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Charles William Branham, III for Augusts A
Adams, Joan M Love, Margaret B Tibbs, John A
Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara
Sylvester, Terry Sylvester, Della Jeanette
Kennedy, George R Spayd, Jr, Michael L Sims,
Danielle B Shipman, James E Love, Jr, Anna
Marie S Pritchett, Glenda K Sellars, Larry G
Sellars, Kathleen Scoggins, Schantel R Green,
Shannon Lynne Tesseniar, David D Scoggins,
Deborah Robichaud, Alyce M Scoggins, Victoria
A Roberts, Richard Long, Paulette W Ross,
Jackie D Roberts, Jerry P Ross, Bessie E Ray,
Joyce J Robinson, Robert B Ray, Jason Andrew
Pike, Shane Chadwick Pike, Bridget Pierce, Mary
Barnhart, Sandra Strickland Link, Linwood W
Pierce, Donald Barnhart, Jr, Christine A Arsenith,
George J Arsenith, Cynthia Anderson, Allan N
Anderson, Jr, Tommy D Agner, Sr, Diane Adams,
Curtis R Perkins, Patricia H Pelfrey, Michael D
Link, Richard R Pelfrey, Dorene L Peifer,
Shannon Payne Lancaster, Kelly Payne Clark,
Judith D Patterson, Michelle Olive, Karen
Reissfelder, Leonard O'Loughlin, Arvella Mullins,
Gary Mullins, Robert P Leblanc, Elaine M Monlux,
Dorothy Mogg, Nelson W Mogg, Martha M
Wilson, Sharon M Milam, David P Mckelvey,
Patrice Mcguire, Philip J Mcguire, Patricia Lamm,
Virginia C Lackey, Gary S Lackey, Jolene R
Kotzerke, Gregory N Tarbuck, Jr, Susan K
Mccarty, Berenice M Kelly, Theodore L Kelly, Sr,
Kristi R Johnson, Michael D Johnson, Zachary D
Hunt, Misti K Crawley, Shirley Ann Caprin, Joan
Hartsell, Cindy Hartsell Martin, Kristen R Helton,
Michelle L Mccormick, Rachel P Greene, Evelyn
V Green, Rhonda V Mcdowell, Terry L Green, Sr,
Patricia C Gosnell, George N Gosnell, Sandra M
Gonce, Dale Giroir, Glenda T Giroir, Amy Gee,
Donald Mcdowell, Ricky Dean Flynn, Wendy M
Fitzgerald, Patricia A Ferrell, Charles Ferrell,
Linda Efird, Robbie M Efird, Vera C Davis, James
F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus

Marcher, Linda A Cook, Linda G Christensen, David E Christensen, Lenora Childers, Alicia Knight, Belvia R Brookshire, Craig R Hagan, Ronald J Brookshire, Tracy Bowery Meyer, Brenda E Bostian, Leah Sandford, Richard Tree, Karen J Lynn, Kathryn Barone, Robert W Lynn, Louise K Wright, Bruce S Wright, Nancy N Williams, Richard A Williams, Harry Wilkinson, Rosalie Wilkinson, Donna B Welch

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Jamie Rae Rutkoski for Augusts A Adams, Joan M Love, Margaret B Tibbs, John A Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara Sylvester, Terry Sylvester, Della Jeanette Kennedy, George R Spayd, Jr, Michael L Sims, Danielle B Shipman, James E Love, Jr, Anna Marie S Pritchett, Glenda K Sellars, Larry G Sellars, Kathleen Scoggins, Schantel R Green, Shannon Lynne Tesseniar, David D Scoggins, Deborah Robichaud, Alyce M Scoggins, Victoria A Roberts, Richard Long, Paulette W Ross, Jackie D Roberts, Jerry P Ross, Bessie E Ray, Joyce J Robinson, Robert B Ray, Jason Andrew Pike, Shane Chadwick Pike, Bridget Pierce, Mary Barnhart, Sandra Strickland Link, Linwood W Pierce, Donald Barnhart, Jr, Christine A Arsenith, George J Arsenith, Cynthia Anderson, Allan N Anderson, Jr, Tommy D Agner, Sr, Diane Adams, Curtis R Perkins, Patricia H Pelfrey, Michael D Link, Richard R Pelfrey, Dorene L Peifer, Shannon Payne Lancaster, Kelly Payne Clark, Judith D Patterson, Michelle Olive, Karen Reissfelder, Leonard O'Loughlin, Arvella Mullins, Gary Mullins, Robert P Leblanc, Elaine M Monlux, Dorothy Mogg, Nelson W Mogg, Martha M Wilson, Sharon M Milam, David P Mckelvey, Patrice Mcguire, Philip J Mcguire, Patricia Lamm, Virginia C Lackey, Gary S Lackey, Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan K Mccarty, Berenice M Kelly, Theodore L Kelly, Sr, Kristi R Johnson, Michael D Johnson, Zachary D Hunt, Misti K Crawley, Shirley Ann Caprin, Joan Hartsell, Cindy Hartsell Martin, Kristen R Helton, Michelle L Mccormick, Rachel P Greene, Evelyn V Green, Rhonda V Mcdowell, Terry L Green, Sr, Patricia C Gosnell, George N Gosnell, Sandra M Gonce, Dale Giroir, Glenda T Giroir, Amy Gee, Donald Mcdowell, Ricky Dean Flynn, Wendy M Fitzgerald, Patricia A Ferrell, Charles Ferrell, Linda Efird, Robbie M Efird, Vera C Davis, James F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus

Marcher, Linda A Cook, Linda G Christensen,
David E Christensen, Lenora Childers, Alicia
Knight, Belvia R Brookshire, Craig R Hagan,
Ronald J Brookshire, Tracy Bowery Meyer,
Brenda E Bostian, Leah Sandford, Richard Tree,
Karen J Lynn, Kathryn Barone, Robert W Lynn,
Louise K Wright, Bruce S Wright, Nancy N
Williams, Richard A Williams, Harry Wilkinson,
Rosalie Wilkinson, Donna B Welch

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

John D. Kassel for Augusts A Adams, Joan M Love, Margaret B Tibbs, John A Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara Sylvester, Terry Sylvester, Della Jeanette Kennedy, George R Spayd, Jr, Michael L Sims, Danielle B Shipman, James E Love, Jr, Anna Marie S Pritchett, Glenda K Sellars, Larry G Sellars, Kathleen Scoggins, Schantel R Green, Shannon Lynne Tesseniar, David D Scoggins, Deborah Robichaud, Alyce M Scoggins, Victoria A Roberts, Richard Long, Paulette W Ross, Jackie D Roberts, Jerry P Ross, Bessie E Ray, Joyce J Robinson, Robert B Ray, Jason Andrew Pike, Shane Chadwick Pike, Bridget Pierce, Mary Barnhart, Sandra Strickland Link, Linwood W Pierce, Donald Barnhart, Jr, Christine A Arsenith, George J Arsenith, Cynthia Anderson, Allan N Anderson, Jr, Tommy D Agner, Sr, Diane Adams, Curtis R Perkins, Patricia H Pelfrey, Michael D Link, Dorene L Peifer, Shannon Payne Lancaster, Kelly Payne Clark, Judith D Patterson, Michelle Olive, Karen Reissfelder, Leonard O'Loughlin, Arvella Mullins, Gary Mullins, Robert P Leblanc, Elaine M Monlux, Dorothy Mogg, Nelson W Mogg, Martha M Wilson, Sharon M Milam, David P Mckelvey, Patrice Mcguire, Philip J Mcguire, Patricia Lamm, Virginia C Lackey, Gary S Lackey, Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan K Mccarty, Berenice M Kelly, Theodore L Kelly, Sr, Kristi R Johnson, Michael D Johnson, Zachary D Hunt, Misti K Crawley, Shirley Ann Caprin, Joan Hartsell, Cindy Hartsell Martin, Kristen R Helton, Michelle L Mccormick, Rachel P Greene, Evelyn V Green, Rhonda V Mcdowell, Terry L Green, Sr, Patricia C Gosnell, George N Gosnell, Sandra M Gonce, Dale Giroir, Glenda T Giroir, Amy Gee, Donald Mcdowell, Ricky Dean Flynn, Wendy M Fitzgerald, Patricia A Ferrell, Charles Ferrell, Linda Efird, Robbie M Efird, Vera C Davis, James F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus Marcher, Linda A Cook, Linda G

Christensen, David E Christensen, Lenora
Childers, Alicia Knight, Belvia R Brookshire, Craig
R Hagan, Ronald J Brookshire, Tracy Bowery
Meyer, Brenda E Bostian, Leah Sandford,
Richard Tree, Karen J Lynn, Kathryn Barone,
Robert W Lynn, Louise K Wright, Bruce S Wright,
Nancy N Williams, Richard A Williams, Harry
Wilkinson, Rosalie Wilkinson, Donna B Welch

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Theile Branham McVey for Augusts A Adams, Joan M Love, Margaret B Tibbs, John A Tibbs, Shirley Butts Taylor, Sandra F Taylor, Sara Sylvester, Terry Sylvester, Della Jeanette Kennedy, George R Spayd, Jr, Michael L Sims, Danielle B Shipman, James E Love, Jr, Anna Marie S Pritchett, Glenda K Sellars, Larry G Sellars, Kathleen Scoggins, Schantel R Green, Shannon Lynne Tesseniar, David D Scoggins, Deborah Robichaud, Alyce M Scoggins, Victoria A Roberts, Richard Long, Paulette W Ross, Jackie D Roberts, Jerry P Ross, Bessie E Ray, Joyce J Robinson, Robert B Ray, Jason Andrew Pike, Shane Chadwick Pike, Bridget Pierce, Mary Barnhart, Sandra Strickland Link, Linwood W Pierce, Donald Barnhart, Jr, Christine A Arsenith, George J Arsenith, Cynthia Anderson, Allan N Anderson, Jr, Tommy D Agner, Sr, Diane Adams, Curtis R Perkins, Patricia H Pelfrey, Michael D Link, Richard R Pelfrey, Dorene L Peifer, Shannon Payne Lancaster, Kelly Payne Clark, Judith D Patterson, Michelle Olive, Karen Reissfelder, Leonard O'Loughlin, Arvella Mullins, Gary Mullins, Robert P Leblanc, Elaine M Monlux, Dorothy Mogg, Nelson W Mogg, Martha M Wilson, Sharon M Milam, David P Mckelvey, Patrice Mcguire, Philip J Mcguire, Patricia Lamm, Virginia C Lackey, Gary S Lackey, Jolene R Kotzerke, Gregory N Tarbuck, Jr, Susan K Mccarty, Berenice M Kelly, Theodore L Kelly, Sr, Kristi R Johnson, Michael D Johnson, Zachary D Hunt, Misti K Crawley, Shirley Ann Caprin, Joan Hartsell, Cindy Hartsell Martin, Kristen R Helton, Michelle L Mccormick, Rachel P Greene, Evelyn V Green, Rhonda V Mcdowell, Terry L Green, Sr, Patricia C Gosnell, George N Gosnell, Sandra M Gonce, Dale Giroir, Glenda T Giroir, Amy Gee, Donald Mcdowell, Ricky Dean Flynn, Wendy M Fitzgerald, Patricia A Ferrell, Charles Ferrell, Linda Efird, Robbie M Efird, Vera C Davis, James F Davis, Jay S Creekmore, Don R Cox, Sr, Klaus

Marcher, Linda A Cook, Linda G Christensen, David E Christensen, Lenora Childers, Alicia Knight, Belvia R Brookshire, Craig R Hagan, Ronald J Brookshire, Tracy Bowery Meyer, Brenda E Bostian, Leah Sandford, Richard Tree, Karen J Lynn, Kathryn Barone, Robert W Lynn, Louise K Wright, Bruce S Wright, Nancy N Williams, Richard A Williams, Harry Wilkinson, Rosalie Wilkinson, Donna B Welch

**The following people have not been served electronically by the Court. Therefore, they must be served by traditional means:**

Anglo American Us Holdings Inc

Element Six Us Corp

Element Six Technologies Us Corp

Executor Of The Estate Of Gary P Robichaud

Legal Heir To David M Scoggins

Personal Rep Of The Estate Of Anthony D Robinson

Legal Heir To David M Scoggins

Special Admin Of The Estate Of David C Scoggins

Personal Rep Of The Estate Of Charles E Shipman

Personal Rep Of The Estate Of Donald E Sims

Administrator Of The Estate Of Rodney L Spence

Administrator Of The Estate Of Ann Taylor Spence

Personal Rep Of The Estate Of Eugene L Sylvester

Element Sic Technologies Or Corp

First Mode Holdings Inc

Platinum Guild International Usa Jewelry Inc

Lightbox Jewelry Inc

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Forevermark Us Inc

Anglo American Crop Nutrients Usa Llc

Charter Consolidated Ltd

Esab Corporation

Central Mining & Investment Corporation Ltd

Administrator Of The Estate Of Bradley D Taylor

Personal Rep Of The Estate Of Horace E Taylor

Personal Rep Of The Estate Of Melvin G Welch

Successor In Interest To Richard J Boetsch

Personal Rep Of The Estate Of Hoyle S Bostian

Personal Rep Of The Estate Of Leon B Bowery

Cape Industrial Services Ltd

Administratrix Of The Estate Of Wallace B Chambers

Personal Rep Of The Estate Of Lewis C Childers

Executor Of The Estate Of Ronald Cook

Cape Holdco Ltd

The Law Debenture Corporation Plc

Mohed Altrad

Altrad Uk Ltd

Cape Uk Holdings Newco Ltd

Personal Rep Of The Estate Of Paul R Mckelvey

Independent Executor Of The Estate Of Jimmie R Milam

Personal Rep Of The Estate Of Ted E Mitchell

Executor Of The Estate Of Richard A Monlux

Executor Of The Estate Of Everette R Olive

Executor Of The Estate Of Mary M Creekmore

Administrator Of The Estate Of Robin M Efird

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639

Special Admin Of The Estate Of Dennis J Fitzgerald

Executor Of The Estate Of Jerry K Flynn

Personal Rep Of The Estate Of Michael L Gee

Executrix Of The Estate Of Dwight Gonce

Anglo American Corporation Of South Africa Ltd

Personal Rep Of The Estate Of Robert J Green

Personal Rep Of The Estate Of Christopher Greene

Co-Personal Rep Of The Estate Of Kenneth D Harding

Altrad Services Ltd

Altrad Investment Authority S A S

Executor Of The Estate Of John K Patterson Jr

Co-Executors Of The Estate Of Shelby L Payne

Co-Executors Of The Estate Of Shelby L Payne

Trustee For The Next-Of-Kin For Ronald M Peifer

Executor Of The Estate Of Patricia L Perkins

Executor Of The Estate Of Vonnie K Agner

Executrix Of The Estate Of Nicholas Barone

Co-Executors Of The Estate Of Marshall E Pike

Co-Executors Of The Estate Of Marshall E Pike

Successor In Interest To David M Scoggins

Co-Personal Rep Of The Estate Of Kenneth D Harding

Personal Rep Of The Estate Of Jerry G Hartsell

Independent Executor Of The Estate Of Shirley A Hilster

Personal Rep Of The Estate Of Lesley D Hunt

Executor Of The Estate Of James H Kennon

Personal Rep Of The Estate Of Richard D King

Executor Of The Estate Of Steven D Kotzerke

Personal Rep Of The Estate Of Michael H Lamm

Personal Rep Of The Estate Of Nikolaus J
Marcher

Legal Heir To Nikolaus J Marcher

Cape Industries Ltd

Cape Asbestos Company Ltd

Anglo American Plc

De Beers Plc

De Beers Centenary Ag

De Beers Consolidated Mines Ltd

De Beers S A

De Beers Uk Ltd

De Beers Jewellers Us Inc

De Beers Jewellers Us Inc

Cape Plc

ELECTRONICALLY FILED - 2024 Dec 12 1:58 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006639